MAIQmia1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4               v.                          21 Cr. 499 (PAE)

 5   DAVON MIAL,

 6

 7               Defendant.

 8                                           Trial
     ------------------------------x
 9
                                             New York, N.Y.
10                                           October 18, 2022
                                             9:00 a.m.
11

12   Before:

13
                      HON. PAUL A. ENGELMAYER,
14
                                             District Judge
15                              APPEARANCES

16   DAMIAN WILLIAMS
17        United States Attorney for the
          Southern District of New York
18   BY:  KEDAR S. BHATIA
          ASHLEY C. NICOLAS
19        MATTHEW J.C. HELLMAN
          Assistant United States Attorneys
20
     LAW OFFICES OF DANIEL A. McGUINNESS, PC
21        Attorney for Defendant
     BY:  DANIEL A. McGUINNESS
22

23   Also Present:
     OWEN FOLEY, U.S.A.O. Paralegal
24   NICHOLAS KIM, Defense Paralegal
     SIMON OTERO, U.S.A.O. Paralegal Intern
25   SPECIAL AGENT ELLIOT RENZ, Homeland Security
```

MAIQmia1

1          (Trial continued)

2          THE COURT:  Be seated.

3          Good morning, counsel.

4          I have several items to take up with counsel this

5    morning.  The first involves the letter I received overnight

6    from the government which supplements its letter at docket 236.

7    The one I received overnight is at docket 239.  And as

8    indicated in docket 236, the government is now elaborating on

9    the disclosures with respect to Officer 2 and taking the

10   position that none of the disciplinary actions with respect to

11   Officer 2 are proper impeachment material.

12          Let me ask, Mr. McGuinness, whether you oppose any of

13   the application that the government makes.

14          MR. McGUINNESS:  Yes, your Honor.  Only as to the 2019

15   incidents.

16          THE COURT:  Just to narrow the scope here.  The

17   government's letter at docket 239 really addresses three

18   incidents, or sets of incidents.  The second one so-called 2012

19   stop-and-frisk incident, you're not seeking to examine the

20   witness on that?

21          MR. McGUINNESS:  No, I'm not.

22          THE COURT:  Okay.  And as to the third, which is the

23   -- which the government refers to as the "2012 report

24   incident," you're not seeking to examine the witness on that?

25          MR. McGUINNESS:  No, your Honor.

MAIQmia1

1          THE COURT:  So we're down to the 2019 incident.

2     You've read the government's advocacy.  What's your position?

3          MR. McGUINNESS:  Your Honor, I believe there's really

4     two issues at play here:  One is that the conduct involved is

5     substantially similar to the types of testimony he's going to

6     be giving, and it's very recent.  It's failure to properly

7     inventory the property.  And that, as I understand from the

8     government's submissions and 3500 material, would be what this

9     officer is testifying about; that he conducted a search and

10    inventory of my client's vehicle.

11         THE COURT:  Let me ask the government, what's the

12    substance of witness Officer 2's testimony?

13         MR. BHATIA:  It is that he conducted a search of the

14    vehicle and found two items in that vehicle.

15         THE COURT:  What are the two items that he says he

16    found?

17         MR. BHATIA:  One of the items is a brown bag that was

18    later searched by another officer and found to contain

19    contraband, and the other item was a set of scales and a label

20    maker.

21         THE COURT:  And will he be authenticating an inventory

22    that he created of those?

23         MR. BHATIA:  He will be testifying that he actually

24    recovered these items.  So we're not putting into evidence the

25    NYPD invoice.  He's putting into evidence the actual items that

MAIQmia1

1    he himself recovered.

2              THE COURT:  I see.  How does he know that he recovered

3    them?

4              MR. BHATIA:  Upon seeing the items in preparation and

5    seeing the invoices, he has a recollection of recovering these

6    items.

7              THE COURT:  Does he have a marking or his initials or

8    anything like that on the items?

9              MR. BHATIA:  There's not a marking on the items

10   themselves.

11             THE COURT:  All right.  Back to you, Mr. McGuinness.

12   Let me see if I understand.  The underlying what was

13   substantiated in the 2019 incident involved a failing to list

14   certain items on an invoice; not essentially putting false

15   information on an invoice but failing to list certain items,

16   correct?

17             MR. McGUINNESS:  I'm looking at the government's

18   submission.

19             THE COURT:  That's what I'm looking at.

20             MR. McGUINNESS:  Based on what they've written.

21             THE COURT:  Do you have any reason to think the facts

22   are otherwise?  I just want to understand what the facts were

23   underlying the 2019 incident.

24             MR. McGUINNESS:  I don't have any reason to think

25   otherwise.

MAIQmia1

1          THE COURT:  You've read such discovery as there is on

2    that.  Does it indicate something different?  I just want to

3    make sure I have an understanding of facts.

4          MR. McGUINNESS:  I don't have an indication of

5    anything different.

6          THE COURT:  Okay.  Mr. Bhatia?  Just as to the

7    incident, I just want to make sure what his error was, if you

8    will, in 2019, was it essentially failing to include certain

9    items?  Was it leaving items off?

10         MR. BHATIA:  Your Honor, so based on the information

11   that we have, we received yesterday -- upon asking for some

12   more information about this, we received yesterday an NYPD

13   record about this incident in particular, and we produced that

14   to the defense.  This record reflects that the witness was

15   alleged to have neglected to include certain items on an

16   invoice voucher, and he was provided the additional instruction

17   that he needs to do a more thorough job when preparing the

18   invoices.

19         THE COURT:  It's not that there's a false statement on

20   the invoice; it's that the invoice is in some respect

21   incomplete.  I realize there's a subtlety there, but that's the

22   nature of the deficiency.

23         MR. BHATIA:  The word in the corrective instruction

24   that stands out to me was the instruction that he should be

25   more thorough in preparing invoices going forward.

MAIQmia1

1          THE COURT:  Okay.  Mr. McGuinness, if that's what we

2     know about these invoices, are you offering this as to the --

3     to show Officer 2's character for truthfulness, or something

4     else?

5          MR. McGUINNESS:  Well, your Honor, I believe

6     truthfulness and something else.  I believe it indicates

7     possibly he was being deliberately untruthful in the invoice

8     despite his self-serving explanation that he simply neglected

9     to do a proper invoice, and I believe it requires and calls for

10    additional exploration during cross-examination, and I believe

11    it also shows a pattern and history, a very recent one, of

12    failure to do these invoicings correctly.

13         THE COURT:  Well, if it's a pattern issue that you're

14    talking about, you're really offering it as something like a

15    404(b), right?  In other words, one theory is that this is

16    proper impeachment evidence, if you will, under Rule 608, I

17    guess.  The other theory is that it's admissible under 404(b).

18         MR. McGUINNESS:  Yes, Judge, I believe it would be.

19         THE COURT:  And the theory is that because there are

20    these two substantiated incidents where he is less than

21    complete in an invoice, because that's the information we have,

22    therefore, as to the invoices here, he is leaving something out

23    or falsely including something.

24         MR. McGUINNESS:  Yes, your Honor.  He's not accurately

25    documenting the items that he's receiving in a particular

MAIQmia1

1    situation on more than one occasion, and that his invoices

2    cannot be relied on.  I think that's a fair conclusion that the

3    jury could reach.

4         THE COURT:  The government says they're not offering

5    the invoice.  In other words, the issue is not -- there's no

6    claim that the officer has ever falsely testified.  The issue

7    is his documentation track record, if you will, that you're

8    putting in question, insofar as the government, I take it, is

9    not offering the invoice itself, they are simply -- they are

10    going to put before him what was seized and ask him whether he

11    recalls retrieving it.

12         MR. McGUINNESS:  My understanding from the

13    government's statements just a moment ago was he only recalls

14    the search based on his viewing of the items and the invoice.

15    So his basis of testimony is that invoice that he himself

16    filled out.

17         THE COURT:  I think what the government said was that

18    upon reviewing the invoice, it refreshed his recollection, but

19    let me see if I've got that right.

20         Mr. Bhatia, what, if any, role does the invoice play

21    here in enabling the officer to testify as he -- I gather it's

22    a he -- will.

23         MR. BHATIA:  I think the invoice did refresh his

24    recollection, and I think this witness recalled seeing some

25    items -- upon looking at all the items from the search of the

MAIQmia1

1    vehicle, recalled seizing some of them, and will testify about

2    the ones that he seized, and didn't recall seizing other ones.

3    So I think that's an indicia that the witness has sort of

4    accurately refreshed his recollection about what he recovered

5    and personally observed, and he'll be testifying from his

6    recollection, not from the invoices.

7            THE COURT:  Mr. McGuinness.

8            MR. McGUINNESS:  Well, your Honor, I think that is

9    assuming a lot of testimony that is forthcoming, and if he is

10   on the stand and he's saying "I don't have an independent

11   recollection.  Based on this invoice, I believe I did such and

12   such," I think that would change things substantially.

13           Your Honor, there is another basis that I think it

14   should be let in on.

15           THE COURT:  Yes.

16           MR. McGUINNESS:  That is, the more concerning one,

17   that he's met with the government very recently, discussing

18   these very recent events and claims to not remember them.  I

19   just don't think that that's credible.  In fact, he's told the

20   government, "Had this happened, I would remember it," as to if

21   to say it didn't happen.  I think that's a misrepresentation.

22           THE COURT:  You're going very fast.  You need to slow

23   this down.  Explain to me what the issue is.

24           MR. McGUINNESS:  This officer has met with the

25   government recently.  I see in the 3500 material he is saying,

MAIQmia1

1    "I don't recall this.  I don't have any recollection."

2              THE COURT:  Than what's the "this"?

3              MR. McGUINNESS:  Sorry, Judge.  Of these 2019

4    incidents.

5              THE COURT:  Sorry.  It's not that he doesn't recall

6    what he's going to be testifying about here as to Mr. Mial.

7    It's that he doesn't recall the incidents that resulted in

8    his -- these substantiated allegations.

9              MR. McGUINNESS:  Yes, and receiving the verbal

10   instructions as a result.

11             THE COURT:  So you want to use the fact that you

12   believe that he is dissembling to the government in improbably

13   claiming not to remember this disciplinary event, you would

14   want to use, in effect, to impeach him, the theory being if he

15   lied to Mr. Bhatia in the last few days about failing to

16   remember a disciplinary event, he's capable of lying on other

17   occasions.  Is that basically the chain of logic?

18             MR. McGUINNESS:  Yes, your Honor, that's it.

19             THE COURT:  Mr. Bhatia, what's your response on that?

20             MR. BHATIA:  Your Honor, the witness has been

21   forthright about incidents of alleged misconduct where there

22   was a proceeding, he was accused of serious misconduct, he was

23   found not guilty.  He's disclosed those incidents to us, and --

24             THE COURT:  Sorry.  Is Mr. McGuinness correct that the

25   witness in meeting with you did not recall the fact of a, you

MAIQmia1

1   know, disciplinary inquiry or whatever the right word is, for

2   the 2019 incident?

3            MR. BHATIA:  That's right.  We asked the witness about

4   it.  And once we received that additional record yesterday, we

5   asked the witness about some of the contents of that to see if

6   it refreshed his recollection at all about this incident.  The

7   witness, what I expect his -- you know, what he said to us is

8   that he just does not have any recollection of any type of

9   allegation regarding an invoice or property clerk discrepancy,

10  and he doesn't have any recollection of getting verbal

11  instructions to say that he should fix it.  He's disclosed

12  other conduct to us, but this one he says, "I really don't have

13  any recollection of this."

14           THE COURT:  Is that credible?

15           MR. BHATIA:  I think it is credible, your Honor.  I

16  think at least, you know, when we met with the witness, I found

17  it to be credible.  I think the witness told us about other

18  conduct and said, "For this one, I just don't know anything

19  about this."

20           THE COURT:  Where does the items that were seized,

21  where do they fit into the case?  Sorry.

22           MR. BHATIA:  One moment, your Honor.

23           (Counsel consult)

24           THE COURT:  Mr. Bhatia.

25           MR. BHATIA:  Yes, your Honor.  I think it's worth

MAIQmia1

```
1    noting in this instance that this was not a formal adjudicatory
2    finding that resulted in this incident.  Instead, it looks like
3    it was what we understand to be a fairly routine NYPD incident
4    where an individual instructed -- where a sergeant -- where a
5    lieutenant instructed a more junior member of his staff, "You
6    need to be more thorough in preparing invoices."
7         There was also another officer who was given a similar
8    instruction regarding the same incident, and because there was
9    no formal sort of adjudicatory process, this might have been a
10   fairly routine incident.  Ultimately, when we met with the
11   officer, we found it to be credible that he just doesn't have a
12   recollection of this.
13        THE COURT:  All right.  Tell me where the evidence
14   that's going to be received from Officer 2 fits in.  It's a
15   vehicle search.  When is it in time?
16        MR. BHATIA:  Sure.  At the time the defendant was
17   arrested on August 9, 2021, he was leaving his apartment
18   building and walking towards his vehicle.  Officers seized from
19   the defendant's person contraband.  Officers then also
20   subsequently seized his vehicle for which they had a search
21   warrant.
22        THE COURT:  And this witness doesn't testify about the
23   person, but the vehicle.
24        MR. BHATIA:  He testifies about the vehicle.
25        THE COURT:  Not the person.
```

MAIQmia1

```
 1              MR. BHATIA:  Not the person.

 2              THE COURT:  What was found on the person and what was

 3    found in the vehicle?

 4              MR. BHATIA:  On the person was 67 capsules containing

 5    crack cocaine.

 6              THE COURT:  What's in the vehicle?

 7              MR. BHATIA:  There were several items in the vehicle,

 8    your Honor, so I just want to -- there were scales.  There were

 9    empty plastic capsules, which are used for distributing crack

10    cocaine, and there was a small quantity of narcotics.

11              THE COURT:  Meaning crack cocaine?

12              MR. BHATIA:  Crack cocaine.

13              THE COURT:  And the substantive counts, are any of

14    them based on the events of August 9 or are those on buys from

15    the undercover on other days?

16              MR. BHATIA:  Buys from the undercover on other days.

17              THE COURT:  So, in other words, the relevance of this

18    is that it is evidence in support of the conspiracy count, and

19    it may have some tendency to support the substantive counts but

20    it postdates the substantive counts.

21              MR. BHATIA:  That's correct.

22              THE COURT:  All right.  One moment.  With respect to

23    the substantive counts where there are five incidents of sales,

24    I take it this officer has nothing to do with the receipt of

25    the crack cocaine that was purchased on those five days?
```

MAIQmia1

1          MR. BHATIA:  Not to my knowledge.

2          THE COURT:  All right.  One moment.

3          Counsel, just while I reflect on this, let me take up

4     one issue with the undercover.  We will take a break,

5     regardless of whether we've already taken a mid-morning break,

6     just to get assembled for the undercover.

7          I want to make sure there is a person at the door

8     here, not just a sign that is able to steer anyone who is not

9     authorized to be here during the undercover's testimony to the

10    separate courtroom where the testimony is being beamed in.  I

11    take it the U.S. Attorney's Office has somebody in that

12    courtroom who is going to be there to make available the

13    exhibits.  I want to make sure there is a human being as well

14    at our door here.

15         MS. NICOLAS:  We will make sure of that, your Honor.

16    Mr. Otero will be the one in the satellite room, and we will

17    also make sure someone is at the door.

18         THE COURT:  At the brief break I give you between this

19    colloquy and the start of the opening statements, please

20    coordinate with Mr. Smallman.  I just want to make sure we've

21    got all that down.

22         MS. NICOLAS:  Of course.

23         THE COURT:  Okay.  One moment.  May I ask you,

24    Mr. Bhatia, how long has the officer been on the force?

25         MR. BHATIA:  More than a decade, your Honor.

MAIQmia1

1      THE COURT:  Will the government be eliciting any

2  affirmative testimony about the invoice, regardless of whether

3  it's offering the invoice on the witness' direct examination?

4      MR. BHATIA:  One moment, your Honor.

5      (Counsel consult)

6      MR. BHATIA:  Your Honor, part of the reason the

7  witness knows that these scales and this bag are the ones that

8  he recovered are because they're associated with an invoice

9  identifying him.

10      THE COURT:  So it's not that the testimony is going to

11  be devoid of references to an invoice; it's part of the

12  narrative by which his memory has been, in effect, refreshed.

13      MR. BHATIA:  That's right.

14      THE COURT:  All right.  Thank you.

15      Look, counsel, first of all, I want to thank the

16  government for the two letters that fronted this issue, docket

17  236 and docket 239.  That's exactly the right way to deal with

18  these things.  Imagine if this had come up just through a

19  verbal presentation this morning.  It would have been much

20  harder for me to follow.  So to begin, thank you for teeing up

21  the issue in that way.

22      I'm going to exclude evidence of the 2019 incident.

23  Here is how I analyze it.  The threshold issue is whether the

24  2019 incident is proper impeachment with respect to the

25  witness's character for truthfulness.  It is not.  There is no

MAIQmia1

1    adjudication, or even apparent allegation, that the witness in

2    some sense willfully lied about anything.  At most what I

3    gather from the government's letter and from its verbal proffer

4    is that the witness was alleged to have neglected to include

5    certain items on an invoice voucher and was admonished to be

6    more thorough.

7            At the end of the day, that is not indicative of

8    character or truthfulness.  It may say something about

9    recordkeeping, but it's not indicative of character or

10   truthfulness, nor is it productive in any event to undertake an

11   inquiry about this incident to see if maybe through

12   cross-examination ultimately one would get to a place in which

13   an argument could be made that the officer had been untruthful.

14   I think at that point we wind up in the 403 problem of a trial

15   within a trial where a lot of time is spent trying to unpack a

16   long-ago incident three years ago involving the caliber of

17   recordkeeping on a pair of invoices.

18           And there would be some capacity for unfair prejudice

19   to the extent the jury mistook the inquiry into all of that or

20   that evidence as reflecting bad character of the witness,

21   Officer 2, as that would not be a proper basis for impeachment.

22   The judgment that because the officer was imperfect with

23   respect to his recordkeeping in connection with a couple of

24   invoices, he's therefore untruthful.  That doesn't follow.

25           Now, there's a separate argument -- there are really

MAIQmia1

1    two separate arguments the defense makes.  The next one is that

2    the officer's habits with respect to the making of invoices are

3    put at issue, and the fact that the officer had two apparently

4    incomplete or not thorough invoices on a prior occasion might

5    suggest that the invoice here also is similarly incomplete or

6    unthorough.

7         That actually presents a somewhat closer issue, but at

8    the end of the day exercising my discretion under Rule 404(b)

9    and Rule 403, I'm going to exclude it as well.  We're quite far

10   from a situation where something looks like a similar act here.

11   Officers make out many, many invoices over the course of a

12   career.  This officer, it is proffered to me, has been on the

13   force for more than a decade.  There is no suggestion of some

14   signature error here.  The record as it's presented to me is

15   that the officer appears to have left something out from an

16   invoice.  There is no allegation here of that.  Presumably the

17   nature of the cross here is trying to suggest that the officer

18   fabricated the claim that in the search of the vehicle he found

19   narcotics paraphernalia, scales, empty capsules, narcotics.

20   This officer did not do the search of the person roughly

21   contemporaneously that uncovered the 67 capsules.  So there

22   really isn't similarity except at a high level of generality,

23   generality being the allegation that the officer's invoicing

24   was unthorough.

25        I think the probative value, therefore, of this is

MAIQmia1

1    remote.  It isn't really similar.  I realize the Second Circuit

2    has an inclusive approach with respect to 404(b), but at the

3    end of the day, this appears to be more in the nature of a bad

4    character examination.  Officer booted his invoices twice,

5    therefore, he has in a different way and in a much more

6    malicious way booted his invoices another time.  I find

7    limited, if any, probative value.  It appears to me this is

8    more in the nature of bad character evidence.

9            In any event, even if there were proper probative

10   value such that the officer's having been deficient with

11   respect to an invoice at a prior time might be fair cross that

12   he in a much more serious way made up issues on an invoice,

13   made up the seizure of the narcotics paraphernalia here, it

14   would be outweighed by other 403 factors.  Once again, you'd

15   have a trial within a trial trying to reconstruct what

16   happening in an episode involving invoicing.

17           It is represented to me by the government that the

18   witness doesn't remember this episode, which would mean to get

19   anywhere on cross, we would effectively be bringing in other

20   evidence.  That can't happen.  That is an improper mode of

21   impeachment by collateral evidence, but it also creates

22   confusion, delay and unfair prejudice to exhaustively get into

23   a paperwork episode from several years ago.  And so even if

24   there were a proper purpose under 404(b), it is clearly

25   outweighed its probative value by 403.

MAIQmia1

1          The final argument that defense counsel makes is that

2     the witness apparently in recent witness prep simply failed to

3     recall the incident in question, and defense counsel argues

4     that that may be a false statement and on that ground seeks to

5     use the alleged false statement in prep, if you will, as a mode

6     of impeachment.

7          Government counsel represents based on his contact

8     with the witness that he did not believe the witness was

9     failing to -- was lying about that.  The Court is obviously in

10    no position to make a credibility judgment, let alone about a

11    witness I haven't seen.

12         Nonetheless, just ruling simply on the basis of 403,

13    the probative value of the incident, I take it in prep, is

14    significantly outweighed by countervailing factors under Rule

15    403.  Whether the witness sincerely or insincerely failed to

16    recall an incident involving his being reprimanded for

17    unthorough recordkeeping three years ago is pretty far afield

18    here.  Even if one indulges the hypothetical that he was

19    conveniently claiming to fail to remember, it's a considerable

20    leap to suggest that that calls into question his claim to have

21    found these items in question in the defendant's car.  And,

22    again, the countervailing factors under 403 would outweigh any

23    probative value of impeachment cross like that.  It would

24    create a trial within a trial as we tried to reconstruct both

25    what happened in prep, but, more important, the underlying

MAIQmia1

1    incident and whether it would tend to be memorable or not.

2              The government represents, for example, that this was

3    an informal corrective given by an immediate lieutenant

4    supervisor, not a formal proceeding.  There would be a debate

5    then as to whether or not this sort of reprimand is the type of

6    thing in the natural order of things that an officer would tend

7    to remember.  We're getting very far afield from the evidence

8    in this case.  So on that one, I exclude it under Rule 403.

9              May I ask the government whether the government will

10   be introducing the items that the officer claims to have seized

11   from the vehicle?

12             MR. BHATIA:  Yes, your Honor.

13             THE COURT:  So the final point is to the extent there

14   is a theory that this was fabricated, there is a form of

15   corroboration in that the items themselves actually exist and

16   will be brought into court?

17             MR. BHATIA:  That's right.

18             THE COURT:  Therein ends the ruling.

19             Let me turn -- because the jury is likely here or will

20   be here imminently -- just to the undercover testimony.  Again,

21   we'll take a break, but I just want to make sure, and I gather,

22   Ms. Nicolas, you're owning this one?

23             MS. NICOLAS:  I am.

24             THE COURT:  I take it, you're putting the undercover

25   on?

MAIQmia1

1          MS. NICOLAS:  I am.

2          THE COURT:  Walk me through all the procedures that

3    are in place just to make sure that there's full compliance

4    with the Circuit's rules and my order about the undercover.

5          MS. NICOLAS:  Of course, your Honor.

6          First, as to the use of the pseudonym, we'll be

7    swearing the undercover in under his true name prior outside

8    the presence of both the jury and the defendant.  He'll then

9    testify under the pseudonym, which we've established with the

10   counsel and Court, which is Ed Murphy.  He will testify in a

11   closed courtroom, but the defendant's family will be permitted

12   in the courtroom as well as a member of the district's press

13   pool.

14         THE COURT:  Pause on that for a moment.

15         Mr. McGuinness, do you expect any members of your

16   client's family to be here today, and, in particular, during

17   that testimony?

18         MR. McGUINNESS:  No, your Honor.

19         THE COURT:  But you understand that in the event that

20   somebody from the defendant's family were to show up, they are

21   at liberty to be here?

22         MR. McGUINNESS:  Yes.

23         THE COURT:  But you're confident no one will elect to

24   do so?

25         MR. McGUINNESS:  Yes.  There was a prior agreement

MAIQmia1

1  that I would provide the names and, I believe, birth dates to

2  the government.  We haven't done so, so we've alerted anybody

3  who might show up will go to the overflow room.

4        THE COURT:  Very good.  Thank you for doing that.

5        Back you to, Ms. Nicolas.

6        MS. NICOLAS:  The government will work with

7  Mr. Smallman to put a sign on the door of the courtroom, as

8  well as to station someone in the hallway to direct people to

9  the satellite courtroom, which I understand is 506.

10        THE COURT:  Right.

11        MS. NICOLAS:  In the satellite courtroom, there will

12  be both a video feed that I understand will be focused off the

13  screen of the undercover but will also allow for those in the

14  overflow courtroom to see what's being displayed on the jury's

15  screen.  So insofar as the undercover is testifying about

16  exhibits, they're displayed on a screen, those will be visible.

17        As a backup, we've also placed a binder in the

18  satellite courtroom that includes photographs of any of the

19  physical exhibits as well as those exhibits that would be on

20  the screen.

21        THE COURT:  Very good.  Who will be minding the

22  binder, if you will?

23        MS. NICOLAS:  Mr. Otero will be down in the satellite

24  courtroom for the duration of the UC's testimony.

25        THE COURT:  Thank you.  Make sure that whoever you

MAIQmia1                        Opening - Ms. Nicolas

1   have here is instructed during the break we have before the

2   undercover comes in.  I don't want somebody out there steering

3   people away for fear that it could be, for example, overheard

4   by a juror that went out to the restroom.  That person really

5   needs to be there only once the jury is here in the courtroom.

6   I want to make sure there's no contact.

7           All right.  I'm told by Mr. Smallman that the jury is

8   all present.  We have been at this will for a half hour.  I

9   will give everyone a two minute comfort break.  Once you're

10  back, we'll bring in the jury.

11          (Recess)

12          THE COURT:  Mr. Smallman, let's get the jury.

13          (Jury present)

14          THE COURT:  Good morning, ladies and gentlemen.

15  Please be seated.  I hope you all had a good evening last

16  night, and thank you for all being on time today.  We're off to

17  a very good start.

18          As I told you yesterday, we'll begin the trial with

19  opening statements.  We'll begin with the government.

20          Ms. Nicolas.

21          MS. NICOLAS:  For over a year, month after month, day

22  after day, rain or shine, a group of men worked together to

23  sell crack cocaine in Midtown Manhattan, hundreds of grams of

24  crack cocaine packaged with thousands of their signature, small

25  multicolored capsules.  Day and night they sold crack to

MAIQmia1                    Opening – Ms. Nicolas

1    vulnerable dug dealers in one of the busiest parts of the City,

2    a spot just a block away from the center of Times Square, a

3    place where they could be sure to have a steady flow of

4    customers desperate for the crew's poisonous product.

5            This man, Davon Mial, the defendant, was a member of

6    that drug crew.  As a member of that crew, he weighed,

7    packaged, and sold crack to his customers in broad daylight on

8    the streets of New York over and over and over again.  Members

9    of the jury, that's what this case is about:  An

10   around-the-clock crack cocaine operation in the heart of

11   Manhattan.  For his sales and for agreeing with others to sell

12   crack, that is, for participating in a conspiracy, the

13   defendant has been charged with multiple federal drug crimes.

14   That is why we are here.

15           So what exactly will the evidence show about this drug

16   crew?  Put simply, I expect that it will show for well over a

17   year if someone wanted to buy crack in Times Square, the

18   stretch of 8th Avenue occupied by the defendant and his crew

19   was the place to get it.

20           The evidence will show that the defendant and his crew

21   worked hard to keep business flowing:  Rainy fall days, cold

22   winter days, during the Covid pandemic.  Over and over again

23   the defendant and those working with him made crack available

24   to anyone who wanted it, including on over 60 occasions to an

25   undercover officer from the NYPD.

MAIQmia1                          Opening - Ms. Nicolas

1          The evidence will show that this crew coordinated

2     their operations.  They kept shifts, splitting their work force

3     between a day team and a night team, both responsible for

4     peddling the crack packaged in this crew's signature, small

5     multicolored capsules.  Even as the pandemic raged, the

6     defendant and his crew made crack available on otherwise quiet

7     streets.  And once they identified a loyal customer on the

8     block, they did what it takes to keep their business, offering

9     to meet those customers at convenient locations, and directing

10    them to other members of the crew for prompt service from

11    within the organization.

12          The evidence will show that as a member of this crew,

13    the defendant repeatedly and brazenly sold drugs on the

14    sidewalks of Midtown, and he did it more than almost anybody

15    else in the crew.  The defendant's customers had options.  They

16    could simply walk to the block and approach the defendant or

17    one of the other dealers in the crew.  If that dealer was

18    holding a supply, they would just sell it to the customer

19    directly.  If not, they'd point that customer to another member

20    of the crew for service.  The defendant's customers could also

21    contact him in advance by phone or by text message and arrange

22    to meet him.  If the defendant was available he'd make the

23    sale.  If not, he'd direct them to someone else in the crew.

24    Regardless of the method, the bottom line is this:  If someone

25    wanted crack, the defendant and his crew sold it to them.

MAIQmia1                    Opening - Ms. Nicolas

1              That's what the evidence will prove.

2              Now, how will the evidence prove it?  What types of

3       evidence will you see?  Well, first, this is a case about a

4       crack cocaine crew.  So you're going to see crack cocaine, a

5       lot of crack, and you'll see the small multicolored packages,

6       the capsules that this crew sold it in, the dozens and dozens

7       of the capsules that this defendant sold directly to the

8       undercover officer.  You'll also see the hundreds of capsules

9       that were found in his car and on his person.  And you'll see

10      the scales that were seized from the defendant's car:  Four

11      small scales of the kind used to weigh drugs before

12      distribution, all of which will show you that this defendant

13      was no small-time drug dealer.

14              And because this is a conspiracy case, you'll also see

15      the drugs sold by other members of the crew, the hundreds of

16      the multicolored capsules that were sold to the undercover by

17      other members of the conspiracy, capsules that are identical in

18      appearance to those found in the defendant's pockets and in his

19      car.  In addition to the capsules, you'll see the baggies and

20      the scales that were seized from other members of the crew, as

21      well as the crack that was seized from those other members,

22      including from the apartment of one of the crew's bosses, along

23      with the tools that the crew used to cook the crack, which is

24      to prepare it for sale on the street.

25              In addition to a lot of physical evidence, you're also

1    going to see a lot of video.  On that video, you will watch

2    this man sell drugs in the middle of the day right out in the

3    open.  You're going to see his face.  You're going to hear his

4    voice over and over and over again, almost 20 times selling

5    crack directly to the undercover officer.  You're going to see

6    those capsules in his hands.  You're going to watch him work

7    with his co-conspirators, and you're going to hear him talk

8    about the crack business.  You will actually see users lined up

9    in front of him so that he can serve them back to back.

10           You're also going to see phone evidence.  You're going

11   to read the text messages between the defendant and the

12   undercover officer, text messages in which he set up sales and

13   directed the undercover to other members of the crew.  And you

14   will see his call logs, call logs that show his communications

15   with his customers and with his co-conspirators, including one

16   of the members of the crew who was arrested while in possession

17   of over 500 grams of crack cocaine.

18           And there will be witness testimony.  You're going to

19   hear from one law enforcement officer who watched days of

20   stationary surveillance camera footage that captured just one

21   small slice of sidewalk occupied by this crew.

22           You're going to hear from the laboratory techs who

23   tested the crack that was seized from the defendant and from

24   his co-conspirators.

25           And you'll hear from the undercover himself.  He's

MAIQmia1                    Opening - Ms. Nicolas

1    going to explain to you how he personally bought crack from

2    this crew on almost 70 occasions.  He's going to talk to you

3    about how law enforcement builds a long-term investigation into

4    a drug trafficking organization like the defendant's crew, the

5    risky and sophisticated operations that go into understanding

6    the relationship between drug dealers, their bosses and their

7    customers.  He's going to explain to you about how he

8    interacted with the crew and how he went about purchasing

9    crack.  He's going to talk to you about the money that's

10   involved in these transactions, and he'll tell you about the

11   relationship he built with other individuals in Times Square,

12   those addicted to narcotics, those whose lives are consumed by

13   this dangerous drug.

14           Over the next few days, you're going to see a lot of

15   evidence.  Each piece of evidence, each witness is one small

16   part of the story of this crew.  At the end of this trial,

17   we'll have another chance to talk to you about how it all fits

18   together and prove each of the charges against the defendant

19   beyond a reasonable doubt.  Between now and then I will ask you

20   to do three things:

21           First, pay careful attention to the evidence as it

22   comes in.

23           Second, listen carefully to Judge Engelmayer's

24   instructions on the law.

25           And, third, use your common sense, the same common

1    sense that you use to make important decisions in your lives

2    every day.

3              If you do those three things, you will come to the

4    only conclusion that's consistent with the evidence, the law

5    and your common sense:  The defendant, Davon Mial, is guilty.

6              THE COURT:  Thank you, Ms. Nicolas.

7              Mr. McGuinness.

8              MR. McGUINNESS:  We all remember where we were in the

9    spring of 2020.  It was a difficult time for everyone:

10   Emotionally, mentally, physically, and financially, the global

11   Covid crisis was hitting the entire world, and it was hitting

12   New York especially hard.  Many of us hit our low points.  And

13   those occurred in a number of different ways.

14             You're going to get a glimpse of Davon Mial at this

15   period.  You're going to see him in the depth of the Covid

16   pandemic, and I ask you to keep that in mind.  You're going to

17   see there's five charges against Davon for selling crack

18   cocaine.  The crack was sold in increments of grams or even

19   fractions of grams.  But the government isn't going to stop

20   there.  The government is going to tell you that he should be

21   held responsible for a conspiracy of hundreds and hundreds,

22   maybe even thousands, of grams.  This is a conspiracy count.

23   This is the count that I'm going to ask you to pay particular

24   attention to and keep in your mind as this trial moves forward.

25             A conspiracy, as you're going to learn, is an

1    agreement between two or more people to do something.  It

2    requires an agreement.  You're not going to see or hear or read

3    anything in which Davon made an agreement with anyone else.

4    You may see him standing next to people.  You may hear that he

5    made phone calls to people.  But that's not against the law.

6    That doesn't make a conspiracy, simply being next to someone.

7           You're going to be asked to make a lot of assumptions,

8    and you're going to hear about a lot of assumptions that more

9    people made.  I am asking you, please do not make those

10   assumptions.  Stick to the proof beyond a reasonable doubt.

11   That's the standard here.  Don't draw any conclusions unless

12   the facts that you're looking at to draw that conclusion are

13   each proven beyond a reasonable doubt.  I'm going to ask you,

14   ladies and gentlemen, to hold Davon Mial responsible for what

15   Davon Mial did, and that's it.  That's what we're here for.

16          Now, as we go through this trial, it's my job to be

17   very critical of the government's case, and I'm going to do

18   that, and I ask that you do that as well.  You hold them to

19   their really high standard.  And noticing what you hear and the

20   evidence that comes in can be just as important as what you

21   don't hear, the evidence that doesn't come in, what wasn't

22   done, what could have presented the full picture.  All of the

23   burden here is on the government.  The government has to prove

24   every element of every offense, everything beyond a reasonable

25   doubt.  Davon has no burden whatsoever, nothing.  He doesn't

MAIQmia1                    Opening - Mr. McGuinness

1    have to do a thing.  That's our system.  That is his right.

2          And I thank you very much, ladies and gentlemen, for

3    your jury service.  Juries often don't get thanked enough.

4    This is an incredible disruption of your lives, but it's an

5    incredibly important one.  This case is incredibly important to

6    Davon, and I know that you're going to do this properly and

7    live up to your oath.

8          And it's not an easy thing to do.  It can be very

9    rewarding serving jury duty, but it's not an easy thing to do

10   if you're doing it correctly.  It's not easy because it

11   requires a level of scrutiny we don't usually use in our lives.

12   It's not like watching a documentary where you can talk to some

13   of us during the panel, if you like to watch documentaries or

14   true crime, where you can form opinions quickly and see the

15   evidence that matches your opinions.  This isn't going to be

16   like that.

17         You can't let it wash over you.  Please, engage with

18   every single piece of evidence that comes in.  Turn it over.

19   See if it holds up to scrutiny.  And as I mentioned, don't make

20   assumptions.  Don't draw conclusions simply because you're

21   being asked to draw them.

22         The government asks you to use your every day common

23   sense.  I absolutely want you to bring your common sense to

24   this trial, but there's a type of common sense we use every day

25   to make little decisions throughout our day that aren't very

1    consequential.  We make these snap judgments very easily.

2    There's another level of common sense and critical decision

3    making that I want you to use here.  Sometimes we're faced with

4    these critical decisions in our lives, and you know these

5    decisions.  They're all different in all of our lives, but

6    whether it's to make a medical decision for a loved one or

7    another decision for someone in your family, you know these

8    decisions; that you pour over every single detail; you agonize

9    over.  We've all had them.  That's the level of common sense

10   that I want you to bring to this trial, and I know you will.

11   Jury duty isn't easy.

12          Another thing that I want to speak about for a minute

13   is the presumption of innocence because that is also not easy.

14   We may all take it for granted what that is, and the judge has

15   mentioned it and instructed as well, but it's not something we

16   do outside this courtroom.  Let's be honest.  Okay?  You see on

17   the news that someone's been arrested.  What's your first

18   thought?  It's usually, "What did they do," right?  We don't

19   apply the presumption of innocence.  We don't think that person

20   is innocent.  They were arrested, but they're innocent.  That's

21   okay outside of this courtroom.  That's fine.  But not here.

22   This is too important.  This is too important for Davon's life.

23   So I ask that you really make that effort and do that work of

24   maintaining the fact that Davon is innocent as he sits there

25   throughout this trial.

MAIQmia1                         Opening – Mr. McGuinness

1            Ladies and gentlemen, thank you again for your time

2    and your service here.  I'm going to get one more chance at the

3    end of this to speak to you.  And when I come back, I'm going

4    to have more to say, but I'm going to ask you the same thing I

5    already asked you:  Hold Davon Mial responsible only for what

6    Davon Mial did.  Thank you.

7            THE COURT:  Thank you, Mr. McGuinness.

8            Government please call your first witness.

9            MR. BHATIA:  Your Honor, the government calls Dennis

10   Frey.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAI7MIA2                        Frey - Direct

1    DENNIS FREY,

2         called as a witness by the Plaintiff,

3         having been duly sworn, testified as follows:

4              THE COURT:  Good morning, Detective Frey.

5              THE WITNESS:  Good morning, Judge.

6              THE COURT:  Keep your voice up.  This is an old

7    courtroom with funny acoustics.  So it would be best to speak

8    loudly.

9              THE WITNESS:  Okay.

10              THE COURT:  Counsel, you may inquire.

11    DIRECT EXAMINATION

12    BY MR. BHATIA:

13    Q.  Where do you currently work?

14    A.  I work at One Police Plaza, the chief detective's office.

15    Q.  What's your title there?

16    A.  I'm a physical officer for NYPD Detective Bureau.

17    Q.  In August of 2021, what was your title?

18    A.  I was a detective investigator assigned to Manhattan South

19    Narcotics.

20    Q.  Did you work in a particular zone?

21    A.  Yeah.  At that time, we were in the west side module.  We

22    covered the west side -- precincts in the west side of

23    Manhattan.

24    Q.  What were your day-to-day responsibilities as a detective

25    in the narcotics bureau?

MAI7MIA2                          Frey - Direct

1   A.   Investigating complaints of narcotics sales, narcotics use

2   in the confines of Manhattan South.

3   Q.   As a detective, have you personally searched vehicles?

4   A.   Yes.

5   Q.   Approximately how many times?

6   A.   At least 100.

7   Q.   After a particular vehicle is seized, are there places

8   where the search can be performed?

9   A.   Yes.

10  Q.   Where are those places?

11  A.   Sometimes initial searches can be done in the street.  Most

12  of the times, it's back at a police facility, precinct.

13  Q.   What do you mean "on the street"?

14  A.   At an arrest location or a location where a vehicle is

15  seized from.  But most likely, an inventory search would be

16  done at a police facility.

17  Q.   How do you record the items that are found during the

18  search of a vehicle?

19  A.   Generally, it would be one detective or one officer

20  searching the vehicle while another officer or detective is

21  recording what was recovered from the vehicle.

22  Q.   What happens after the items are recovered?

23  A.   After the items are recovered, they're vouchered on -- we

24  have -- it's called the PET system in the NYPD, and it's --

25  they're placed in bags with distinct numbers that are

1    particular to that item.  There are also voucher numbers

2    generated that's particular to that item, and they're sealed

3    and stored away.

4    Q.  Detective Frey, I want to direct your attention to

5    August 9, 2021.  Were you involved in a vehicle search on that

6    date?

7    A.  Yes, I was.

8    Q.  And what vehicle did you search?

9    A.  That was a gray Honda Accord.

10   Q.  What was the license plate of that vehicle?

11   A.  I don't remember off the top of my head.

12   Q.  Is there anything that might help you recall the license

13   plate number of the vehicle?

14   A.  Sure.  Paperwork from that day or vouchers pertaining to

15   that vehicle.

16   Q.  Mr. Foley, can you publish for the witness only the

17   document marked as Government Exhibit -- excuse me.  As

18   3516-064.

19        Detective Frey, please review this record and look up

20   at me when you're finished.

21        Mr. Foley, you can take down the page.  Thank you.

22        Detective Frey, now that you've reviewed that item,

23   can you testify from your memory about the license plate

24   number?

25   A.  Yes.  After looking at that, the license plate number is,

1    KLN9116.

2           MR. BHATIA:  Your Honor, I'd like to read into

3    evidence a stipulation between the parties.

4           THE COURT:  You may.  Let me just briefly explain to

5    the jury what a stipulation is.

6           I had mentioned yesterday that there were several

7    types of evidence that were proper for you to consider.  One of

8    them is a stipulation.  A stipulation is simply an agreement

9    between the parties that certain facts are true.  If the

10   parties stipulate that certain facts are true, you must take

11   those facts as true.  But as with all facts, it's for you, the

12   jury, to decide what weight, if any, you give to that evidence.

13          Go ahead.

14          MR. BHATIA:  "It is hereby stipulated and agreed by

15   and between the United States of America, by Damian Williams,

16   United States Attorney for the Southern District of New York,

17   that Kedar S. Bhatia and Ashley C. Nicolas, assistant United

18   States attorneys, of counsel, and Davon Mial, the defendant, by

19   his attorney, Daniel A. McGuinness, Esq., that:

20          If called to testify at trial, a witness from the New

21   York State Department of Motor Vehicles would testify that,

22   prior to and on August 9, 2021, the gray Honda Accord with New

23   York license plate KLN9116 and vehicle identification number

24   1GCB1F38LA012757 was registered to Davon Mial.

25          It is further stipulated and agreed that this

MAI7MIA2                          Frey - Direct

1  stipulation may be received as an exhibit at trial."

2          THE COURT:  What is the exhibit number of the

3  stipulation?

4          MR. BHATIA:  Exhibit No. 2003.

5          The government offers stipulation 2003 into evidence.

6          THE COURT:  Any objection?

7          MR. MCGUINNESS:  No objection.

8          THE COURT:  All right.  Exhibit 2003 is received.

9          (Government Exhibit 2003 received in evidence)

10 BY MR. BHATIA:

11 Q.  So, Detective Frey, where did you search this vehicle?

12 A.  In the parking lot at the Midtown South Precinct.

13 Q.  Why did you search this vehicle?

14 A.  In relation to the case and the arrest that were taking

15 place that day.

16 Q.  What authorization did you have to search the vehicle?

17 A.  There was -- a court signed a search warrant.

18 Q.  Detective Frey, you have in front of you a box with various

19 items.  It's to your right.  Can you please remove from that

20 box the item marked for identification purposes as Government

21 Exhibit 904?

22 A.  Okay.

23 Q.  Do you recognize that item?

24 A.  Yes, I do.

25 Q.  At a high level, what is it?

MAI7MIA2                        Frey - Direct

1    A.   This is a green camouflage bag that was recovered from the

2    gray Honda Accord that day.

3              MR. BHATIA:  Your Honor, the government moves to admit

4    Government Exhibit 904.

5              THE COURT:  Any objection?

6              MR. MCGUINNESS:  No objection.

7              THE COURT:  Received.

8              (Government Exhibit 904 received in evidence)

9    BY MR. BHATIA:

10   Q.   Detective Frey, can you please hold up Exhibit 904 for the

11   jury and describe what's in this evidence bag?

12   A.   This is the green camouflage-colored Supreme bag.

13   Q.   Why did you recover this bag from the vehicle?

14   A.   This was in the rear of the vehicle.  Like I said, any time

15   we seize a vehicle, we not only search for arrest evidence, but

16   we also have to do a complete inventory search of the vehicle.

17   So everything that's inside that vehicle has to be removed.

18   Q.   Detective Frey, did you ultimately open up that bag to see

19   what was inside?

20   A.   Yes.

21   Q.   Detective Frey, can you remove from the box to your left

22   the item marked as Government Exhibit 907?

23              Detective Frey, do you recognize that item?

24   A.   Yes, I do.

25   Q.   What is that item?

MAI7MIA2                        Frey - Direct

```
 1    A.  These are items that were recovered from inside that green
 2    Supreme bag.  There are plastic vials and also small like
 3    plastic capsules.
 4    Q.  Did you personally recover those items?
 5    A.  Yes.
 6            MR. BHATIA:  Your Honor, the government offers
 7    Government Exhibit 907 into evidence.
 8            THE COURT:  Any objection?
 9            MR. MCGUINNESS:  No objection.
10            THE COURT:  Received.
11            (Government Exhibit 907 received in evidence)
12    BY MR. BHATIA:
13    Q.  Detective Frey, can you hold up that bag and describe the
14    contents for the jury?
15    A.  Sure.  Canisters in baggies containing plastic bottles of
16    different colors.  There's larger plastic bottles here.
17    Q.  Can you describe the vials in that bag?
18    A.  I'm sorry?
19    Q.  Can you describe what the vials are like?
20    A.  They're small, like I said, plastic, all different colors,
21    like a pop top.
22    Q.  What are the different colors of the vials?
23    A.  There's orange, green, purple, there's larger clear ones,
24    and pink also.
25    Q.  Do the capsules appear to be empty or do they appear to
```

MAI7MIA2                         Frey - Direct

1    have something in them?

2    A.   These appear to be empty.

3    Q.   And, Detective Frey, why did you recover those capsules

4    from the vehicle?

5    A.   Well, like I said, everything that's in the car that we're

6    searching is inventoried.  These were vouchered as arrest

7    evidence.  Felt that they pertained to the case.  These are

8    commonly used for the sale of narcotics, packaging and sale of

9    narcotics.  And also, throughout the case, this is -- the

10   narcotics that were purchased were normally packaged in these

11   type of materials.

12   Q.   Detective Frey, can you remove from the box Government

13   Exhibit 905 marked for identification purposes only?

14        Detective Frey, do you recognize that item?

15   A.   Yes.

16   Q.   At a high level, what is it?

17   A.   This is a small, yellow, plastic capsule that was

18   containing crack cocaine.

19   Q.   Did you personally seize that item?

20   A.   Yes.

21   Q.   And from where did you seize that item?

22   A.   This was also from within that Supreme bag.

23        MR. BHATIA:  Your Honor, the government offers GX 905

24   into evidence.

25        THE COURT:  Any objection?

MAI7MIA2                          Frey - Direct

1                MR. MCGUINNESS:  Can I just see the physical exhibit

2      for a minute?

3                THE COURT:  Of course.

4                MR. MCGUINNESS:  No objection.

5                THE COURT:  It's received.

6                (Government Exhibit 905 received in evidence)

7      BY MR. BHATIA:

8      Q.  Detective Frey, can you hold up that item for the jury?

9                It's far away, so can you describe it?

10     A.  It's just a small, yellow, plastic capsule.

11     Q.  And why did you recover that item?

12     A.  While doing the inventory search, everything is recovered.

13     And also, because this was pertaining to the case, I believe

14     there was narcotics with the same packaging we've been seeing

15     throughout this case, and same narcotics.

16     Q.  Detective Frey, can you remove from the box Government

17     Exhibit 902 marked for identification purposes?

18               Do you recognize that item?

19     A.  Yes.

20     Q.  How do you recognize it?

21     A.  This was a small, brown, leather-type bag that was also

22     recovered from that gray Honda Accord.

23     Q.  Did you search that item in connection with the vehicle

24     search?

25     A.  Yes, I did.

1          MR. BHATIA:  Your Honor, the government offers GX 902

2     into evidence.

3          THE COURT:  Any objection?

4          MR. MCGUINNESS:  No objection.

5          THE COURT:  Received.

6          (Government Exhibit 902 received in evidence)

7     BY MR. BHATIA:

8     Q.  Detective Frey, can you hold up that bag?  Can you describe

9     what that is?

10    A.  A small, brown, leather bag that was recovered from inside

11    that gray Honda.

12    Q.  Did you personally recover it from the Honda or did you

13    only later search it?

14    A.  I searched it after it was recovered by another member of

15    my team.

16    Q.  Describe that process.

17    A.  At this time, we were both searching the car, so he had

18    removed the bag from the vehicle and had given it to me to

19    further search the contents of the bag.

20    Q.  And once a vehicle is removed from -- once an item is

21    removed from a vehicle, where does it go?

22    A.  Like I said, we were searching at the Midtown South

23    Precinct, so whatever we removed from the vehicle would be

24    brought into the precinct and items would be vouchered in the

25    computer inside the precinct.

MAI7MIA2                            Frey - Direct

1    Q.  Detective Frey, can you remove from the box next to you the

2    item marked for identification purposes as GX 903?

3           Do you recognize that item?

4    A.  Yes.

5    Q.  At a high level, what is it?

6    A.  This was an electronic scale and also a small tray that was

7    removed from inside of that brown bag.

8    Q.  How do you recognize that item?

9    A.  It's the items that I recovered from the brown bag.

10          MR. BHATIA:  Your Honor, the government offers GX 903.

11          THE COURT:  Any objection?

12          MR. MCGUINNESS:  No objection.

13          THE COURT:  Received.

14          (Government Exhibit 903 received in evidence)

15   BY MR. BHATIA:

16   Q.  Detective Frey, can you hold up that evidence bag and

17   describe its contents?

18   A.  This would be the electric scale to the left, and then this

19   small Backwoods tray on the right.

20   Q.  Can you point again to the electric scale and describe it,

21   please?

22   A.  It's just a small, black in color, electric scale.

23   Q.  Why did you recover a scale from the bag?

24   A.  Like I said, all items are recovered and accounted for.

25   And additionally, electric scales like this are commonly used

MAI7MIA2                          Frey - Direct

1    in the sale and packaging of narcotics.

2              MR. BHATIA:  Your Honor, may I approach the witness?

3              THE COURT:  You may.

4    Q.  Detective Frey, I'm handing you what's been marked as

5    Government Exhibits 902P, 903P, 904P, 905P, and 907P.

6              Can you take a look at those and look up at me when

7    you're finished?

8              Detective Frey, do you recognize those photographs?

9    A.  Yes.

10   Q.  How do you recognize them?

11   A.  These are photographs of the items that I recovered and

12   vouchered from the vehicle.

13   Q.  Were those all the items that were recovered from the

14   vehicle or just the ones that you recovered?

15   A.  These are definitely the items that I recovered.  I don't

16   know off the top of my head what else was recovered and

17   vouchered, if anything.

18             MR. BHATIA:  Your Honor, the government offers GX

19   902P, 903P, 904P, 905P, and 907P.

20             THE COURT:  Any objection?

21             MR. MCGUINNESS:  No objection.

22             THE COURT:  Received.

23             (Government Exhibits 902P-905P and 907P received in

24   evidence)

25             MR. BHATIA:  Mr. Foley, can you please publish for the

MAI7MIA2                          Frey - Cross

1   jury Government Exhibit 904P.

2   BY MR. BHATIA:

3   Q.  Detective Frey, what is this item?

4   A.  That's the green Supreme bag.

5   Q.  Is this a photograph of the item that you testified about

6   previously?

7   A.  Yes.

8        MR. BHATIA:  Mr. Foley, can you please publish for the

9   jury Government Exhibit 907P?

10  Q.  Detective Frey, what does this photograph show?

11  A.  These were the plastic vials recovered from inside the

12  Supreme bag.

13  Q.  And were these the photographs that you just testified

14  about?

15  A.  Yes.

16       MR. BHATIA:  Mr. Foley, can you please publish for the

17  jury Government Exhibit 903P?

18  Q.  And what does this item show, Detective Frey?

19  A.  This was the scale and tray that were recovered inside that

20  brown bag.

21       MR. BHATIA:  No further questions, your Honor.

22       THE COURT:  Cross-examination?

23  CROSS-EXAMINATION

24  BY MR. MCGUINNESS:

25  Q.  Good morning.

MAI7MIA2                         Frey - Cross

1    A.  Good morning.

2    Q.  Now, you mentioned that there were capsules and vials

3    recovered in the items that you found?

4    A.  Yes.

5    Q.  And you said that the capsules were similar to the

6    narcotics transactions that you were investigating, right?

7    A.  Yes.

8    Q.  These are narcotics transactions around Times Square?

9    A.  Yes.

10   Q.  And, in fact, there was an undercover making purchases

11   around Times Square as part of your investigation, right?

12   A.  Yes.

13   Q.  And he purchased crack, and sometimes it was received in

14   capsules, right?

15   A.  Yes.

16   Q.  Sometimes it was received in vials, right?

17   A.  Yes.

18   Q.  There are occasions when it was received in a plastic

19   twist, right?

20   A.  I don't recall plastic twists.

21   Q.  There are occasions where he received crack cocaine in a

22   Ziploc baggy, right?

23   A.  Couldn't say for sure if there was or wasn't.

24   Q.  So you're not sure if he received crack cocaine purchased

25   in all of those different variety of ways throughout this

MAI7MIA2                        Taveras - Direct

1    investigation?

2    A.  Off the top of my head, no.

3              MR. MCGUINNESS:  Nothing further.

4              THE COURT:  All right.  Any redirect?

5              MR. BHATIA:  No, your Honor.

6              THE COURT:  All right.  Detective Frey, you may step

7    down.  Your testimony is complete.  Thank you.

8              (Witness excused)

9              THE COURT:  Government, please call your next witness.

10             MR. BHATIA:  Your Honor, the government calls José

11   Taveras.

12   JOSÉ TAVERAS,

13        called as a witness by the Plaintiff,

14        having been duly sworn, testified as follows:

15             THE COURT:  Thank you.  Please be seated.

16             All right.  Good morning, Detective Taveras.

17             THE WITNESS:  Good morning, everyone.

18             THE COURT:  I'm going to ask you to speak slowly and

19   distinctly and keep your voice up so that it could be heard in

20   the large courtroom.

21             THE WITNESS:  Yes.

22             THE COURT:  Go ahead, counsel.

23   DIRECT EXAMINATION

24   BY MR. BHATIA:

25   Q.  Where do you currently work?

MAI7MIA2                    Taveras - Direct

1   A.  I work at Manhattan South Narcotics.

2   Q.  And what is your title there?

3   A.  Investigator.

4   Q.  And do you work in any particular zone?

5   A.  Yes.

6   Q.  What zone do you work in?

7   A.  Manhattan South, which is the Lower East Side all the way

8   up to 57th Street, Manhattan.

9   Q.  What is your rank at the NYPD?

10  A.  I'm a detective.

11  Q.  Detective Taveras, how long have you been with the NYPD?

12  A.  Approximately 14 years.

13  Q.  And what are your day-to-day responsibilities as a

14  detective?

15  A.  As a detective, I'm an investigator.  Usually my supervisor

16  will assign cases, which is complaints from 911.  We go through

17  real-time crime and we proceed with investigation on narcotics

18  complaints.

19          THE COURT:  Could you keep your voice up a bit?  Thank

20  you.

21  Q.  Detective Taveras, when you search a vehicle, how do you

22  record the items that are found during a search?

23  A.  Usually when we do a search of vehicle, we itemize.  We

24  number each item found for arrest evidence.

25  Q.  And do you prepare any sort of document associated with

MAI7MIA2                          Taveras - Direct

1   each item that's recovered?

2   A.  Yes.  We prepare a voucher, which is an invoice, itemizing

3   each item found that is going to be used for arrest evidence.

4   Q.  Detective Taveras, I want to direct your attention to

5   August 9, 2021.  Were you involved in a vehicle search on that

6   date?

7   A.  Yes.

8   Q.  What vehicle did you search?

9   A.  It was a gray Honda Accord.

10  Q.  And did you search the vehicle with anyone else?

11  A.  Yes.

12  Q.  Who else?

13  A.  Detective Frey.

14  Q.  And why did you search that vehicle?

15  A.  This vehicle was searched -- we had a -- the arresting

16  officer had a search warrant for the vehicle, and I conducted a

17  search at the station house to look for evidence in regards to

18  the case.

19  Q.  To whom did the vehicle belong?

20  A.  Mr. Davon Mial.

21  Q.  Detective Taveras, where did you search the vehicle?

22  A.  I searched the vehicle, the lungeable area, front lungeable

23  area inside the glove compartment, and in the back seat of the

24  vehicle.

25  Q.  Detective Taveras, there's a box just to your left.  Could

MAI7MIA2                          Taveras - Direct

1   you remove from that box the item marked as Government Exhibit

2   901?

3           You can put the other item back in the box.

4           Detective Taveras, do you recognize Government Exhibit

5   901?

6   A.  Yes.

7   Q.  How do you recognize it?

8   A.  These are the items that I searched and I found in the

9   glove compartment of the vehicle.  These are --

10  Q.  Detective Taveras, before you describe it, I just have a

11  few more questions.

12          Did you personally seize those items from the vehicle?

13  A.  Yes.

14          MR. BHATIA:  Your Honor, the government offers into

15  evidence GX 901.

16          THE COURT:  Any objection?

17          MR. MCGUINNESS:  Can I just see the items, please?

18          THE COURT:  Of course.

19          MR. MCGUINNESS:  No objection.

20          THE COURT:  Received.

21          (Government Exhibit 901 received in evidence)

22  BY MR. BHATIA:

23  Q.  Detective Taveras, can you now hold up the evidence bag for

24  the jury and describe what's inside?

25  A.   Inside this bag you have four scales and one label maker

MAI7MIA2                         Taveras - Direct

1    found in the vehicle.

2    Q.  Can you describe some of the scales?

3    A.  These are the scales and this is the label maker.

4    Q.  Where in the vehicle did you find those items?

5    A.  It was inside the glove compartment.

6    Q.  You mean the passenger's glove compartment or the one in

7    the middle?

8    A.  The passenger's glove compartment.

9    Q.  Why did you recover the scales from the vehicle?

10   A.  This is -- based on my experience in narcotics, when we

11   found these items, it's more like to weigh narcotics.

12   Q.  And why did you recover the label maker?

13   A.  The label maker also was by the scales, which is -- the

14   label maker is used to label the narcotics.

15            MR. MCGUINNESS:  Objection.

16            THE COURT:  Just a moment, ladies and gentlemen.

17            Would you read back the answer, please?

18            (Record read)

19            THE COURT:  Overruled.

20   BY MR. BHATIA:

21   Q.  Detective Taveras, can you remove from the box to your left

22   Government Exhibit 902?

23            Detective Taveras, do you recognize that item?

24   A.  Yes.

25   Q.  At a high level, what is it?

MAI7MIA2                      Taveras – Cross

1    A.  It's a bag, it's a brown bag.

2    Q.  And how do you recognize that item?

3    A.  It was found in the back seat of the vehicle.

4    Q.  Did you find the item in the vehicle?

5    A.  Yes.

6              MR. BHATIA:  Your Honor, the government offers GX 902

7    into evidence.

8              THE COURT:  Any objection?

9              MR. MCGUINNESS:  No objection.

10             THE COURT:  Received.

11             (Government Exhibit 902 received in evidence)

12   BY MR. BHATIA:

13   Q.  Detective Taveras, can you hold up that bag and describe it

14   for the jury?

15   A.  This is a brown bag found in the back seat of the vehicle.

16   Q.  And why did you recover that item?

17   A.  I recovered the bag -- usually, this bag is for putting

18   narcotics inside, based on our experience.

19   Q.  After you recovered that from the vehicle, what did you do

20   with it next?

21   A.  I brought it back to the base for arrest evidence.

22             MR. BHATIA:  No further questions, your Honor.

23             THE COURT:  All right.  Cross-examination.

24   CROSS-EXAMINATION

25   BY MR. MCGUINNESS:

MAI7MIA2                        Taveras - Redirect

1   Q.  Good morning.

2   A.  Good morning.

3   Q.  Detective, you said you did this search with another

4   officer?

5   A.  Yes.

6   Q.  Were you searching the vehicle at the same time?

7   A.  Yes.

8   Q.  Do you have a specific recollection of searching this

9   vehicle?

10  A.  Yes, I do.

11  Q.  And the items that you testified you just recovered from

12  the vehicle, are you certain that you were the one who

13  recovered them?

14  A.  Yes.

15  Q.  Where was the vehicle located when you conducted this

16  search?

17  A.  The vehicle was located in the rear of the basement of the

18  precinct of Midtown South.

19  Q.  Inside of the garage?

20  A.  Inside the garage.

21          MR. MCGUINNESS:  No further questions.

22          THE COURT:  All right.  Any redirect?

23          MR. BHATIA:  Yes, your Honor.

24  REDIRECT EXAMINATION

25  BY MR. BHATIA:

MAI7MIA2                          Taveras - Redirect

1    Q.  Detective Taveras, I just wanted to ask you two follow-up

2    questions that I didn't ask you on the direct examination.

3              Mr. Foley, can you display for the witness only

4    Government Exhibit 901P.

5              Detective Taveras, do you recognize this document?

6    A.  Yes.

7    Q.  What is it?

8              MR. MCGUINNESS:  Objection to scope, your Honor.

9              THE COURT:  Mr. Bhatia, I take it you inadvertently

10   failed to elicit the photograph during direct?

11             MR. BHATIA:  That's right.

12             THE COURT:  All right.  In an exercise of discretion,

13   I'll permit it.  I take the spirit of the objection, but I'll

14   permit it.

15   Q.  Do you recognize this item?

16   A.  Yes.

17   Q.  At a high level, what is it?

18   A.  It's the items -- it's the scales and items found in the

19   vehicle.

20   Q.  Does it depict the evidence you testified about earlier?

21   A.  Yes.

22             MR. BHATIA:  Your Honor, the government offers GX 901P

23   into evidence.

24             THE COURT:  Any objection?

25             MR. MCGUINNESS:  No objection.

MAI7MIA2

1               THE COURT:  Received.

2               (Government Exhibit 901P received in evidence)

3    BY MR. BHATIA:

4    Q.  Mr. Foley, can you display for the witness only Government

5    Exhibit 902P.

6               Detective Taveras, do you recognize this item?

7    A.  Yes.

8    Q.  What is it?

9    A.  It's the brown bag found in the vehicle.

10              MR. BHATIA:  Your Honor, this one is in evidence

11   already, so no further questions.

12              THE COURT:  All right.  Any recross?

13              MR. MCGUINNESS:  No, your Honor.

14              THE COURT:  All right.  You may step down.

15              THE WITNESS:  Thank you.

16              (Witness excused)

17              THE COURT:  Can I just briefly see counsel at the

18   sidebar.

19              (Continued on next page)

20

21

22

23

24

25

MAI7MIA2

```
 1              (At sidebar)
 2              THE COURT:  We appear to be making quicker progress
 3     than may have been anticipated.  We're now up to the
 4     undercover, correct?
 5              MS. NICOLAS:  Yes.
 6              THE COURT:  So I'm going to take a 15-minute break and
 7     just explain that I have to take care of some matters.
 8              When we get -- you know what, I'll excuse the jury and
 9     then we'll take care of the mechanics.
10              MS. NICOLAS:  All right.
11              (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MAI7MIA2

1          (In open court)

2          THE COURT:  Ladies and gentlemen, there's a matter I

3    need to attend to, so we're going to take a somewhat earlier

4    mid-morning break now than I usually do.  As you'll see, my

5    usual practice is to do it around 11.  This is a convenient and

6    good time for me to do it, though.  So we'll take a 15-minute

7    comfort break.  And when you come back in, we'll resume with

8    the next witness's testimony.

9          As always, please don't discuss the case.

10          THE DEPUTY CLERK:  All rise.

11          (Jury not present)

12          THE COURT:  All right.  Be seated.

13          Mr. McGuinness, your objection was well taken to the

14    scope of the redirect.  It was clearly just inadvertent that

15    the photograph wasn't put in.  It seemed to me, in the interest

16    of clarity, it made sense to get the photograph in, and there

17    was no harm in permitting limited few questions beyond the

18    scope.  But as a formal matter, I understand where you were

19    going.

20          All right.  So with that, as soon as the jury is in I

21    want the undercover and the sign on the door.

22          Who is doing that?

23          MS. NICOLAS:  So Mr. Foley will be placing the sign on

24    the door.  We have an additional undergraduate intern from our

25    office who is going to stand outside.  Mr. Otero is headed to

MAI7MIA2

1    the satellite room.  And the undercover is crossing the bridge

2    to come be sworn in.

3              THE COURT:  All right.  So why don't you put the

4    undercover in my witness room now.  I'll be down in 5 minutes

5    to swear in the undercover.

6              Anything else that we need to attend to?

7              MS. NICOLAS:  Just a few other mechanics, your Honor.

8              We do have a transcript binder with 18 transcripts of

9    portions of the conversations that are captured on video.

10   We've spoken to Mr. Smallman about placing those under the

11   jury's seats before they come back.

12             THE COURT:  Do you have a copy for the Court?

13             MS. NICOLAS:  We have a copy for the Court, the court

14   reporter, and your clerk.  We will hand those out as well.

15             We also spoke to Mr. Smallman last night anticipating

16   using a large velcro board, as well as a map, and understand

17   that we will be setting these up kind of in this area of the

18   well during the break.

19             THE COURT:  Okay.  That stage management all sounds

20   right.  I mean, I take it the judgment was that it's just

21   easier for them to review the transcript in the binders than to

22   leaning forward in pairs looking at the small screen?

23             MS. NICOLAS:  I think that's right, your Honor.

24             THE COURT:  Yes.  It's a blast from the past.  That's

25   the way it was done decades ago.  I've more often seen it on

MAI7MIA2

1    the screens, but I think that makes good sense.

2              Any instructions I need to give them, then, with

3    respect to the binder, including don't read ahead?

4              MS. NICOLAS:  I think that's right, your Honor.  I

5    would ask that you instruct them to leave those binders under

6    their seats until they're directed.  The binders are tabbed, so

7    we can direct them to the appropriate tab.

8              THE COURT:  So as soon as they come in, I should

9    notify them that there are binders under their seats, do not

10   access them now.  And when they first access them, I will

11   admonish them to stick with the tab in question.

12             I expect that during the examination you, rather than

13   me, will be the one saying, Members of the jury, you should now

14   turn to whatever the next tab.  I don't need to get involved in

15   that choreography.

16             MS. NICOLAS:  Exactly.

17             THE COURT:  All right.  In terms of where the easel or

18   the exhibit will be, I take it it will be essentially back and

19   to the right of the government table?

20             MS. NICOLAS:  Where Special Agent Renz was sitting

21   earlier, we're going to place it there.  I think that will be a

22   sufficient space.  And we'll be asking your Honor's permission

23   to have the witness step down to place things onto the board

24   during his testimony.

25             THE COURT:  Very good.

MAI7MIA2

1          Mr. McGuinness, I take it no issue with any of those

2    logistics?

3          MR. MCGUINNESS:  No issues.

4          THE COURT:  All right.  Good.  I appreciate that

5    everyone is on top of everything.

6          Let's have the undercover in the witness room in five

7    minutes.  I'll be in my robing room, and Mr. Smallman will come

8    get the witness and counsel for the oath.

9          Thank you.

10          THE DEPUTY CLERK:  All rise.

11          (Recess; page 101 sealed)

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

MAIQmia3

```
 1                (In open court; jury not present)
 2                THE COURT:  I just want to make sure we're all set up.
 3      Can I bring the jury out in a moment?
 4                MS. NICOLAS:  We're checking the door right now, but I
 5      believe we'll be all right.
 6                THE COURT:  The binders are under the seats?  All
 7      right.  Very good.  I will admonish the jury once they take
 8      their seats.
 9                (Jury present)
10                THE COURT:  To begin, I apologize for taking more time
11      than I forecasted.  The good news is that it allowed me to work
12      out some logistical issues with counsel which should have the
13      effect of making things move more efficiently as we go through
14      the day.
15                You'll notice, but do not take, that each of you has a
16      binder under your seat.  Do not pick it up right now.  Later on
17      I'm told during the examination there will be occasion for you
18      to consult the binder and follow along as counsel will direct
19      turning to specific tabs, but you should all have one under
20      your seats.
21                With that, counsel, please call your next witness.
22                MS. NICOLAS:  Yes, your Honor.  The United States
23      called Detective Ed Murphy.
24
25
```

MAIQmia3                      Murphy - Direct

1    ED MURPHY,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              DEPUTY CLERK:  Thank you.  Please be seated, speak

5    into the mic as best you can.  Please state and spell your full

6    name.

7              THE WITNESS:  Detective Ed Murphy.  Murphy common

8    spelling.

9              THE COURT:  Spell your name, please.

10             THE WITNESS:  M-U-R-P-H Y.

11             THE COURT:  Good morning, Detective Murphy.  I'll ask

12   you to speak loudly and distinctly so you can be heard in this

13   old and acoustically challenging courtroom.

14   DIRECT EXAMINATION

15   BY MS. NICOLAS:

16   Q.  Good morning, Detective Murphy.  Where do you currently

17   work?

18   A.  Manhattan South Narcotics.

19   Q.  Is that part of the NYPD?

20   A.  Yes, it is.

21   Q.  Within Manhattan South Narcotics, do you work for any

22   particular unit?

23   A.  I do.

24   Q.  What unit is that?

25   A.  I work for the team that covers the west side of Manhattan.

MAIQmia3                         Murphy - Direct

1    Q.  When you say "the west side of Manhattan," can you describe

2    exactly where you're talking about?

3    A.  If you were to split Manhattan in half from right to left,

4    I work on the west side, which is the left side if you're

5    looking from north to south.

6    Q.  Is that one precinct?

7    A.  No.  I work multiple precincts.

8    Q.  What precincts do you cover?

9    A.  We cover the 6 precinct, the 10 precinct, the 14 precinct,

10   Manhattan North, 18 precinct, but I also will work in every

11   other precinct with the other teams as well.

12   Q.  How long have you been a member of the NYPD?

13   A.  For the last 18 years.

14   Q.  What is your current rank?

15   A.  Detective second grade.

16   Q.  Can you describe what it means to be a detective second

17   grade?

18   A.  When you get promoted detective, from police officer to

19   detective, you're considered a third grade detective.  This is

20   the vast majority of detectives in the New York City Police

21   Department.  Approximately 10 to 15 percent of detectives will

22   ever be promoted to second grade.  Then approximately 3 to

23   5 percent will ever be promoted to first grade, the highest

24   grade of detective.

25   Q.  As a detective in Manhattan South Narcotics, what type of

MAIQmia3                        Murphy - Direct

1    crimes do you typically investigate?

2    A.   We investigate drug crimes.

3    Q.   Do you focus on any particular type of drug crime?

4    A.   Mostly sales.

5    Q.   Now, when you're investigating sales of drugs, do you have

6    any particular role in those investigations?

7    A.   Yes.  I am an undercover detective.

8    Q.   What is an undercover?

9    A.   An undercover is a term for the detective who goes out on

10   the streets and purchases narcotics.  Then the other detectives

11   are the ones that do the investigations.

12   Q.   You just mentioned a moment ago that as an undercover, you

13   purchase narcotics.  Have you personally purchased narcotics as

14   an undercover?

15   A.   Yes, I have.

16   Q.   Approximately how many times?

17   A.   Several thousand.

18   Q.   Do you see anyone in this courtroom from whom you've

19   purchased drugs?

20   A.   Yes.

21   Q.   Who?

22   A.   The individual with the bald head sitting at the back table

23   there.

24   Q.   What name do you know him by?

25   A.   I know him by Mr. Mial, also JD Smooth and JD Eyes.

1           MS. NICOLAS:  Your Honor, may the record reflect that
2     the witness has identified the defendant, Davon Mial, as an
3     individual from whom he's purchased narcotics.
4           THE COURT:  The record will so reflect.
5     Q.  How often did you purchase narcotics from this individual?
6     A.  Approximately 17 times.
7     Q.  Was that part of a larger investigation?
8     A.  Yes.
9     Q.  Where did those purchases, in general terms, take place?
10    A.  They happened in the Times Square area, specifically around
11    8th Avenue and 43rd Street.
12    Q.  You just identified the defendant as Davon Mial.  Did he
13    ever tell you another name?
14    A.  Yes.
15    Q.  What name did you know him by?
16    A.  He told me to call him Smooth.
17    Q.  Smooth.  I'll turn back to specific of those investigations
18    in a bit, but, first, you mentioned awhile ago you're a
19    detective second grade in the NYPD.  How long have you been
20    working undercover?
21    A.  I've been an undercover detective the last 16 years.
22    Q.  Can you tell the jury a little bit about the training that
23    you've received to work as an undercover?
24    A.  Yes.  16 years ago, when I first became an undercover, I
25    went through a three-week training course where we went over

MAIQmia3                        Murphy - Direct

1    different type of drugs, different types of operations,

2    different types of equipment, how to operate safely, things of

3    that nature.

4    Q.  Have you continued to receive training since your initial

5    entry onto the force?

6    A.  Yes.  All the way up until Covid, we did at least minimum

7    training every six months to refresh and to learn new things.

8    Q.  Do you ever instruct other undercover officers?

9    A.  Yes, I'm now one of the training officers who trains all

10   new undercovers that come into the New York City Police

11   Department.

12   Q.  What are some of the topics that you provide instruction

13   on?

14   A.  I give them instruction on different types of drugs,

15   different street terminologies.  I also help them operate

16   safely.  I will bring them out into the field and show them how

17   operations work.

18   Q.  When you say that you instruct on different types of drugs,

19   can you describe to the jury what you mean?

20   A.  Different types of drugs as in crystal meth, crack cocaine,

21   powder cocaine, fentanyl, different types of prescription

22   pills, heroin, all those types of drugs.

23   Q.  We will come back to that in a moment.

24           Again, before getting into any specifics about this

25   case, I want to talk a little more generally about undercover

1    operations.  Are there different types of undercover narcotics
2    investigations?
3    A.  Yes, there is.
4    Q.  Can you describe those different types for the jury?
5    A.  There is two main types of operations.  One is called
6    buy-and-bust operation, or B&B for short.  This operation is a
7    short-term operation where we have no specific target.  We
8    would just go to a location where we have community complaints
9    and attempt to purchase narcotics off of anyone that is
10   selling.  If an individual sells to an undercover, a backup
11   field team will move in, apprehend, and arrest the individual.
12   The.
13           The other type of operations are long-term operations
14   or short-term operations.  A short-term operation is a case buy
15   where you will buy multiple times from subjects, approximately
16   five times.  And then the investigators once they have the
17   information they need, will take down the case.
18           Long-term operation, you will have go on for several
19   months up to several years where you will work to find a whole
20   organization to try and bring everything down.
21   Q.  Are the goals different as it relates to a buy-and-bust
22   operation versus a case buy operation?
23   A.  Yes.
24   Q.  Can you just briefly describe what the goals are of those
25   respective different types of operations?

MAIQmia3                        Murphy - Direct

1    A.  When you're doing buy-and-bust operations, you're normally

2    just getting the person off of the street, the street-level

3    person.  You don't typically get the higher level people

4    involved in the operation.

5          During case buy operations, your goal is to either

6    move up on weight on how much drugs you're purchasing or to

7    find the other individuals that are involved in the

8    organization.

9    Q.  In the course of a buy and bust, is it common to make

10   arrests?

11   A.  Yes.

12   Q.  At what point?

13   A.  After the undercover purchases drugs during a buy and bust,

14   he will leave the location.  Another member of the field team

15   who is watching the location will radio transmissions to the

16   rest of the field team, will then move in and apprehend any

17   persons dealing with the undercover.  At this point the

18   undercover will have an opportunity to view the individuals in

19   custody and let the field team know if they're the ones who

20   actually sold him or her narcotics.

21   Q.  We'll come back to the mechanics of the field team in a

22   moment.

23          When you're talking about case buy, the longer term

24   operations, are quick arrest common in those operations?

25   A.  No.  The only time quick arrest is made during case buy

1   operation if the undercover's safety is in jeopardy.

2   Q.  A moment ago you testified one of your goals is to move up

3   on weight.  What does that mean?

4   A.  Move up on weight is terminology for buying larger

5   quantities of narcotics.  There are different levels of charges

6   for how many -- how much narcotics you're selling.  So if

7   you're able to get a higher weight charged against somebody

8   during an operation, it's a good thing.

9   Q.  When you're engaged in these type of undercover operations,

10  street-level operations, commonly how many law enforcement

11  personnel are involved?

12  A.  We have a minimum of six field team members who are either

13  detectives or police officers, two undercovers, and one

14  supervisor, and that is the bare minimum to go out on the

15  street.

16  Q.  Let's walk through each of those different roles.  Can you

17  describe, beginning with the supervisor, what their role is

18  during an undercover operation?

19  A.  The supervisor's job is to sit in a leader vehicle.  He

20  will monitor radio transmissions and give any directions, if

21  needed, to place personnel where they might be best used.

22  Q.  You said there are two undercovers involved.  What are the

23  roles of those two undercovers?

24  A.  The first undercover is a primary undercover, which I am,

25  who goes out and purchases narcotics.  The second undercover,

MAIQmia3                          Murphy - Direct

1    it can be a prior undercover or an undercover that is still

2    active, and their job and their terminology is called a ghost.

3    What they do is they follow the primary undercover, and they

4    have a radio hidden on their person so that like I'm talking to

5    you today, you would never know I'm transmitting, and they will

6    radio to the rest of the field team of where the undercover is,

7    descriptions of individuals he's dealing with, and basically

8    they paint a picture for the field team.

9    Q.  We'll come back to the ghost in a second.

10            You mentioned the field team a few times.  What does

11   the field team do?

12   A.  The field team is the other six detectives or police

13   officers that are out on the street.  They are backup

14   individuals for the primary undercover.  If he is in need of

15   help, they will move in and help him or if arrests need to be

16   made, they move in and make the arrests.

17   Q.  Typically how far are they away from the undercover?

18   A.  It depends on the case.  Sometimes they're within a half a

19   block.  But most of the time they're at least a block away.

20   Q.  Now, you're talking about the ghost a second ago.  Why is

21   that the name you use for that role, ghost?

22   A.  They're supposed to be hidden.  They're not supposed to be

23   noticed.  So that's why they call them a ghost.  It's just cop

24   terminology.

25   Q.  What's the primary purpose of the ghost?

MAIQmia3                    Murphy - Direct

1   A.  Their primary purpose is the undercover's safety.  They are

2   the first ones there to see if something is going to happen bad

3   to the undercover or something bad is happening to the

4   undercover, and they are instructed to move in and help out the

5   primary undercover, as well as radio the field team.

6   Q.  Prior to going out on the street, is there anything that

7   this group of law enforcement officers do to prepare for a

8   particular operation?

9   A.  Yes.  Before every operation, every member of the field

10  team that is going to be going on the street has to be present

11  in the clothes they're going to be wearing.  We get together,

12  it's called a tactical meeting, tack plan meeting where we go

13  over the events of the day, what's going to happen.  Equipment

14  is checked and handed out.

15  Q.  Why is it important that they're wearing the clothing

16  they'll be wearing during the operation?

17  A.  Because if something goes wrong and the undercover is in

18  need of help, when the investigators move in, sometimes

19  scenarios can be chaotic and you need to know that the

20  investigators know exactly who the undercovers are.

21  Q.  You say that you operate as a primary undercover.  What

22  does that mean?

23  A.  The primary undercover is our term for the purchasing

24  undercover, the undercover whose job it is to be out purchasing

25  narcotics.

MAIQmia3                          Murphy - Direct

1    Q.  So in advance of these operations, is there anything that

2    you do to personally prepare to go out as the primary

3    undercover?

4    A.  I check money that's given to me.  I count the money that's

5    given to me by the leader so I know exactly how much money I

6    have on me.  I make sure I'm dressed appropriately, and I check

7    my firearm.

8    Q.  What do you mean by "dressed appropriately"?

9    A.  If I'm going to a club, I make sure I put on clothes that

10   will afford me to get into a club.  If I'm just walking out on

11   the street, then I'll just wear whatever street clothes I have.

12   Or if I'm doing something that requires me to have a suit, I'll

13   make sure I put on a suit.

14   Q.  Do you carry a law enforcement ID when you're undercover?

15   A.  I'd say 95 percent of the time no.  Rare occasions I have

16   had it on me.

17   Q.  Why don't you carry the ID?

18   A.  I've been searched multiple times during the course of my

19   job, and if they were to find a police identification on me, it

20   could put me at risk.  Mostly I make sure not to do this.  One

21   hundred percent if I'm going to be going into buildings or

22   apartments, I will not have any police identification on me.

23   Q.  Now, putting your law enforcement hat on for a moment,

24   speaking from the perspective of a law enforcement officer,

25   when you're engaged in these undercover operations, what are

1    your goals?

2    A.   Each operation is a little different, but when I first

3    interact with an individual out on the street, I look for any

4    safety concerns.  I look for bulges in waistbands or pockets or

5    if they're wearing a fanny pack, possible places to hide

6    weapons, keep eyes on their hands.  Then I start looking at

7    clothing descriptions and facial structures so I can remember

8    exactly who I'm dealing with.  I look for scars, hair color,

9    things of that nature, body type.

10   Q.   In particular, when you're engaged in these longer term

11   case buy operations that you've testified about, what goals do

12   you have?

13   A.   As the case goes on, my goals slightly shift.  Once I

14   become very familiar with persons I'm dealing with and I know

15   exactly who they are by sight, I start listening for street

16   names that are used by individuals.  I start looking to see if

17   they're being given directions by anyone else, if there's a

18   higher structure involved or if this person is working alone.

19   Q.   When you use the term "street names," what do you mean?

20   A.   Street names just is a nickname that anyone could have.

21   You know, in this case, Mr. Smooth, that's what he said his

22   street name was, Mr. Mial.

23   Q.   Over the course of your investigation, how do you build an

24   understanding of the nature of the relationships with an

25   organization?

MAIQmia3                    Murphy - Direct

1   A.  You slowly try and work your way in and talk to different

2   people.  If you notice there is some sort of structure, you'll

3   try and talk to every individual you can and get -- familiarize

4   yourself with them.  And then as you can linger around and hang

5   around, you'll see individuals that will always be giving

6   directions to other people and telling them what to do, and

7   those are the types of things you really need to pick up on.

8   Q.  What, if anything, do you do to build relationships with

9   the targets of your investigation.

10  A.  I just talk to them like people, like anyone would.

11  Q.  Now, in the course of building relationships in narcotics

12  investigations, have you ever been asked to use narcotics?

13  A.  Yes.

14  Q.  When did that happen?

15  A.  It happens quite often.  People try to see if you're a cop

16  or not by telling you, you know, "You have to smoke this crack.

17  You have to snort this heroin in front of me."  I always come

18  up with back stories on why I cannot.  There's different types

19  of things to maybe pull on that person to let them let me slide

20  and not have to use the drugs.

21  Q.  Have you ever used narcotics?

22  A.  I have never had to use narcotics.

23  Q.  Aside from the targets of your investigation, do you

24  develop relationships with any other people who are in the area

25  that you're investigating?

MAIQmia3                         Murphy - Direct

A.  Yes.  I work a lot of the same areas.  I have the entire 16
years of being an undercover, so I do know lots of people that
live on the street.  I will hang out with them.  I will talk to
just regular tourists walking around and just say hi to people,
just look like you fit in and you're from the neighborhood.

Q.  Are there ever times when you communicate with drug dealers
in advance of a sale?

A.  Yes.

Q.  How do you do that, just speaking in general terms?

A.  Phone calls, text messages, things of that nature are big
in advance communications.

Q.  Now, when you're working as an undercover, do you make
recordings of your interactions?

A.  I try to, yes.

Q.  When you say you "try to," what do you mean?

A.  Speaking in general of my experiences, I will try my best
to at least get audio recordings.  I do try to video all my
buys that are case buys.

        Buy and bust is a little more difficult because you're
going into scenario in which you don't know what's going to
happen.  But during case buy operations when you get a feel for
everything, you can start introducing cameras and start
videoing everything.

Q.  Can you describe the devices you use to make those video
recordings?

1    A.  I have an audio recording device if you look at it, you

2    would never know what it is.  It looks like a normal item.

3    Same thing with the cameras.  Cameras can be hidden into almost

4    anything that you have on your person today.

5    Q.  Now, do those recordings always produce perfect audio?

6    A.  No, they do not.

7    Q.  What might interfere with the audio production of those

8    recordings?

9    A.  Building locations, you know, skyscrapers and things of

10   that nature interfere with the devices.  Also, just modern

11   technology sometimes just doesn't want to work.

12   Q.  Are there times when the video recording fails entirely?

13   A.  Yes.

14   Q.  What do you do if that happens?

15   A.  If that happens, I note it.  I don't know that happens

16   until I get back to where I process my paperwork.  And once I

17   realize the audio recording or video recording failed, I will

18   make a notation of that in my paperwork.

19   Q.  Let's go back to talking a little bit about those members

20   of the team again.  You mentioned the ghost.  Does the ghost

21   have a way to communicate with the field team as they're

22   observing the undercover?

23   A.  Yes, they do.

24   Q.  How do they communicate?

25   A.  The ghost has, as I said before, a radio hidden on their

MAIQmia3                          Murphy - Direct

1    person.  This is point-to-point radio, meaning they could

2    communicate with the other members of the field team, and the

3    other members of the field team could communicate with them.

4    It's just like a regular police radio.  There are wires and

5    such that hide it on their person so that no one would know

6    that they had the radio on them.

7    Q.  Does the undercover have a way to communicate with the

8    field team?

9    A.  The only way the undercover could communicate with the

10   field team is through physical signals, gestures such as like

11   rubbing your shoulder or something.  These signals are

12   predetermined at the tack plan.  And then also cell phones, if

13   they have a cell phone on them.  The undercover does -- primary

14   undercover does not carry any type of radio.  They do have a

15   small one-way transmitter called a Kel device, K-E-L.  This is

16   a one-way transmitter that transmits back to the leader's

17   vehicle.  It's a last hope safety mechanism that if the leader

18   hears something over it, like yelling or something, he can

19   direct the field team to move in.

20   Q.  Does the Kel record?

21   A.  Kel does not record.

22   Q.  So why do you use it if it's not recording?

23   A.  The Kel is not recorded because it's extremely unreliable,

24   and we're trained to treat it as though it is not working

25   because, especially in Manhattan, if you turn a corner and the

1    leader's vehicle is a block away, nothing is going to get

2    picked up.

3    Q.  I want to go back to focusing on the planning for these

4    operations.  Are you familiar with the term prerecorded buy

5    money?

6    A.  Yes.

7    Q.  And if I refer to that as PRBM, are you going to know what

8    I'm talking about?

9    A.  Yes.

10   Q.  What is PRBM?

11   A.  PRBM, prerecorded buy money, is money that is photocopied

12   prior to going out on the street.  PRBM, prerecorded buy money,

13   is typically used during arrest scenarios, like buy-and-bust

14   operations, or a case takedown where a buy is made right before

15   the case is taken down.

16       It's simply just regular money taken out of the ATM

17   that is lined up on a photocopier with some administrative

18   stuff written down on the paperwork, and it's photocopied so

19   that every single serial number on every bill is visible.  So

20   if an arrest is made, when they're processing the arrest, they

21   can go through the individual who was arrested, his money that

22   he has on him, to see if any of the money used was the money

23   used by the undercover in the money he has.

24   Q.  Just to be clear, when you say the money is photocopied,

25   who's doing that photocopying?

MAIQmia3                          Murphy - Direct

A.  Usually the lead investigator or the arresting officer is
the person that photocopies all the money, and they hold a copy
of this photocopy.  The money is then given to the undercover
who then uses it in drug purchases.  Then the arresting officer
attempts to find that money again on the individual who was
arrested.

Q.  You testified a moment ago that PRBM is often used in
buy-and-bust operations.  Is it used in case buy operations,
the longer term investigations?

A.  The only time it's used during case buy operations is if
I'm -- I set up a deal today to buy drugs, and he's going to be
arrested later today, then we will use that money.  Other than
that, it's not prerecorded because over a long-term
investigation, it could be months, and money changes hands
pretty quickly.

Q.  So in circumstance when you're not using prerecorded buy
money, can you describe for the jury the process by which you
get the money to go pay for narcotics as an undercover officer?

A.  All the money comes from our supervisor.  He has an account
with the NYPD that he is in charge of.  The supervisor will
either hand the money directly to me or to the case officer who
will then hand it to me.

Q.  Is there a record made of that transaction?

A.  Yes.

Q.  Can you describe what those records look like and how that

MAIQmia3                          Murphy – Direct

1   process works?

2   A.  The records are basically any time I spend money, I create

3   an expense report, which is basically just all the money that I

4   spend and which money I gave back to the supervisor.

5   Q.  Are you familiar with the term "set"?

6   A.  Yes.

7   Q.  What's a set?

8   A.  A set is street terminology or cop terminology for a drug,

9   the location.  Set could be anywhere from three blocks, you

10  know, or smaller; it could just be a corner.  It's basically

11  where you're going to be doing your operation and where they

12  sell drugs.

13  Q.  So speaking in general terms, and not specific to this

14  case, when you arrive on the set and you're acting in your

15  undercover capacity, what do you do?

16          MR. McGUINNESS:  Objection.

17          THE COURT:  Overruled.

18  A.  Once I'm at a location of where I'm looking to purchase

19  narcotics, I will first just observed a little bit and walk

20  around if it's a location that I'm unfamiliar with.  If it's

21  one I'm familiar with, I'll walk to where exactly I know they

22  sell drugs and then start looking around.  You look to see if

23  people are hanging out or people constantly moving their head

24  side to side looking around, which I will do the same, and I

25  hope for somebody to approach me offering drugs, or if not, I

1    will just walk around and say hi to people and just get into

2    conversations.

3    Q.  Is it the case that you purchase drugs from everyone that

4    you approach?

5    A.  No.  The vast majority of people I talk to out on the

6    street I've never purchased drugs from.

7    Q.  How do you know whether or not you're going to be able to

8    purchase drugs from someone?

9    A.  I gauge responses based on how I talk to them.  You know,

10   if I say hi to someone, and they say hi back to me, and they

11   say, "What are you looking for?"  I'll just tell them the drug

12   I'm looking for, and we go from there.

13   Q.  How do you communicate the type of narcotic that you're

14   interested in purchasing?

15   A.  I judge based upon the area and my past purchases with what

16   I purchased at different locations to know what to purchase.

17   Sometimes individuals will just blatantly tell you "I have X,"

18   you know, and then I'll just go along with whatever drug they

19   say they had.

20   Q.  Are there particular terms associated with particular

21   drugs?

22   A.  Yes.

23   Q.  Can you describe what some of those are?

24   A.  MDMA is molly; that's a big one.  White girl is cocaine,

25   powder cocaine.  Also, soft could be powder cocaine.  On the

1  flip side, hard is crack cocaine.  Crills is another street
2  term for crack cocaine.  Sometimes crack is just called crack.
3  Heroin could be dog food, H, heroin, or with heroin it's unique
4  because they have their own individual stamps, so they can go
5  by the different stamp names.
6  Q.  Let's focus on cocaine and crack cocaine.  What was the
7  term for crack cocaine?
8  A.  Powder cocaine is usually either just coke, white girl or
9  soft.
10  Q.  And why soft?
11  A.  Soft because it's a powdery substance, it's a lot more
12  fluffy than crack cocaine.
13  Q.  What is the term for crack cocaine?
14  A.  Crack cocaine is hard because it's a hard, rocky substance.
15  Crills, I'm not sure why.  It's just what they've called it for
16  years.
17  Q.  When you purchase crack, how do you communicate the
18  quantity that you want to purchase?
19  A.  It all comes back to what dealers you're dealing with.  If
20  it's somebody I'm not used to dealing with, I'll just tell them
21  the money denomination I'm looking for.  I'll tell them I'm
22  looking for 60, I'm looking for 40, so they will give me what
23  they deem appropriate.  Because some people sell $10.  Some
24  people sell $50, $20 and some places you could even buy $5, but
25  that's rare.

MAIQmia3                          Murphy - Direct

1    Q.    Why is it that you communicate the money amount rather than
2    the amount of drug?
3    A.    When I'm dealing with new people, I don't want to say, "Let
4    me get two," and they hand me two bags, and I was expecting it
5    to be 20, and they're expecting me to give them 40.  So if that
6    happens, then they'll question you, like, "Wait, you've never
7    been here before?  Who are you?"  And it just creates conflict.
8    Q.    Can you describe a typical hand-to-hand drug transaction?
9    A.    Hand-to-hand drug transactions are very, very fast.  They
10   could give a quarter to the person sitting next to you or
11   handing over a cigarette.  It happens in seconds, and then
12   that's it.  Then the two parties separate.
13   Q.    Throughout your career as an undercover, have there been
14   times you've served as a ghost?
15   A.    Yes.
16   Q.    Approximately how many times?
17   A.    At least 5,000.  I do ghost work every week.
18   Q.    When you're serving as a ghost, do you observe hand-to-hand
19   transactions?
20   A.    I do.
21   Q.    Generally speaking, what do you observe?
22   A.    As a ghost, my job is to be there for the safety of the
23   undercover, so I'll hang back, and I mostly never see the
24   actual hand-to-hand because they're so quick and with street
25   traffic in Manhattan.  So I hang back just so I can hear what's

MAIQmia3                          Murphy - Direct

1    going on with the undercover.  If they're in trouble, I'll let

2    them know and let the team know, but we lose sight of the

3    primary undercover quite often.

4    Q.  Let's move back to talking about when you're operating as

5    an undercover officer.  Once you've been able to successfully

6    purchase narcotics, what do you do next?

7    A.  Once I purchase narcotics, I'll hold it on my person until

8    I get away from the location.  Usually back in the vehicle, I

9    will put it into a secure envelope which has a tamper-proof

10   seal and a unique serial number.  This is called an undercover

11   envelope.  It's a plastic envelope that I keep on my person.

12   Until later that day when all the operations are done, I'll

13   hand it to the lead investigator or the arresting officer to be

14   vouchered in evidence and sent to the lab.

15   Q.  Let's walk through that step by step.  Once you put the

16   narcotics into the envelope, where does the envelope go next?

17   A.  Once I put the narcotics into the envelope, it goes in my

18   pocket and doesn't leave my pocket until I hand it to the

19   investigator.

20   Q.  We're going to come back to the undercover envelopes in a

21   moment.

22          Now, during your time as an undercover, have you

23   conducted investigations in and around Times Square?

24   A.  I have.

25   Q.  How many times?

1    A.  That's too vast to approximate.  I've been working that

2    same neighborhood for 16 years multiple times a week.

3    Q.  When you're working in your undercover capacity in Times

4    Square, can you just describe the role that you typically play?

5    A.  When I'm in Times Square, specifically on 8th Avenue, I

6    play -- I never tell anyone that I'm a user, but I could be

7    viewed as a user, and I try to typically spend a little more

8    money than the average person so I stand out.

9    Q.  When you say that you try to appear as a user, can you

10   describe what you mean by that?

11   A.  The clothing I wear, I won't walk down 8th Avenue in a suit

12   typically to buy crack cocaine, although I have.  But I'll let

13   my beard grow out, my hair is a mess, things of that nature.

14   Q.  Beginning in the winter of 2019, did you begin a long-term

15   case buy operation along 8th Avenue just off of Times Square?

16   A.  Yes.

17   Q.  How did that investigation begin?

18   A.  That investigation began, I was given intel by the lead

19   investigator in this case, Detective Murdock, that possibly

20   there was a group that set up on the corner, and it was

21   multiple individuals who were working together selling

22   narcotics.

23   Q.  Based on that information, did you take any investigatory

24   steps?

25   A.  Yes I did.

MAIQmia3                    Murphy - Direct

1    Q.  What did you do?

2    A.  I went to that location.  I bought off of several

3    individuals that were not involved in this case.  I got my face

4    noticed by certain individuals, and I eventually purchased from

5    the person who I learned to be JD Ghost.

6    Q.  We are going to come back to that name in a moment.

7          As you began making purchases, what were your goals?

8    A.  My goals during this case and on that corner were to find

9    as many individuals involved with this operation as possible;

10   and then while doing that, start looking for any structure,

11   anybody that's giving orders, anybody that appears to be

12   running the show.

13   Q.  Can you describe what you mean by "structure"?

14   A.  Individuals that seem to be giving orders, bosses, you

15   know, telling other people what to do, watching out and, you

16   know, telling people who to sell drugs to or how much.

17   Q.  Over the course of this particular investigation, did you

18   purchase narcotics?

19   A.  I did.

20   Q.  On how many occasions?

21   A.  67 occasions.

22   Q.  A little more background.  Based on your experience in this

23   case, what quantity of narcotics was consistent with a user in

24   Times Square between 2019 and 2021?

25   A.  The users in that neighborhood, they spend anywhere from

MAIQmia3                          Murphy – Direct

1   $10 to $30 typically.  Obviously, there are occasions where

2   people will spend more, and that's how much the street-level

3   person that lives over there or is visiting over there will

4   spend.

5   Q.  How much crack cocaine will $10 to $30 buy you in Times

6   Square in 2019 to 2021?

7   A.  Depends on the dealer, but typically a $10 bag will be --

8   think of a small, groomed pinky fingernail.  The packaging

9   varies, but during this time they mostly sold capsules, you

10  know, so you can get three capsules if you had $30.  Sometimes

11  if you had $8, they'll sell you one capsule.

12  Q.  Would $10 to $30 get you the same amount of cocaine,

13  powdered cocaine?

14  A.  No.

15  Q.  How does it differ?

16  A.  You would not be able to by $10 or $30 worth of powder

17  cocaine in that neighborhood.  Powder cocaine is usually sold

18  by the gram in that neighborhood.  Some people will ask at

19  least $100 a gram, and I've heard as much as $200 a gram.

20  Q.  Why is that?

21  A.  It's a touristy neighborhood, and people from New York will

22  take advantage of tourists when they can.

23  Q.  Now, did the amount of cocaine that you were purchasing

24  change over the course of the investigation?

25  A.  Yes.

MAIQmia3                         Murphy - Direct

1  Q.  Why is that?

2  A.  I started off, to not raise any eyebrows, a little higher

3  than the typical street user.  I started spending the first

4  five weeks $40, then I started staying around the $60 mark; and

5  as everyone of the group started to get to know me, I started

6  spending upwards of a hundred dollars plus.

7  Q.  Was there a reason you started spending additional money?

8  A.  I wanted them to think of me as a good customer, someone

9  reliable, and someone that they wanted to talk to.

10  Q.  You testified earlier when you were speaking about

11  investigations generally that you try to make recordings of

12  your undercover operations.  Did you make recordings of the

13  transactions you participated in during this investigation?

14  A.  Yes, I did.

15  Q.  Did make audio recordings?

16  A.  Yes.

17  Q.  Did you make video recordings?

18  A.  Yes.

19  Q.  Did your recording devices always work during this

20  investigation?

21  A.  No.  Several times throughout this investigation my audio

22  recordings or video recordings failed.

23  Q.  When they failed, what did you do?

24  A.  I notated it on my paperwork that I do when I get back to

25  my base to process everything.

MAIQmia3                        Murphy - Direct

1    Q.  You say you notate it on your paper.  What kind of
2    paperwork do you do when you get back to the base?
3    A.  When I get back to the base, the first thing I do is it's
4    called an undercover buy report.  This is a synopsis so that
5    the undercover with read it at a later date and it will refresh
6    his memory or her memory on what they did on that particular
7    day because some of these cases go on for years.
8    Q.  How close in times to the actual transaction do you prepare
9    that report?
10   A.  Depends on how many operations I do in a day.  If you make
11   the buy when you first go out, it could be four hours later,
12   but it's always the same day.
13   Q.  Detective Murphy, in front of you on the stand there,
14   there's a thumb drive.  It has a yellow sticker marked
15   Government Exhibit 401 to 467.  Do you see that?
16   A.  I do.
17   Q.  Do you recognize that?
18   A.  I do.
19   Q.  Have you seen it before?
20   A.  I have.
21   Q.  How do you know that you've seen it before?
22   A.  I know I've seen this before because it has my initials on
23   it written right where it says Government Exhibit.
24   Q.  Did you write those initials?
25   A.  I did.

MAIQmia3                         Murphy - Direct

1    Q.   Have you reviewed the contents of that drive?

2    A.   I have.

3    Q.   What's on there in general terms?

4    A.   On the drive is my recordings of the buys I made during the

5    course of this investigation and also small little clips taken

6    out of my longer video for the buy.

7    Q.   In total, approximately how many hours of recordings are on

8    that thumb drive?

9    A.   A couple hours, few hours.

10   Q.   Have you looked at every file that's on that drive?

11   A.   I have.

12   Q.   Does each file have a number?

13   A.   Yes.

14   Q.   Have you examined each one of those numbered files?

15   A.   I have.

16        MS. NICOLAS:  Your Honor, at this time the government

17   offers government exhibits on the drive, and I will read those

18   into the record one by one if your Honor would prefer.

19        THE COURT:  Not necessary, but do they span 401 to 467

20   with some -- do they capture all 67 that are in there or are

21   there some holes in there?

22        MS. NICOLAS:  They do capture all 67, but it may be

23   easier for me to read the numbers skipped.  There are no

24   Government Exhibits 419, 425, 431 or 453 and 454.  Otherwise,

25   that drive is inclusive of 401 to 467, as well as the excerpts

1   which are the government exhibits numbers accompanied by an A

2   or B.

3           THE COURT:  Any objection?

4           MR. McGUINNESS:  No objection.

5           THE COURT:  They're all received.

6           (Government's Exhibits 401 to 467, exclusive of 419,

7   425, 431 or 453 and 454 received in evidence)

8   Q.  Detective Murphy, there should also be a binder on your

9   stand that includes a set of government exhibits that begin

10  again with 4 followed by a T.

11          Mr. Foley, if you could ...

12          THE COURT:  Yes.

13  Q.  I'm going to ask you just to flip through that binder for a

14  moment and look up when you're done.

15  A.  I've looked at this earlier.

16  Q.  In general terms, what's contained in that binder?

17  A.  These are transcripts of the audio/video recordings that I

18  did during this case.

19  Q.  Have you reviewed those transcripts?

20  A.  I have.

21  Q.  In the course of your investigation, did you speak with

22  targets of the investigation when you were making buys?

23  A.  Yes.

24  Q.  On how many occasions did you have discussions with these

25  individuals?

MAIQmia3                          Murphy - Direct

1    A.  I don't remember exactly how many occasions because I did

2    67 buys, but on other days I did speak with Mr. Mial over the

3    phone.  So over 67 times.

4    Q.  When you reviewed these transcripts, did you review the

5    content for its accuracy?

6    A.  I did.

7    Q.  Did you also review the voice attributions contained

8    therein?

9    A.  Yes.

10   Q.  Are these transcripts a fair and accurate representation of

11   the contents of the videos -- some of the videos that are

12   contained in Government Exhibits 401 to 467?

13   A.  Yes.

14        MS. NICOLAS:  Your Honor at this time the government

15   offers the set of transcripts that include Government Exhibits

16   412T, 420T, 427T, 432T, 434T, 435T, 437T, 438T, 441T, 444T,

17   445T, 446T and 447T, 449T, 451T, 455T, as well as 464T and

18   467T.

19        THE COURT:  Any objection?

20        MR. McGUINNESS:  Yes, your Honor, I object to their

21   admission in evidence.  I object to their admission into

22   evidence and ask they be used only as an aid to the jury.

23        THE COURT:  Any objection to that, counsel?

24        MS. NICOLAS:  No objection, your Honor.

25        THE COURT:  All right.  I will receive the transcripts

MAIQmia3                          Murphy - Direct

1   solely as an aid to the jury.

2            Ladies and gentlemen, I will instruct you further

3   about this at the end of the case.  But the short of it for now

4   is that it is ultimately the words on the audio or the video

5   that control.  The transcript is merely an assist to you to

6   enable to you follow.  But ultimately it's the words that are

7   recorded that control, and if you conclude that the words that

8   are used that are tape-recorded are different from the ones in

9   the transcript, that is what you should use to guide your

10  determinations.

11           Mr. McGuinness, does that do the trick?

12           MR. McGUINNESS:  Yes, thank you.

13           THE COURT:  With that, they are received.

14           MS. NICOLAS:  Thank you, your Honor.

15           (Government's Exhibits 412T, 420T, 427T, 432T, 434T,

16  435T, 437T, 438T, 441T, 444T, 445T, 446T and 447T, 449T, 451T,

17  455T, 464T and 467T received in evidence)

18  Q.  Now, we spoke a minute ago about the UC's envelopes you've

19  used over the course of your career.  I would ask you to take a

20  look at an item that's been placed on the witness stand that's

21  marked for identification as Government Exhibit 299.  Do you

22  see that?

23  A.  I do.

24  Q.  Mr. Foley, could you please publish for the witness, the

25  parties and the Court only Government Exhibit 299P.

MAIQmia3                        Murphy - Direct

1          Do you recognize that?

2    A.   I do.

3    Q.   Speaking in general terms, what is that?

4    A.   This is the undercover envelope on which I seal my

5    narcotics into prior to giving it to the investigating officer.

6    Q.   Is that a used narcotics envelope?

7    A.   No, this one is unused.

8    Q.   Is the image depicted in 299P a fair and accurate depiction

9    of the object you're holding in your hand, which is Government

10   Exhibit 299?

11   A.   Yes.

12         MS. NICOLAS:  Your Honor, the government offers

13   Government Exhibits 299 and 299P.

14         MR. McGUINNESS:  No objection.

15         THE COURT:  Received.

16         (Government's Exhibits 299 and 299P received in

17   evidence)

18   Q.   Can you hold up Government Exhibit 299.  It's also depicted

19   on the screen.

20         Mr. Foley, if you could please publish Government

21   Exhibit 299P for the jury.

22         Could you explain how you used this bag?

23   A.   This bag is the undercover envelope which I seal narcotics

24   into.  At the top, if you look at the top of your screen, you

25   will see a little white part with a serial number on it.  Just

below that, it's a little hard to see on the video, but you

could see it looks like a little strip.  That is a sticky

strip.  Once you take the plastic off the back, it will seal

the plastic envelope.  It's a tamper-proof seal.  It cannot be

opened without ripping the bag.

        So the serial number on the bag you can see is a

little bit below that.  It's the same serial number that's on

top.  This is where the drugs are put in.  And once it's

sealed, it cannot be tampered with at all without having the

bag rip.

        Below that, you'll see the white box in the middle.

It's hard to see, but from the top going to the bottom, I

handwrite on all my bags, the date, the time I made the

purchase, the location, the JD name, and then the time I sealed

the bag, so what time I closed the bag and put the drugs in it.

Q.  Now, you mentioned it's a tamper-proof bag.  When, if ever,

is that bag opened up?

A.  The bag is sealed.  For some drugs, it's not opened up

until it gets to the laboratory to be tested.  Sometimes with

powdered cocaine or rock crack cocaine, the investigating

officer will open the bag and field test the narcotics to

know -- it's a presumptive test -- so we know if it's real or

not.

        If it comes back fake, I can then communicate with the

dealers and tell them that they gave me fake stuff.  If it's

1    real, the investigating officer will follow the normal process

2    and vouchering the drugs.

3    Q.  In the course of this particular case buy operation, was

4    there ever a fake drug field test?

5    A.  No.

6    Q.  You mentioned there's a serial number on this bag.  Is that

7    a unique serial number?

8    A.  Yes, it's a unique serial number to this one specific bag.

9    Q.  Can you just direct the attention to the jury where that

10   seal number is located on the bag?

11   A.  You can see it on the top part, which part of that is able

12   to be ripped off for the undercover to keep or the investigator

13   to keep.  And just below that, it's a little down and to the

14   left, which is highlighted now, there's the same serial number

15   in a second spot.

16   Q.  What is the serial number used for?

17   A.  It's for drug identification purposes so that we know the

18   drugs I purchased off of the individual that I write on this

19   bag are always the same drugs.

20   Q.  Does that serial number go anywhere else?

21   A.  This serial number gets put on the seizure invoice.

22   There's two different invoices that are done, and it's written

23   on both of those.

24   Q.  Mr. Foley, you can pull that down.

25        Detective Murphy, I'm going to be ask you to be

MAIQmia3                    Murphy - Direct

1   careful here.  Behind you, just off to your right, there are

2   two boxes.  Do you see those?

3   A.  I do.

4   Q.  Can you turn around for a moment, flip through those boxes,

5   and tell us what's in there.

6        Do you recognize those items?

7   A.  I do.

8   Q.  In general terms, what are they?

9   A.  They're narcotics that I purchased during the course of

10  this investigation.

11  Q.  Is each one of those bags marked with a Government Exhibit

12  sticker?

13  A.  Yes.

14  Q.  Are those bags placed in order?

15  A.  Yes.

16  Q.  Again, I'm going to ask you to look, can you tell me what

17  the first and last numbers of the bags are?

18  A.  The bags go from 201 to 267, split into two boxes.

19  Q.  Have you had a chance to examine those bags prior to your

20  testimony today?

21  A.  I have.

22  Q.  Again, in general terms, what's inside of those bags?

23  A.  The narcotics I purchased during this investigation.

24  Q.  Did you examine the invoice numbers that are on those bags?

25  A.  I have.

MAIQmia3                         Murphy - Direct

1    Q.  Did you see anything inside of those bags that you

2    recognized?

3    A.  Yes, the drugs that I purchased during this investigation

4    are packaged inside those bags.

5    Q.  Is there anything else in those bags that you recognized?

6    A.  Yes, the plastic security envelope that I used during my

7    narcotics purchases are in the bag as well.

8    Q.  Did you verify the numbers on those envelopes match the

9    numbers on the invoices?

10   A.  Yes.

11   Q.  And did you examine the contents of those bags as compared

12   to the invoices in your reports?

13   A.  I did.

14   Q.  Are the items that are in those bags in substantially the

15   same condition as they were when you turned them over in the

16   course of the investigation?

17   A.  They're in a similar condition, but they have been changed

18   through processing during laboratory analysis.

19   Q.  What kind of changes have been made?

20   A.  They have been unpackaged from my UC envelope.  Some of the

21   drugs appear to have been tested, and some of them were not.

22   It's all laid out inside the bag.

23   Q.  Now, during the course of your career, have you seen

24   similar changes made to narcotics during processing?

25   A.  Yes.

MAIQmia3                         Murphy – Direct

1    Q.  There's also a binder in front of you that contains

2    Government Exhibits 201P to 267P.  The front of the binder

3    should say government exhibits.  If you could flip to the tab

4    that begins 201P?

5    A.  Yes.

6    Q.  Flip through those for a moment and look up when you're

7    done.

8    A.  Okay.

9    Q.  Are the items marked Government Exhibits 201P to 267P a

10   fair and accurate depiction of the seized narcotics that you

11   talked about that are in Government Exhibits 201 to 267?

12   A.  Yes, they are photographs, copies of the bags.

13

14        MS. NICOLAS:  Your Honor, at this time the government

15   offers both Government Exhibits 201 to 267, as well as

16   Government Exhibits 201P to 267P.

17        THE COURT:  Any objection?

18        MR. McGUINNESS:  Yes, your Honor, I object.  The

19   foundation hasn't been properly laid for all of these items.

20        THE COURT:  Let me see counsel at the sidebar.

21        I'll ask the witness to step down, please.

22        (Continued on next page)

23

24

25

MAIQmia3                          Murphy - Direct

1              (At the sidebar)

2              THE COURT:  What's the basis for the objection?

3              MR. McGUINNESS:  Judge, I don't believe there has been

4    a proper basis for all 67 items to come in.  I think the only

5    foundation that's been laid with these were the drugs purchased

6    during the investigation, not who from, not when.  Surely

7    there's going to be additional questions as to each of these

8    purchases.  I think that's the time for them to come in after

9    that specific foundation has been made.

10             THE COURT:  Ms. Nicolas, is there a way to ask a few

11   more questions, at least at a general level, without having to

12   go bag by bag that can a little more tightly define the

13   parameters he used to define the investigation?

14             MS. NICOLAS:  I can do that.

15             THE COURT:  Very good.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1           (In open court)

2    BY MS. NICOLAS:

3    Q.  Detective Murphy, those 67 evidence bags, were they all

4    purchased in the course of the same long-term case buy

5    investigation?

6    A.  Yes.

7    Q.  In each instance, what did you do to log that evidence in

8    the same investigation?

9    A.  In every single instance, I put the drugs into my UC

10   plastic security envelope, which was then held on my person the

11   entire time.

12          Once I got back to the command, I handed it to either

13   Detective Murdock, or one of the other investigators on a rare

14   occasion, to be vouchered into evidence where it's assigned its

15   invoice number, where my UC number is documented on, and then

16   it's sent to the laboratory.

17   Q.  On each of those occasions, did you also prepare a report?

18   A.  Yes.

19   Q.  Were those reports all filed under a particular number

20   associated with the long-term case buy operation?

21   A.  Yes.

22   Q.  How does that differ than when you purchase narcotics in a

23   single buy-and-bust operation?

24   A.  In a single buy-and-bust operation, the same measures are

25   taken, except for the person is arrested, and it's put on their

1    arrest paperwork, not just my buy reports and expense report.

2              MS. NICOLAS:  Your Honor, at this time the government

3    offers Government Exhibits 201 to 267, as well as Government

4    Exhibits 201P to 267P.

5              MR. McGUINNESS:  Same objection, your Honor.

6              THE COURT:  Ms. Nicolas, a little more.  In other

7    words, what led him to conclude that the particular buys were

8    associated with the same group that he says he was

9    investigating?  That's what I think the objection goes to.

10   Q.  Specific as to those 67 evidence bags, Detective Murphy,

11   when was this investigation -- or excuse me when were those

12   transactions occurring, what time period?

13   A.  They occurred from December 2019 and on.  During each

14   purchase, the JD names or the government names were logged onto

15   the narcotic envelope, and that's how I know it's assigned to

16   my number that they were the drugs that I purchased.

17   Q.  Let's focus on those JD names for a minute.  Who determines

18   a JD name?

19   A.  A JD name, also known as a John Doe name or a Jane Doe, is

20   a name that is given by an undercover to an individual involved

21   in the case when they don't know their government name.  In

22   this case, Mr. Mial, before I knew his name, was JD Eyes, and

23   then once he told me his name was Smooth, he became JD Smooth.

24   Q.  To your left are what's been marked as Government Exhibits

25   101C, 101D, 102C, 103C, 103D, 104C, 105C, 106C, 107C and 108C.

MAIQmia3                         Murphy - Direct

1          Have you found those, Detective Murphy?

2    A.  Yes.

3    Q.  Just looking at -- the Government Exhibits numbers on the

4    back of those items.  Just flipping through those for a moment,

5    101C and D, 102C 3C, 3D, 4C, 5C, 6C, 7C and 8C, what are those

6    items?

7    A.  These are JD names of the individuals that I purchased from

8    during the course of this investigation.

9    Q.  Again, who determines those JD names?

10   A.  I did.

11   Q.  Are those fair and accurate depictions of the JD names you

12   used during this particular case buy investigation?

13   A.  Yes.

14   Q.  Are those the individuals from whom you coordinated and

15   purchased narcotics from on those 67 occasions?

16   A.  Yes.

17          MS. NICOLAS:  Your Honor, at this time the government

18   offers Government Exhibits 101C, 101D, 102C, 103C, 103D, 104C,

19   105C, 106C, 107C and 108C?

20          THE COURT:  Any objection?

21          MR. McGUINNESS:  If I could just take a look.

22          THE COURT:  Sure.

23          MR. McGUINNESS:  No objection.

24          THE COURT:  All right.  These are all the name plates?

25          MS. NICOLAS:  Yes, your Honor.

1           THE COURT:  They are all received.

2           (Government's Exhibits 101C, 101D, 102C, 103C, 103D,

3   104C, 105C, 106C, 107C and 108C received in evidence)

4   Q.  In the course of those 67 buys, were there some occasions

5   on which you purchased narcotics from individuals who are not

6   named in those name plates?

7   A.  Yes.

8   Q.  What did you observe that led you to believe that those

9   individuals were involved in the same long-term set, involved

10  in the narcotics that you were purchasing?

11  A.  The individuals, you mean that are not here or these

12  individuals?

13  Q.  The individuals who are not named there.

14  A.  There are other persons that I purchased from during the

15  course of this investigation.  Some -- one or two, I believe,

16  were not involved at all with this organization.  And the ones

17  that I bought from that are here -- that are not here are

18  individuals who we were never able to ID, find, and arrest, and

19  other ones charges were not brought.

20  Q.  So for the individuals for whom you determined were not

21  involved at all, are those narcotics included among the 67

22  evidence bags that are behind you?

23  A.  No.

24  Q.  For those for whom you were not able to identify, what did

25  you observe that led you to believe that they were part of the

MAIQmia3                      Murphy - Direct

1    same crew?

2    A.   They were working with the individuals I was purchasing off

3    of.  A couple times I was given drugs by an individual who we

4    were not able to identify, and they are not here on these name

5    plates.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAI7MIA4                         Murphy - Direct

1   Q.  When you say "working with," what did you observe that made

2   you think that they were working with other people?

3   A.  They were given orders to sell to me, and then they sold

4   the drugs to me from members of this operation.

5          MS. NICOLAS:  At this time, your Honor, the government

6   offers Government Exhibits 201-267, as well as 201P-267P.

7          THE COURT:  May I just ask you, when you said they

8   were given orders, what was your basis for that?

9          THE WITNESS:  I saw individuals who are on these name

10  plates tell other subjects who physically handed me the drugs

11  to hand me the drugs.

12         THE COURT:  All right.

13         MR. MCGUINNESS:  Same objection.

14         THE COURT:  All right.  At this point, the objection

15  is overruled.  And I will receive all of the exhibits into

16  evidence.

17         (Government Exhibits 201-267 and 201P-267P received

18  into evidence)

19  BY MS. NICOLAS:

20  Q.  Can you reach behind you and pull out what's in evidence

21  now as Government Exhibit 201?

22         And, Mr. Foley, if you could please publish for the

23  jury what's now in evidence as Government Exhibit 201P.

24         THE COURT:  May I just see counsel at the sidebar for

25  one moment, please.

MAI7MIA4                          Murphy - Direct

1              (At sidebar)

2              THE COURT:  I just wanted to make it clear, in

3     receiving the exhibits, I'm doing it to subject to connection.

4     It's been proffered to me, of course, that there are reasons to

5     connect, for example, the other names on the name plates to the

6     organization of this defendant.  That said, just given the way

7     the evidence comes in——we're not there yet——I didn't want to

8     articulate that in front of the jury, but I'm receiving it

9     subject to connection that the later evidence will link up the

10    others.  But given that proffer, it's properly received.

11             Very good.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2    BY MS. NICOLAS:

3    Q.  Okay.  Detective Murphy, now that the jury can also see

4    Government Exhibit 201, I'd like to just walk through what

5    we're looking at in this bag.

6        Beginning with the bag itself, is there a place on

7    that bag that you see an invoice number?  And it's the exact

8    same thing you're holding in your hand, if it's easier for you

9    to see.

10   A.  Yes.

11   Q.  Can you describe where that is?

12   A.  If you look on the left side of the bag, going bottom to

13   top, you'll see the second number over to the right——it starts

14   with 1001——that is the precinct voucher number which are

15   assigned to these narcotics and these narcotics only.

16   Q.  Now, if you could flip the bag over, and Mr. Foley can go

17   to page 2, can you just describe what's contained within

18   beginning with where "UC envelope" is.

19   A.  My UC envelope is on the bottom.  It's marked No. 3 on the

20   bag.  And you can see the serial number there.

21   Q.  And moving up into what's marked as 1, what is that?

22   A.  One is the unpackaged narcotics that I purchased on this

23   day.

24   Q.  Mr. Foley, you can pull that down.

25       Detective Murphy, you can place that back into the

MAI7MIA4                          Murphy - Direct

1    bag -- excuse me.  Into the box.

2              Mr. Foley, if you could please publish for the Court,

3    witness, and counsel what's been marked for identification as

4    Government Exhibit 3004.

5              Detective Murphy, in very general terms, what is

6    Government Exhibit 3004?

7    A.  This is a list of the purchases that I made during this

8    case, starting from 1 going all the way to 67.

9    Q.  Does this chart summarize the events that are captured on

10   the videos contained in Government Exhibit 401 and 407?

11             THE COURT:  Can I just ask, for the benefit of the

12   witness and the Court, that this be enlarged?

13             MS. NICOLAS:  Yes.

14             Mr. Foley, if you could zoom in on the top half there,

15   or even the top third.

16             THE COURT:  Thank you.

17   Q.  So I'll ask again:  Does this chart summarize the events

18   that are captured on videos contained on what is in evidence as

19   Government Exhibits 401 to 467?

20   A.  Yes.

21   Q.  Does it also contain the information that is the contents

22   of the evidence bags that are in evidence as Government

23   Exhibits 201 to 267?

24   A.  Yes.

25   Q.  Did you participate in the creation of this chart?

MAI7MIA4                          Murphy - Direct

1    A.  I reviewed this chart.

2    Q.  And in reviewing this chart, did you make corrections?

3    A.  I did.

4    Q.  Okay.  Now, does this chart fairly and accurately describe

5    the events that are captured in the videos that are Government

6    Exhibit 401 to 467?

7    A.  Yes.

8    Q.  As well as the evidence bags that are 401 for 267?

9    A.  Yes.

10          MS. NICOLAS:  Your Honor, at this time, the government

11   offers Government Exhibit 3004.

12          THE COURT:  Any objection?

13          MR. MCGUINNESS:  May I voir dire?

14          THE COURT:  You may.

15          MR. MCGUINNESS:  Good morning, Detective.

16          THE WITNESS:  Good morning.

17          MR. MCGUINNESS:  In this column, "seller," there's

18   instances where there's more than one person; do you see that?

19          THE WITNESS:  I do.

20          MR. MCGUINNESS:  Does that reflect two separate

21   transactions.

22          THE WITNESS:  That reflects the same transaction, it's

23   just two persons were involved.

24          MR. MCGUINNESS:  When you say "involved," were two

25   people giving you drugs at the same time?

1          THE WITNESS:  Some occasions, I was handed drugs by

2     multiple people.  The majority of the transactions, one person

3     handed me drugs.

4          MR. MCGUINNESS:  And when you say "involved," that's a

5     determination that you made subjectively about whether they

6     participated, correct?

7          THE WITNESS:  No, not subjectively.

8          MR. MCGUINNESS:  Well, the person didn't necessarily

9     have to give you drugs or receive your money to make it onto

10    your seller list; is that fair to say?

11         THE WITNESS:  Correct.

12         MR. MCGUINNESS:  No objection.

13         THE COURT:  All right.  It's received.

14         (Government Exhibit 3004 received in evidence)

15    BY MS. NICOLAS:

16    Q.  So before we talk about any particular transactions --

17         THE COURT:  Do you want to publish?

18         MS. NICOLAS:  Your Honor, may I publish?

19         THE COURT:  Sure.  Let me just take a moment and

20    explain to the jury what we all are saying when we use the word

21    "publish."

22         From time to time, as you've already seen, exhibits

23    are shown only to counsel and to the witness and to the Court.

24    That is because, until I determine that an exhibit can be

25    received in evidence, it can't be shown to you.  Once the

1    exhibit is received in evidence, counsel will often ask that it

2    be published, and that simply means in lawyer speak, judge

3    speak, that it be displayed to you.  So Ms. Nicolas is asking

4    that this chart, which is Exhibit 3004, be displayed to you.

5    And the answer is yes.

6              MS. NICOLAS:  Thank you, your Honor.

7    BY MS. NICOLAS:

8    Q.  Mr. Foley, can you please publish to the jury.

9              So beginning on the far left, I just want to walk

10   through what type of information is in each column.  The far

11   left column that's marked "USAO transaction number," what is

12   the information in that column?

13   A.  That is the order in which I made my purchases.  So 1 was

14   the first purchase that I made in this case.

15   Q.  The next column says "buy date."  What is that?

16   A.  That is the date in which I had purchased the narcotics.

17   Q.  The next column is "quantity."  What is quantity?

18   A.  Quantity is the amount I purchased, along with the

19   packaging type in which I received.

20   Q.  Now, there's a couple different types of packaging types

21   listed here.

22             Can you just describe in very general terms what a

23   twist is?

24   A.  A twist, think about putting a small rock into a corner of

25   a clear sandwich bag.  You turn it and turn it, the rock, until

MAI7MIA4                          Murphy - Direct

1    it twists and then you rip it off.  So then you tie the end

2    into a knot and that would be a twist of crack cocaine.

3    Q.  What's a capsule?

4    A.  A capsule is a small, plastic container which has a top

5    affixed to it so you could just flick it open and the top

6    doesn't fall off.  And inside that plastic container is where

7    the crack is kept, or whatever drug the person is selling.  And

8    they come in a variety of colors.

9    Q.  We'll look at some twists and capsules in a bit.

10            Moving to the next column, "cost," what is that?

11   A.  Cost is the amount I spent on that particular buy.

12   Q.  Now, the next column "seller," I want to come back to.

13            "Buy location," what is buy location?

14   A.  The buy location is the location on which I purchased the

15   narcotics.  This is in an approximate location.  It's usually

16   within a building or two of each other because, on the street,

17   I don't have paper to write it down.

18   Q.  Going back to that seller column, a moment ago we talked

19   about some Government Exhibits with JD names on them.

20            In the seller column, are those JD names?

21   A.  Yes.  This is the JD name which I gave to all the subjects

22   in the case.

23   Q.  Is there a reason there's not their true names in that

24   column?

25   A.  I don't know all of the government names of every

MAI7MIA4                          Murphy - Direct

1    individual I purchase from.  I try not to learn their names

2    during the course of my investigation because I don't want to

3    slip and actually call them by their name.

4    Q.  Did you learn the true names of any of the people that's

5    listed in the seller column here?

6    A.  Yes.  Ghost is Mr. Johnny Perez.  And Smooth Eyes is

7    Mr. Davon Mial.

8    Q.  So I want to walk through these one by one for a moment.

9         The first individual you just testified, Ghost, is

10   Johnny Perez?

11   A.  Yes.

12   Q.  All right.  I'm going to ask you to take a look at what's

13   been marked as Government Exhibit 102B, which should be a

14   smaller Government Exhibit sitting next to you there further

15   back on the witness stand.

16        Okay.  What is Government Exhibit 102B?

17   A.  102B is the name "Mr. Johnny Perez" written on a little

18   foam board.  This is the name of -- government name of JD

19   Ghost.

20        MS. NICOLAS:  Your Honor, the government offers

21   Government Exhibit 102B into evidence.

22        THE COURT:  Any objection?

23        MR. MCGUINNESS:  No objection.

24        THE COURT:  Received.

25        (Government Exhibit 102B received in evidence)

MAI7MIA4                         Murphy - Direct

1   Q.  And, Detective Murphy, I'm also going to ask you to look at

2   101B.

3          Do you recognize that?

4   A.  Yes.

5   Q.  What is 101B?

6   A.  101B is the name "Davon Mial."  It's the individual

7   involved in this case, the defendant, whose JD names was Eyes

8   and Smooth.

9          MS. NICOLAS:  Your Honor, the government offers

10  Government Exhibit 101B into evidence.

11          MR. MCGUINNESS:  No objection.

12          THE COURT:  Received.

13          (Government Exhibit 101B received in evidence)

14  BY MS. NICOLAS:

15  Q.  Detective Murphy, to avoid too much movement here, I'm

16  going to ask Mr. Foley to assist, if that is all right with

17  your Honor.

18          THE COURT:  Absolutely.

19  Q.  I'm going to ask you to hand Mr. Foley Government Exhibit

20  101B as well as the JD names associated with that individual,

21  and just describe for the jury what you're handing Mr. Foley.

22  A.  I am handing Mr. Mial's government name on the foam board

23  along with two JD names that I assigned to Mr. Mial during the

24  course of this investigation to him.

25  Q.  What were those two JD names?

MAI7MIA4                    Murphy - Direct

1    A.   JD names are Eyes and Smooth.

2    Q.   Mr. Foley, if you could please just affix those to the top

3    right corner of the Velcro board -- excuse me.  The top left

4    corner.

5            Next, I want to move to Government Exhibit 102B, which

6    is in evidence as the name plate for Johnny Perez and the JD

7    name associated with Johnny Perez.  If you could pull those

8    two.

9            Okay.  And if you could just describe for the jury

10   what two name plates you just pulled out.

11   A.   The two foam name plates I have in my hand is Johnny Perez,

12   JD Ghost is what I called him during the course of this

13   investigation.  And I have both name plates.

14   Q.   You can hand those to Mr. Foley.

15           Mr. Foley, if you could place those at the top middle

16   of the Velcro board.

17           You testified a moment ago that those were the two

18   individuals from whom you know the government names.  I just

19   want to walk through the other JD names that you're familiar

20   with.  Beginning with what's been marked as Government Exhibit

21   103D, which in evidence as the name plate for Duke, did you

22   know of any other JD names associated with Duke?

23   A.   Yes.  On the very first buy I did with JD Duke, I did not

24   know his street name "Duke," so I called him JD Heavy.  And I

25   have the name plate for him right here.

MAI7MIA4                    Murphy - Direct

1  Q.  And did you purchase narcotics from JD Duke, also known as

2  JD Heavy throughout this particular investigation?

3  A.  I did.

4  Q.  If you could hand those to Mr. Foley, Mr. Foley could put

5  those in the top right corner.

6          And while he's doing that, Detective Murphy, I'm going

7  to ask you to find Government Exhibit 104C, which is in

8  evidence.

9          What name is reflected on Government Exhibit 104C?

10 A.  Harlem.

11 Q.  Who do you know JD Harlem to be?

12 A.  JD Harlem is an individual I had several purchases with

13 during the course of this investigation.

14 Q.  If you could please hand that name plate to Mr. Foley.

15         Mr. Foley, if you could put that kind of in the middle

16 of the board, creating a second row below Johnny Perez, JD

17 Duke.  Leave some space.  Great.

18         Next, 105C, which is in evidence as a Government

19 Exhibit.

20         What JD name is on Government Exhibit 105C?

21 A.  The name Tre, T-R-E.

22 Q.  And who is JD Tre?

23 A.  JD Tre is another person who I purchased it narcotics off

24 of multiple times during the course of this investigation.

25 Q.  And again, if you could hand that to Mr. Foley.

1                And, Mr. Foley, you could put that in the middle of

2      the middle row.

3                And Detective Murphy, we're going to move to 106C,

4      which is in evidence as a government exhibit.

5                What JD name is on 106C?

6      A.   106C is JD Mac, M-A-C.  And he is an individual who I

7      purchased multiple times from during the course of this

8      investigation.

9      Q.   Mr. Foley, again, if you could take that from Detective

10     Murphy and place it on the board.

11               And, Detective Murphy, we'll go to 107C next.

12               What JD name is reflected on 107C?

13     A.   JD Trinny, T-R-I-N-N-Y.  He's an individual I purchased

14     narcotics from multiple times during the course of this

15     investigation.

16     Q.   Okay.  Hand that to Mr. Foley and pull out 108C.

17               And what JD name is reflected on 108C?

18     A.   JD Tattoo.  He's another subject of whom I purchased

19     narcotics from multiple times during the course of this

20     investigation.

21     Q.   And for the last time, I'll ask Mr. Foley to take that from

22     you and place it on the board.

23               So, as Mr. Foley was placing those on the board, you

24     said that these are individuals from whom you've purchased

25     narcotics.

1        Generally speaking, over the course of this
2   investigation, where did those purchases occur?
3   A.  The majority of the purchases happened within a block or
4   two of 8th Avenue and 43rd Street.
5   Q.  And are those particular locations reflected in that last
6   column on Government Exhibit 3004, which I believe is still
7   published on the jury's screens?
8   A.  Yes.
9   Q.  Now, the locations on this chart, are they exact locations?
10  A.  No.
11  Q.  Why not?
12  A.  Out on the street while I'm purchasing, a lot of times
13  we're walking, or even if we're standing still I can't always
14  stare at the exact building number I'm standing in front of, so
15  I use the building number within a building or two that I know
16  from knowing the area.
17  Q.  Mr. Foley, if you could show just the witness, counsel, and
18  the Court what's been marked for identification as Government
19  Exhibit 3006.
20        THE COURT:  And same request that it be enlarged.
21        MS. NICOLAS:  I think this one might be okay, your
22  Honor.
23        Can you enlarge the middle part of that screen,
24  Mr. Foley.
25        I'm also going to ask you to hand to the witness the

1    physical exhibit that is marked as Government Exhibit 3006

2    without showing the jury.

3    Q.   Detective Murphy, have you seen Government Exhibit 3006

4    before?

5    A.   I have.

6    Q.   Generally speaking, what is this?

7    A.   This is a map, an overview of the location of Midtown.

8    Specifically, it has all the locations of my purchases.

9    Q.   Now, did you review the locations that are marked on

10   Government Exhibit 3006 prior to your testimony today?

11   A.   Yes, I did.

12   Q.   Okay.  And does Government Exhibit 3006 represent a fair

13   and accurate depiction of the area near Times Square where you

14   purchased narcotics, as well as the locations of those

15   narcotics purchases?

16   A.   Yes.  It's an overview map of the area where I purchased,

17   and the locations.

18           MS. NICOLAS:  Your Honor, the government offers what's

19   been marked as Government Exhibit 3004 into evidence.

20           THE COURT:  3006.

21           MS. NICOLAS:  Excuse me.  3006.

22           THE COURT:  Any objection?

23           MR. MCGUINNESS:  No objection.

24           THE COURT:  Received.

25           (Government Exhibit 3006 received in evidence)

1    BY MS. NICOLAS:

2    Q.  Mr. Foley, if you could both place the physical exhibit on

3    the easel and then publish for the jury what's in evidence as

4    Government Exhibit 3006.

5         So before we begin talking about particular buys here,

6    again, could you just——now that they can see it——explain for

7    the jury the area that's depicted in this map?

8    A.  If you're looking at the map, top side of the map is

9    northbound, the bottom side is south, the left side is west,

10   the right side is east.  If you look where all the red dots

11   are——you can't really see the corner because there's so

12   many——that's the corner of 43rd Street and 8th Avenue.  Each of

13   these little markers are a location in which I purchased

14   narcotics.  Some of them are outside of that little area, but

15   most of them are at the corner of 43rd and 8th.

16   Q.  So those marks are two different colors.

17        Can you explain the difference in the colors?

18   A.  The yellow color are the purchases I made from Mr. Mial, JD

19   Smooth.  The red color are purchases I made from other subjects

20   involved in this case.

21   Q.  Mr. Foley, can you publish side by side what is Government

22   Exhibits 3004 and 3006.  And then could you just zoom in on

23   Government Exhibit 3004 just on the first column, perhaps the

24   first five transactions.  First column.  Perfect.

25        Okay.  Detective Murphy, could you explain the

1    significance of the numbers of the flags that appear in

2    Government Exhibit 3006?

3    A.   The transaction number which you see as the left column,

4    first column on the exhibit is the number of which buy.  The

5    number that is on the left column of that sheet corresponds to

6    the number that is tagged on these flags.  One through five

7    would be very difficult to see because they were at the corner.

8    But if you look at the buy, 65, you could see that on the west

9    side of the map.  It's on the left side of the map.

10            THE COURT:  May I just interject with a question?

11            This may be on the minds of some jurors, but where a

12   bubble or indicator is covered up by others, is there a way of

13   removing the top one so one can actually see the ones

14   underneath?

15            THE WITNESS:  I'm not sure.

16   Q.   If someone wanted to know the exact location of a

17   transaction, where on Government Exhibit 3004 could they look.

18            And Mr. Foley, if you could go back to the full

19   Government Exhibit 3004.

20   A.   The exact location of the buy is on the right side of the

21   exhibit where it says "buy location."  That will give you the

22   exact street building number which will correspond to the

23   little bubble on the map.  But unfortunately, on the map, it's

24   hard to see every single buy location because they're all in

25   the same area.

1          THE COURT:  Very good.  Thank you for the explanation.

2     Q.  All right.  We're going to come back to both of these

3     charts a number of times.

4          But, Mr. Foley, you can pull them down for now.

5          Detective Murphy, in front of you——we've talked about

6     this binder before——there's a large binder marked "Government

7     Exhibits."  Inside there, I'm going to ask you to flip to

8     what's been marked for identification as Government Exhibits

9     301 to 308.

10    A.  Okay.

11    Q.  Have you looked at Government Exhibit 301 to 308?

12    A.  Yes, I have.

13    Q.  And do you recognize these?

14    A.  Yes.

15    Q.  Generally speaking, what are Government Exhibit 301 through

16    308?

17    A.  Each exhibit is a different photograph of the area on which

18    I made purchases, specifically the area of 8th Avenue and 43rd

19    Street.

20    Q.  Before we proceed, Mr. Foley, if you could please publish

21    for the witness, the Court, and the parties the electronic

22    versions of 301 and 308 and flip through those.

23          Detective Murphy, have you seen those photographs

24    before?

25    A.  Yes.

MAI7MIA4                        Murphy - Direct

1    Q.  Are they fair and accurate depictions of the area along 8th

2    Avenue where you purchased narcotics during the course of this

3    investigation?

4    A.  The buildings and structures, yes.  Cars change and the

5    people change, but it is a fair and accurate representation of

6    the streets.

7              MS. NICOLAS:  Your Honor, the government offers

8    Government Exhibit 301 to 308 into evidence.

9              THE COURT:  Any objection?

10             MR. MCGUINNESS:  No objection.

11             THE COURT:  They're all received.

12             (Government Exhibits 301-308 received into evidence)

13   BY MS. NICOLAS:

14   Q.  I want to take a moment to orient the jury to the area that

15   we're talking about near Times Square.

16             Mr. Foley, if you could please publish what's in

17   evidence as Government Exhibit 301.

18             At a high level, could you just describe for the jury

19   what this strip of 43rd is like?

20   A.  This strip of 43rd Street, specifically this photo of it,

21   you're facing 8th Avenue.  So you're just west of 8th Avenue.

22   You can see the corner in the picture of 8th Avenue.  43rd

23   Street runs from east to west.  So the photo is being taken as

24   though your back is towards 9th Avenue.  This area is mixed

25   residential and commercial.  There are residences on this block

MAI7MIA4                        Murphy - Direct

1   and there are commercial establishments, like Chick-fil-A,
2   which you could see on the right side of the screen.
3   Q.  So walking through some of the businesses that are along
4   this street --
5           Mr. Foley, if you could publish what's in evidence as
6   Government Exhibit 302.
7           As you begin walking down 43rd, can you just describe
8   the businesses that you'll encounter?
9   A.  Yes.  This is still on 43rd, just west of 8th Avenue.  It's
10  a little closer to 8th Avenue.  You cannot see 8th Avenue in
11  the photo, but it would be on the right side of the photo.
12  This is facing northbound, so this is the north side of the
13  street.  You can see the 99-cent pizza there.  To the right of
14  that is the deli, which is the actual corner of 43rd Street and
15  8th Avenue.  That deli is on the northwest corner.
16  Q.  Were there times during this investigation when you
17  purchased narcotics at this location?
18  A.  Yes.
19  Q.  More than once?
20  A.  Yes.  Whether I -- I have met subjects there and walked off
21  to another location, and I've also purchased narcotics there.
22  Q.  Mr. Foley, could you publish Government Exhibit 303.
23          Continuing a little bit further down the street, can
24  you just describe this establishment?
25  A.  This is the deli that's on the northwest corner of 43rd

1    Street and 8th Avenue.  It's a closer picture to 8th Avenue.

2    Here, you can start to see the crosswalk on the right side of

3    the screen.  That's the crosswalk across 8th Avenue.

4    Q.  And over the course of the investigation, what did you

5    observe at this location in general?

6    A.  I observed different subjects involved in this case hanging

7    out in the vicinity of this deli.

8    Q.  Mr. Foley, if you could publish Government Exhibit 304.

9            As compared to the last photograph in Government

10   Exhibit 303, where is this location?

11   A.  This location is the opposite side of the street of the

12   deli, so this would be the southwest corner.  We are still just

13   west of 8th Avenue.  If you look on the left side of the

14   screen, you can see the 8th Avenue running north and south.

15   This is the Chick-fil-A, which I had previously mentioned in

16   the other photograph.

17   Q.  Government Exhibit 305, Mr. Foley.

18           Continuing, if you could just describe where this

19   photograph is relative to the last and what you see here?

20   A.  In this photograph, you'll notice is the Westin Hotel.  And

21   next to it is a small cafe, which is attached to the

22   Westin Hotel.  This is the southeast corner of 43rd Street and

23   8th Avenue.  So in this photograph, we have now passed over 8th

24   Avenue.  And then you can see 43rd Street on the left side of

25   your screen running east to west.

MAI7MIA4                      Murphy - Direct

1  Q.  Were there times during the course of this investigation

2  where you encountered subjects in this investigation here at

3  this establishment?

4  A.  Yes.

5  Q.  In particular, who did you encounter here?

6  A.  I met with Mr. Mial right at that cafe where the chairs are

7  outside.

8  Q.  If we can move to Government Exhibit 306, Mr. Foley.

9        And we changed perspective here a bit.  Can you orient

10 the jury to what this photograph is now capturing?

11 A.  Okay.  This photograph is now capturing the Westin from a

12 different angle.  We are now east of 8th Avenue facing

13 westbound, so going with vehicle traffic; whereas before, we

14 were going against vehicle traffic.  So our back would be back

15 towards Broadway, 7th Avenue, and we're facing 8th Avenue.  On

16 the left side of the screen is the Westin that was just

17 depicted on the last photo, just the opposite corner of the

18 building, the other side of the building.

19 Q.  Where is the Chick-fil-A?

20 A.  The Chick-fil-A you can see straight ahead of you, it's the

21 big white building.  See the little police cars parked on the

22 corner -- police vans?

23 Q.  We can go to Government Exhibit 307.

24        Okay.  How has our perspective changed here?

25 A.  From the last photo, if you took a 90-degree turn to the

1    right, you'd be looking northbound.  This is the north side of

2    43rd Street, just east of 8th Avenue.  This is the Times Square

3    Hotel.  It's a hotel on the north side of 43rd, a little bit

4    opposite the Westin.  It's kind of kitty-corner if you walk at

5    an angle from the Westin, you would land here at this hotel.

6    Q.  Can you describe the Times Square Hotel?

7    A.  The Times Square Hotel is used as a shelter for individuals

8    who have fallen on hard times.  They have single occupancy

9    rooms where one individual lives in each room.  It's a small

10   little room, I think a studio apartment with a bathroom and a

11   bed.

12   Q.  Mr. Foley, Government Exhibit 308.

13            And again, if you could orient us to what we're

14   looking at in Government Exhibit 308?

15   A.  We're now looking eastbound towards 7th Avenue.  You can

16   see on the left side of the screen the bricks, that's all part

17   of the Times Square Hotel.  And just under the scaffolding

18   right there it says "psychic," there's a small, little ATM

19   there.  It's hard to see on the photo, but there's an ATM

20   there.  This is the north side of 43rd Street.  On the right

21   side of the screen where the other scaffolding is, that's the

22   south side of 43rd Street.

23   Q.  Over the course of this investigation, were there times you

24   purchased narcotics in the area depicted on the screen in

25   Government Exhibit 308?

MAI7MIA4                    Murphy - Direct

A.   Yes.  On -- under both scaffoldings during the course of
this investigation, I had purchased narcotics.  So both on the
north side and the south side of 43rd Street.

Q.   Were there times over the course of this investigation when
you purchased narcotics from the defendant in the location
depicted on the screen in Government Exhibit 308?

A.   Yes.

Q.   Mr. Foley, if you could just place side by side Government
Exhibits 301 and 308.

          And again, before we move on, if you could just
clarify and orient the jury to the location in which many of
these case buys happened as these two photos compare?

A.   The case buys happened all -- not all the case buys.  The
majority of the case buys happened from where you're standing
on 301, the picture on the left side of the screen, up into the
scaffoldings, which you see on 308 on the right side of the
screen.  That is the main area of which I met these subjects.
Some buys happened a little west on 43rd, so west of the photo
on the left; and a couple buys happened on completely different
blocks.

Q.   Is the area in Government Exhibit 308 visible in Government
Exhibit 301?

A.   Yes.

Q.   Where is it?

A.   If you look at the direct center of Exhibit 301——that's the

MAI7MIA4                          Murphy – Direct

1   photo on the left side of the screen—if you follow where that

2   police car is and you follow that sidewalk, which it's hard to

3   see the sidewalk, but straight back, you could see the big,

4   tall building on the corner, that's where the Times Square

5   Hotel is, just past that corner.  And the Westin is on the

6   opposite side of the street on the other corner.

7          MS. NICOLAS:  Your Honor, if we may have a brief

8   sidebar.

9          THE COURT:  Yes.

10          MS. NICOLAS:  Mr. Foley, you can pull these down.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAI7MIA4                          Murphy - Direct

1                    (At sidebar)

2                    THE COURT:  Yes?

3                    MS. NICOLAS:  Just a suggestion:  We're about to start

4        walking through the buys.  This may be a good time to break.

5                    THE COURT:  I'm going to give a slightly longer break.

6        There's an issue or two I want to take up with you and I have

7        something I have to be at between 1 and 2, so I'll have them

8        come back at 2 o'clock.

9                    (Continued on next page)

 1                (In open court)

 2                THE COURT:  Ladies and gentlemen, we're going to use

 3     this as an opportunity to take our lunch break now.  I'm going

 4     to take a slightly longer lunch break because of a couple

 5     matters I have to take up with counsel.  It's a little after

 6     12:40.  I'll see you back at 2 o'clock.  So be in the jury room

 7     at 2 o'clock.  Mr. Smallman will bring you out then.

 8                Have a good lunch.  As always, please don't discuss

 9     the case.

10                (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  I've instructed counsel to have the sign

3    taken away from the court.  There should being nothing out of

4    the ordinary as the jury passes by.

5           All right.  Be seated.

6           Ms. Nicolas, thank you for the heads up.  I was

7    looking for a natural break.  It would have been soon.  This

8    sounds like a good one.

9           A couple things that came up during the examination

10   which were unobjected to, and they were not objectionable, but

11   they raised issues I want to flag for counsel.  One issue is

12   that the witness made a reference to charges.  He made a

13   reference to who was charged in the case.  And I understand

14   that he was apparently doing so in an effort to draw parameters

15   around who was within or outside the scope of the buys that

16   he's included within the 67.

17          I don't expect there will be any further examination

18   of witnesses as to who was charged.  Is that your intention?

19          MS. NICOLAS:  This is my intention, your Honor.  And,

20   frankly, I don't think there's anything that -- he was not

21   involved in the arrest, so I certainly do not --

22          THE COURT:  No.  I appreciate it.  And there's an

23   instruction at the end of the day that the jury is not to

24   speculate on who was charged and who wasn't and what became of

25   all that, but ultimately it's better that there not be any

1  testimony along those lines.  It passed by in a blink.  I just

2  want to make sure that that's out of bounds for further

3  questioning.

4              MS. NICOLAS:  Yes, your Honor.

5              THE COURT:  And Mr. McGuinness, anything further on

6  that discrete point?

7              MR. MCGUINNESS:  No, your Honor.

8              THE COURT:  Okay.  The second issue that came out was

9  as follows:

10             The witness was asked in the context of longer term

11  undercover investigations what his goals were.  One of the

12  goals that he identified was purchasing enough narcotics,

13  presumably as to a particular person but, in any event, enough

14  narcotics to achieve certain sentencing consequences.

15             I understand that the spirit of that offer was

16  intended to allow him to explain why certain goals are set.

17  And there wasn't an objection to it.  And it certainly was

18  useful for the jury to hear it insofar as it just explains why

19  there are particular targets.  Nevertheless, it obviously opens

20  up a potential can of worms.

21             First of all, do you expect any further testimony on

22  direct about that subject?

23             MS. NICOLAS:  No, your Honor.  It was not our intent

24  to elicit that answer on that point.  There's certainly no

25  other questioning related to --

1          THE COURT:  Well, was there any intention, as you

2     understand it in this case, for purchases to be made up until

3     the point at which they crossed what somebody believed to be a

4     relative sentencing rubicon?

5          MS. NICOLAS:  I certainly think that that's part of

6     the investigatory quest here in a narcotics investigation.  I

7     think particular to this witness, his understanding of the

8     goals at the outset of the investigation were, frankly, driven

9     by an understanding of state law, so I don't even think he was

10    referring to (b)(1)(A) (b)(1)(B) type plea.

11         THE COURT:  This was as the undercover operation was

12    going on, but it was not federally directed but was state

13    directed?

14         MS. NICOLAS:  Correct.

15         THE COURT:  Right.  I guess the question would be --

16    assuming that there was a permissible question along these

17    lines, if he was asked the question, "In your dealings with the

18    overall group or with any particular member of it, were you

19    instructed to make purchases up to any particular threshold,"

20    what would the answer be?

21         MS. NICOLAS:  I am frankly not sure, your Honor, what

22    his direct answer would be if asked if he was directed to buy

23    particular amounts from particular individuals.  I think his

24    answer would be more along the lines of an understanding of the

25    organization at large and buying from those who were present

1    when he arrived on the block.

2          THE COURT:  I mean, I guess the question is, while I

3    understand him to have been testifying in general about his

4    *motus operandi*, it sounds as if that feature of it is somewhat

5    disconnected from the facts of this case.  You don't

6    understand, for example, that, even if his dealings with

7    Mr. Mial or more generally, he was shopping until he filled

8    up -- he crossed some particular weight line?

9          Is that your understanding?

10          MS. NICOLAS:  That is my understanding.

11          THE COURT:  All right.  And you don't intend to elicit

12    anything further about that subject?

13          MS. NICOLAS:  No.

14          THE COURT:  All right.  Mr. McGuinness, you didn't

15    object, and that's fine, and it may be that it's just best left

16    alone, but do you have any views on this subject?

17          MR. MCGUINNESS:  Yes, your Honor.  It did strike me as

18    a considerable statement.  I did not object to it because I

19    believe it's fertile ground for cross-examination, and I

20    believe that's opened the door for cross-examination.

21          THE COURT:  Well, it may have, but I want to work

22    through this with you.

23          What do you have in mind?

24          MR. MCGUINNESS:  To be honest, I'm still formulating

25    it.  This was not a pre-thought-out cross-examination topic.

1          THE COURT:  Let me just say the following:

2          The one thing that, without explicit permission the

3    Court, is clearly out of bounds would be anything that

4    indicates to the jury what the sentencing consequences are of

5    any quantity.  And so it may or may not be permissible for you

6    to examine whether he was purchasing to get to some particular

7    level.  You may or may not be allowed to inquire whether in

8    this case he had instructions to clear some quantity.  But I do

9    not want in any way, shape, or form any questioning to suggest

10   anything about what the consequences would be of those

11   quantities.  I think it may be that the government's

12   questioning opened the door to whether that was a motivation

13   here, that is to say to buy a particular quantity.  But I do

14   not want the legal consequences anywhere close to me

15   questioning.

16         Do you understand that?

17         MR. MCGUINNESS:  I do, your Honor.  And I will say

18   that it seems fair game that the purpose of continuing to buy

19   was to increase the consequences against the individuals.

20   Without getting into specifics, I think those lines of

21   questions I would hope are in bounds.

22         THE COURT:  Well, I'd like to think over the lunch

23   break what you have in mind, because I don't disagree with you

24   that some door may have been opened there that otherwise might

25   have been closed.  However, it requires some attention and

1   forethought before I can rule as to what the ground rules are

2   here.  I know for certain that the actual sentencing

3   consequences are out of bounds.  The closer question involves

4   the extent to which his instructions in this particular case

5   are fair game.

6               MS. NICOLAS:  Your Honor, if I may, I do think that

7   the testimony -- without looking at the transcript, I do think

8   the testimony continued that he was buying up in an effort to

9   learn the nature and the extent of the conspiracy and to decide

10  when who had the authority to sell what and when.  And so I do

11  think he directly addressed his motivations for why he was

12  buying increasing amounts over the investigation.

13              THE COURT:  The problem is that he established --

14  before that, he said, without specific reference to this case,

15  that purchasing, because of the penal consequences, is a thing,

16  it is sometimes a motivation.  I appreciate that you then

17  inquired as to this case.  And that was not elicited as a

18  motivation.

19              Nonetheless, with the door having been opened perhaps

20  by defense counsel, that's what cross-examination is for.  And

21  maybe defense counsel doesn't believe that.  And just because

22  he says it doesn't mean it has to be taken as gospel.

23  Candidly, had he volunteered that, you'd be in a better

24  position to close off examination on that point.  I think with

25  the door having been opened, it's a little more permissible for

MAI7MIA4                    Murphy - Direct

1    Mr. McGuinness to inquire.  But I want to put some tight

2    parameters on it, because what I don't want is the jury to be

3    speculating, which I would be instructing them at the end that

4    they not consider as to what the punishment consequences are.

5    I've already instructed them during jury selection that that's

6    not a matter for the jury, and I will be further instructing

7    them, consistent with the standard instruction, to that effect

8    at the end of the case.  So I don't want any notion of that.

9            That being said, we'll welcome counsel's views as to

10   whether on cross-examination Mr. Murphy can be asked whether he

11   was trying to clear some quantity in the purchases from a

12   particular person or the group.  Why don't you all reflect on

13   that over the lunch break.

14           May I just ask, what's the overall quantity that was

15   bought from Mr. Mial, and what's the overall quantity that was

16   bought from the group?

17           MS. NICOLAS:  The gram amount is not on the top of my

18   head, your Honor.  I will say that the defendant directly sold

19   on 17 of the 67 buys and was involved in either pointing the

20   purchasers to other members of the crew or setting up the

21   purchase by text message in advance.  So for nearly a third of

22   the transactions, he was, in fact --

23           THE COURT:  Right.  Do you know, though, the

24   approximate weight of those transactions?

25           MS. NICOLAS:  For the direct buys, it sounds like 10

MAI7MIA4                          Murphy - Direct

1    grams of about 60 total grams that were sold.  So the UC came

2    from the defendant.

3              THE COURT:  Okay.  All right.  That's helpful to know.

4    And so at the end of the day, the (b)(1)(A) quantity that you

5    will be asking the jury to find is that one has to go beyond

6    the aggravating the 67 buys to get there.

7              MS. NICOLAS:  Yes, absolutely, your Honor.

8              THE COURT:  And I understand there are various

9    arguments to be made in that direction.  Okay.  That's helpful

10   to know.

11             All right.  Mr. McGuinness, give some thought to that

12   because you may get a little bit of a leash here, it's not

13   going to be an endless one, and I want to talk through that

14   with you outside the presence of the jury before cross begins.

15             Ms. Nicolas, are we likely to begin cross today?

16             MS. NICOLAS:  I would say we're about halfway through.

17   I do expect that things will start to move faster during the

18   second half of his testimony today.  I do think we will

19   probably start cross today.

20             THE COURT:  I mean, you've got about two hours and 40

21   minutes on the clock.  Do you think --

22             MS. NICOLAS:  I think we'll get to the beginning of

23   cross, your Honor.

24             THE COURT:  All right.  And then there's some time

25   sensitivity to think through this issue.

MAI7MIA4                          Murphy - Direct

1              I'll see you all 5 minutes before 2.

2              Thank you.

3              THE DEPUTY CLERK:  All rise.

4              (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAIQmia5

```
 1                        AFTERNOON SESSION

 2                            2:00 p.m.

 3              (In open court; jury not present)

 4              THE COURT:  Be seated.

 5              Mr. McGuinness, your client is not here.

 6              MR. McGUINNESS:  I got a text from him that he was

 7    coming up at 1:51.  He may have crossed paths with some of the

 8    jurors in the elevator, and he's trying not to cross paths.

 9              THE COURT:  He needs to be here on time.

10              MR. McGUINNESS:  Yes, your Honor.

11              THE COURT:  A short colloquy about the legal issue,

12    and then we'll get the witness in the box.

13              Once the jury is in the box, the government should

14    have the person outside the door and the sign on the door.

15              Briefly, have you given any thought, Mr. McGuinness,

16    as to whether there is any proper cross driven off of the

17    witness's testimony on direct about sometimes being -- the

18    operational design of some longer term programs being aimed at

19    drug quantity.

20              MR. McGUINNESS:  Yes, your Honor.  The questions I

21    intend to offer on cross-examination are basically to reiterate

22    and underscore the statement he's already made, which is that

23    as part of long-term drug investigation, he increases the

24    quantity purchased because it leads to more serious charges,

25    and that is something that he tries do in cases, and that in
```

MAIQmia5

1      this particular case he determined the amount that was sold by

2      asking for amounts, and they were in far excess of a typical

3      transaction.

4                  THE COURT:  And that would be the extent of the cross?

5                  MR. McGUINNESS:  That's all I have planned.  If he

6      volunteers anything, your Honor, I may ask another followup.

7                  THE COURT:  Government, I think all of those points

8      were, in essence, brought out in direct.

9                  MS. NICOLAS:  Well, your Honor, I don't think the

10     testimony was that it's driven because it affects charges.  I

11     think that he said that it can affect charges.  And what's

12     reflected in the 3500 from our most recent conversation with

13     him is that the amount that he buys is primarily driven --

14     that's what I would expect he would testify -- primarily driven

15     by an effort of him to understand the nature of the

16     organization.

17                 THE COURT:  Who will be -- who decided in this case,

18     him or somebody else, when to stop buying?

19                 MS. NICOLAS:  I think that's a decision that was made,

20     to stop buying, in conjunction between the investigators and

21     the U.S. Attorney's Office.  What he I believe would testify --

22                 THE COURT:  As long as this board is here blocking me,

23     I need someone to block the door to make sure we don't have

24     that happen again.

25                 Go ahead.

MAIQmia5

1              MS. NICOLAS:  I think what he will testify, and what
2    is reflected in 3500, is that he is not involved in the
3    decision of stopping, starting, and making charging decisions.
4    He is tasked with go to the block and make a buy.  He makes
5    buys that he's comfortable within the scope of his
6    understanding of the organization, and that at times he may be
7    directed to try to buy from particular individuals, but,
8    generally speaking, he buys from whoever is available.
9              THE COURT:  That's all fine and good, and you're at
10   liberty to elicit that.
11             I guess the question is, Mr. McGuinness, you want to
12   elicit -- because the witness brought it out on direct -- and
13   the defendant is here.
14             Mr. Mial, this can't happen again.
15             THE DEFENDANT:  Absolutely not.
16             THE COURT:  You need to be here on time.
17             THE DEFENDANT:  Absolutely.  Sorry.
18             THE COURT:  Look, Mr. McGuinness wants to, I think,
19   elicit that since you're following up on the direct, that there
20   are cases in which drug -- the design of the program aims to
21   achieve a certain drug quantity.  I think that much was
22   established on direct; not specifically this case, but in
23   general, correct?
24             MS. NICOLAS:  I think that's right, your Honor, but I
25   do think the government has some concern about the territory in

MAIQmia5

1    which that brings and not knowing how he'll be asked or will

2    answer on cross.  He did not mention sentencing.  He did not

3    mention punitive anything.

4              THE COURT:  Look, Mr. McGuinness, there can't be a

5    word about sentencing, period.  There can't be a word about

6    anything like that.  There cannot be a word about punishment

7    turning on any of this.  However, it seems to me -- let's wait

8    for the government -- it seems to me that given the door that

9    the government kicked open here, even if it was the witness and

10   not the government counsel, it is appropriate for you to

11   explore the operational design of this investigation.

12             But that being said, I don't want word one about

13   sentencing, about punitive consequences, anything like that.

14   And if ultimately the answer is there wasn't an aspiration here

15   or design that was quantity driven, you've got to move on.

16   Understood?

17             MR. McGUINNESS:  Yes, your Honor.

18             THE COURT:  Ms. Nicolas, is that a fair line to draw?

19             MS. NICOLAS:  I mean, I do think we still have

20   concerns about the suggestion that more serious -- I think the

21   very common sense inference is that a more serious charge

22   carries a more serious sentence.

23             THE COURT:  I just told him he can't ask about

24   sentencing or charging.  All I've authorized him to explore is

25   the operational design of this program.  Frankly, the way the

MAIQmia5

record has been left now by the examination, the jury might
well infer that because he volunteered the idea that there are
times when you buy with the goal of approaching some number,
the door has not been clearly slammed on that.

Candidly, this examination, whether it's restarted on
the rest of direct or accomplished on cross or on redirect, may
from your perspective afford the jury clarity on a point that
is right now hazy.  My point is punishment and sentence cannot
be hinted at or referred to, but the programmatic design here
of whether he was managing to a number and who decided or
whether he decided or somebody else is, I think, fair game
given the way the door opened.

THE COURT:  Absolutely.  And that will be shut down by
MS. NICOLAS:  Totally agree, your Honor.  We just want
to make sure that any suggestion about seriousness of charges
is covered by your instruction on sentencing.

THE COURT:  Absolutely.  And that will be shut down by
strong words if there is any suggestion of that.  That is
clearly outside his ken.  And he did not open the door to that.

MR. McGUINNESS:  Your Honor, I just want to be clear.
My question I posed that I thought was cleared by the Court
whether in long-term operations he purchased additional weight
to lead to more serious charges.  And I got that phrase from
what he said on direct.

THE COURT:  I think he did say that on direct.

Ms. Nicolas, just as a descriptive matter, that's

MAIQmia5

1    correct, is it not?

2              MS. NICOLAS:  My recollection was that the testimony

3    was that it affects charges, but, again, I'm not positive what

4    he said.

5              THE COURT:  Look, if you're going to say anything like

6    that, you may have --

7              MR. McGUINNESS:  I'm trying to --

8              THE COURT:  You know what?  I think I would rather you

9    focus on what happened in this case.  No other case is at issue

10   here, and while he made what appears to have been an untoward

11   slip in volunteering about other cases, the relevant issue is

12   what happened here.  So what I would ask you to do is explore

13   what happened here; but for the time being, I don't want any

14   reference to charges or sentences, okay?

15             MR. McGUINNESS:  Yes, sir.

16             THE COURT:  Okay.  Very good.

17             Anything before we get the jury or anything before we

18   get the witness?

19             MS. NICOLAS:  Nothing from the government.

20             THE COURT:  The jury is here.  Let's get the witness

21   in the box, and then I'll have Mr. Smallman get the jury.

22             Mr. Smallman, get the jury.  And, meanwhile,

23   government, set the precautions at the door.

24                  (Continued on next page)

25

MAIQmia5

1          (Jury present)

2          THE COURT:  Welcome back, ladies and gentlemen.

3    Please be seated.  We'll resume now with the examination of

4    Officer Murphy.

5          Officer Murphy, I'll remind you, you are still under

6    oath.

7          THE WITNESS:  Yes.

8          THE COURT:  Counsel, you may inquire.

9          MS. NICOLAS:  Thank you, your Honor.

10   BY MS. NICOLAS:

11   Q.  Detective Murphy, welcome back.

12         Mr. Foley, could you please publish for the witness

13   and the parties, as well as the jury, Government Exhibit 3004.

14   After you've done that, Mr. Foley, I'm going to ask you to zoom

15   in on that first, let's say, three rows.  Thank you.

16         Detective Murphy, I want to focus here and direct your

17   attention to what is contained in the row marked USAO

18   transaction number 1.  When did that transaction occur?

19   A.  It happened on December 3, 2019.

20   Q.  And can you just describe in broad terms what happened that

21   day?

22   A.  On that day, we were doing case buy operations into this

23   case, and I went to the corner of 43rd Street and 8th Avenue in

24   an attempt to purchase crack cocaine.

25   Q.  On that day, what did you purchase?

MAIQmia5

1  A.  On that day, I purchased two twists of crack cocaine for

2  $40 from a person I named JD Ghost, Mr. Johnny Perez.

3  Q.  We've looked at this already briefly.  Mr. Foley, if you

4  could please publish what's in evidence as Government Exhibit

5  201P, and please go to the second page.

6          Detective Murphy, this is Exhibit 201 if you'd like to

7  look at the hard copy in the box behind you.

8          Just zoom in, if you could, on box 1, Mr. Foley.

9          Detective Murphy, what's contained within Government

10  Exhibit 201?

11  A.  This is the narcotics I purchased on December 3 from

12  JD Ghost.

13  Q.  Now, on that particular day, was the purchase audio and

14  video recorded?

15  A.  I attempted to video record and audio record the purchase,

16  but, unfortunately, the video failed, the video equipment I had

17  on my person.

18  Q.  When did you realize the equipment had failed?

19  A.  Later that night back at the station house as I was

20  processing the equipment.

21  Q.  Once you realized there had been a failure, what did you

22  do?

23  A.  I notified my supervisor that there was a failure, and we

24  made plans to go out on the next night to purchase again.

25  Q.  Did you in fact go out the next day to make another

MAIQmia5

1    purchase?

2    A.  I did.

3    Q.  Mr. Foley, if we could turn back to Government Exhibit

4    3004, please.

5              On that next day, what was the date?

6    A.  The date was December 4, 2019.

7    Q.  On that particular day, who did you purchase narcotics

8    from?

9    A.  Again, I purchased narcotics from JD Ghost, and I bought

10   three twists of crack cocaine for $60 of U.S. currency.

11   Q.  Can you remind the jury what other name do you know

12   JD Ghost by?

13   A.  Mr. Johnny Perez.

14   Q.  Mr. Foley, can you please publish what's in evidence as

15   Government Exhibit 402A and just play the first two or three

16   seconds.

17             (Video played)

18   Q.  Thank you.  This is the first video we've watched,

19   Detective Murphy.  Can you just explain before we talk about

20   the substance, what we're looking at here?  What's the

21   orientation of this camera?

22   A.  This camera is on my person.  It is videoing the front of

23   me.  As I face the jury now, it would be videoing you guys.  On

24   the video, you could see on the bottom right is a timestamp.

25   On the equipment that I have, it's -- the timestamp is usually

MAIQmia5

1   unreliable.  Sometimes it's right.  Sometimes it's wrong.  And
2   this is accurate video of what I'm looking at.
3   Q.  So as you're looking here, do you recall where you are in
4   New York City?
5   A.  Yes.  Where this is freeze frozen -- frame is frozen is the
6   south side of 43rd Street, just west of 8th Avenue.  It's
7   opposite the early photos you've seen of the pizzeria and the
8   deli.  It's just west of Chick-fil-A.
9   Q.  Before I have Mr. Foley play the remainder of this clip,
10  can you describe what happens next?
11  A.  What happens next is I meet up with JD Ghost, the person I
12  purchased from on the prior day.  We have a short conversation,
13  and then Mr. Ghost, JD Ghost sells me crack cocaine.
14  Q.  Mr. Foley, if you could go ahead and play the clip
15  beginning at six seconds.
16          (Video played)
17  Q.  If you could move backwards two seconds.
18          The video is paused at ten seconds into the clip.
19  Detective Murphy, do you recognize this individual?
20  A.  Yes.  This individual that's depicted on my video is Johnny
21  Perez, the person I labeled JD Ghost.
22  Q.  Detective Murphy, next to you, I think under your
23  Government Exhibit binder, there's a stack of Government
24  Exhibits, one of them marked as Government Exhibit 102B.
25  A.  102A?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MAIQmia5

1    Q.  102B.  Excuse me, 102A, you're correct.

2    A.  Yes, I have 102A in my hands.

3    Q.  All right.  What is 102A?

4    A.  102A is a foam board with JD Ghost, Mr. Johnny Perez's

5    photo on it, taken from, it appears, this video here.

6    Q.  Is that a fair and accurate depiction of the image that's

7    on the screen?

8    A.  Yes.

9          MS. NICOLAS:  Your Honor, at this time the government

10    offers Government Exhibit 102A.

11          THE COURT:  Any objection?

12          MR. McGUINNESS:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibit 102A received in evidence)

15    Q.  Detective Murphy, I'm going to ask you to hand that to

16    Mr. Foley.  Mr. Foley, if you could affix that right below the

17    JD name or JD Ghost.

18          Beginning at ten seconds, Mr. Foley, I'm going to ask

19    you to continue to play this clip, and then pause it when I ask

20    you to.

21          (Video played)

22    Q.  During that conversation, when Ghost said, "I already

23    served you," what did you understand that to mean?

24    A.  He was talking about the prior night when I purchased crack

25    cocaine off of him.

MAIQmia5

1  Q.  During this particular conversation, did JD Ghost have any

2  particular nickname for you?

3  A.  They called me Narcotics.  In the early part of the video,

4  you briefly heard someone say, "Oh, that's Narcotics."  On the

5  prior night, they called me Narcotics.  They thought I might

6  have been a police officer.

7  Q.  Did you purchase narcotics during this interaction?

8  A.  Yes, I did.

9  Q.  Over the course of the investigation, were there occasions

10  when you were directed to purchase drugs from this individual

11  by other people; that is, did anyone direct you to purchase

12  from Ghost?

13  A.  No.

14  Q.  Mr. Foley, you can pull this one down.  If we could go back

15  to Government Exhibit 3004, please, Mr. Foley.  I want to move

16  to the third row.

17        When did that purchase occur?

18  A.  Transaction number 3?

19  Q.  Yes.

20  A.  Occurred on December 10, 2019.

21  Q.  Mr. Foley, could you please publish what's been marked as

22  Government Exhibit 403A.  Again, if you could just play the

23  first two or three seconds.

24        (Video played)

25  Q.  Pausing at three seconds, Detective Murphy, can you

MAIQmia5

1  describe what area of New York City this video was recorded in?

2  A.  It's very hard to tell from just that short clip.  If you

3  play it for another second or two if that's possible, I would

4  be able to let you know.

5  Q.  Mr. Foley, could you let it play until the second 14.

6          (Video played)

7  Q.  Detective Murphy, where was this video recorded?

8  A.  This video was on the corner of 42nd Street and 8th Avenue.

9  When the video first started, I was walking eastbound on the

10 north side of 42nd Street.  I then turned to go northbound on

11 8th Avenue on the west side.

12 Q.  As you were walking 42nd Street that day, what were you

13 doing?

14 A.  I was looking for subjects that might be involved in this

15 organization.

16 Q.  Where is this conversation relative to where you purchased

17 narcotics on December 4?

18 A.  This is one block south of where I purchased narcotics from

19 on December 4.

20 Q.  Do you recognize this individual on the screen?

21 A.  Yes.

22 Q.  Who is that?

23 A.  That is a person who I named on this case to be JD Duke.

24 Q.  Back in that pile next to you of government exhibits, there

25 should be a Government Exhibit marked 103A.  If you could pull

MAIQmia5

1    that out and take a look.  Do you recognize that?

2    A.  Yes.

3    Q.  What is that?

4    A.  This is a foam board that has a photograph of JD Duke on

5    it.

6    Q.  Is that a fair and accurate depiction of JD Duke as he

7    appears in surveillance video of narcotics purchases in this

8    case?

9    A.  Yes.

10           MS. NICOLAS:  At this time, your Honor, the government

11    offers Government Exhibit 103A.

12           THE COURT:  Any objection?

13           MR. McGUINNESS:  No objection.

14           THE COURT:  Received.

15           (Government's Exhibit 103A received in evidence)

16    Q.  Detective Murphy, if you could hand that to Mr. Foley so he

17    could place it on the board under the JD name Duke.

18           As you approached JD Duke on this day, December 10,

19    2019, do you recall the substance of your conversation with

20    him?

21    A.  Yes.

22    Q.  What was discussed in this first part of the conversation?

23    A.  I was attempting to purchase crack cocaine off of JD Duke.

24    Q.  Do you recall what JD Duke -- how JD Duke responded to your

25    request?

MAIQmia5

1    A.   JD Duke told me to go around to the corner, and he

2    described the location.  It was the same location that I had

3    purchased narcotics on the previous two buys.

4    Q.   Mr. Foley, could you continue playing this clip beginning

5    at second 14 to the end.

6              (Video played)

7    Q.   When JD Duke instructed you to go to the same place, what

8    did you understand that to be a reference to?

9    A.   To go to the place where I purchased narcotics on prior

10   occasions.

11   Q.   Did you in fact go to that place?

12   A.   I did.

13   Q.   Mr. Foley, could you please publish what's in evidence as

14   Government Exhibit 403 B, please.

15             (Video played)

16   Q.   I'm going to ask you to play and pause this at second 28.

17             (Video played)

18   Q.   We are pausing it on second 18.  At this point, where are

19   you relative to where your conversation was with JD Duke?

20   A.   JD Duke, when I first met him, I was on 42nd Street and 8th

21   Avenue.  It's a northwest corner.  There's a Duane Reade there.

22   I walked one block north and maybe 50 to a hundred feet west on

23   43rd Street where the prior two buys had taken place, and

24   that's where I am at right now.

25   Q.   After you arrived in that location, did anyone meet you?

MAIQmia5

1    A.  Yes.  After waiting for several minutes, JD Duke approached

2    me while standing at a spot right before I started walking

3    again on the video.  You could catch a small glimpse of his

4    face on the video.

5    Q.  At this point in the video, are you alone?

6    A.  No, I'm with JD Duke.

7    Q.  Mr. Foley, can you please continue playing up to ten

8    seconds.

9             (Video played)

10   Q.  Whose voice do we hear yelling in the video?

11   A.  You hear JD Duke yelling across the street.

12   Q.  What did you understand him to be communicating during

13   that?

14   A.  He was giving instructions to persons at this point I was

15   unable to see.  He was yelling out down the street, "It's a

16   do-whatever-you-want day."

17   Q.  It's a do-whatever-you-want day?

18   A.  That's what it sounded like to me, yes.

19   Q.  Speak closer to the microphone so we can hear you.

20   A.  Sorry.

21   Q.  Mr. Foley, if you can continue playing and pausing at one

22   minute ten seconds.

23            (Video played)

24   Q.  Go back about one second, Mr. Foley.

25            At this point, who is participating in this

MAIQmia5

1    conversation?

2    A.   The person whose photo is on the screen right now is JD

3    Tre, and he is listening to JD Duke give him instructions.

4    Q.   How do you know JD Tre?

5    A.   I know JD Tre through the course of this investigation.

6    That's the name I gave him.  I have several purchases into him.

7    Q.   By "several purchases into him," what do you mean?

8    A.   I bought narcotics off of him on multiple occasions.

9    Q.   What did you understand to be happening in this interaction

10   between JD Duke and JD Tre?

11   A.   JD Duke --

12            MR. McGUINNESS:  Objection.

13            THE COURT:  Overruled.

14   A.   JD Duke was talking to JD Tre and asking him questions

15   about what he's doing, and is it do-whatever-you-want time.

16   Q.   Next to you, there should be a government exhibit marked

17   105A.  Do you see that marked there?

18   A.   I do.

19   Q.   Do you recognize that?

20   A.   Yes.

21   Q.   Who is that a photograph of?

22   A.   This is a photograph of JD Tre.

23   Q.   Is it a fair and accurate depiction of JD Tre as he appears

24   in the surveillance footage from this investigation?

25   A.   Yes.

MAIQmia5

1          MS. NICOLAS:  Your Honor, the government offers

2    Government Exhibit 105A.

3          MR. McGUINNESS:  No objection.

4          THE COURT:  Received.

5          (Government's Exhibit 105A received in evidence)

6    Q.  Mr. Foley, if you could grab 105A from Detective Murphy and

7    place it under the name JD Tre.

8          Mr. Foley, if you could restart the video beginning at

9    1:09 and pause at 1:35.

10          During that interaction, what did you understand to be

11    happening?

12    A.  At this point, JD Duke instructs JD Tre to go up the block.

13    He also instructed several other street persons, potential

14    users, buyers, to follow JD Tre.  I was about to walk with

15    JD Tre when I was told to stop, and I stayed with JD Duke

16    because he wanted to talk to me more.

17    Q.  As you stayed with JD Duke, what did you observe JD Tre to

18    do?

19    A.  He walked up the block a little bit, and then I lost sight

20    of him but he left with the other individuals there that were

21    attempting to purchase narcotics.

22    Q.  As you stood with JD Duke, what happened next?

23    A.  JD Duke questioned me about my appearance because my

24    appearance had changed over last purchase to this purchase, and

25    I was just talking with him about why.

MAIQmia5

1    Q.  Mr. Foley, if you could begin playing again.

2           (Video played)

3    Q.  Pause 2 minutes 33 seconds.

4           Detective Murphy, can you describe what happened on

5    the video?

6    A.  JD Duke was questioning me about who you knew, who knew me,

7    using names of people from the organization.  As that

8    questioning went on, I just, you know, was telling him about

9    the people I knew.

10          When the other individual walked up, he was asked

11   whether he knew me or not, and you could faintly hear it on the

12   video, but he walks up to me and laughs and says, "Oh, this is

13   Narcotics."  It's the street term that they had given me on my

14   prior buys, and both subjects laughed about it, and then it

15   continues.

16   Q.  Did you successfully purchase narcotics on this occasion?

17   A.  I did.

18   Q.  Now, up until this point, what observations had you made

19   about JD Duke's interactions with others on the set?

20   A.  JD Duke was clearly giving orders to persons on the street

21   and giving directions to individuals.

22   Q.  How did that inform the investigative steps that you

23   decided to make?

24   A.  In my mind, when I went back and spoke with the

25   investigators, it showed that JD Duke was higher up in the

MAIQmia5

1    organization to where he was able to give orders to other

2    people.

3    Q.   Did your narcotics purchases in this case continue into

4    January of 2020?

5    A.   Yes.

6    Q.   Mr. Foley, could you please publish Government Exhibit 3004

7    and zoom in on transaction 7 please.

8            Detective Murphy, what was the date of transaction 7

9    A.   Transaction 7 happened on January 15, 2020.

10   Q.   Mr. Foley, could you please publish what's in evidence as

11   Government Exhibit 407A.

12           (Video played)

13   Q.   Before we start talking about what's happening here, can

14   you just orient the jury as to where this recording took place?

15   A.   When the recording first started, I was walking on 43rd

16   Street on the south side of the street.  I was walking

17   eastbound towards 8th Avenue, and we stopped just prior to the

18   previous buy that was shown on video.  There is construction in

19   the little parking lot there.

20   Q.   Who did you approach on this occasion?

21   A.   At this point, I stopped when I saw JD Duke, and I had a

22   conversation with JD Duke.

23   Q.   Mr. Foley, if you could play beginning at second 15.

24           (Video played)

25   Q.   Pause it.

MAIQmia5

1          Detective Murphy, can you explain what we just watched

2    happen?

3    A.  I greeted JD Duke.  At that point, the other person that I

4    was with, which you briefly see, is JD Harlem.  We start

5    walking westbound on the south side of 43rd Street, and he was

6    asking me how much I had.

7    Q.  Mr. Foley, if you could take the video back to second 15,

8    and if you could play that excerpt from second 15 to second 26.

9          (Video played)

10   Q.  In response to the question how much you had, what did you

11   respond?

12   A.  I had 40, meaning $40.

13   Q.  Did you successfully purchase narcotics on this date?

14   A.  Yes.

15   Q.  Who actually sold you the narcotics?

16   A.  JD Harlem.

17   Q.  Next to you, you should see a government exhibit marked

18   Government Exhibit 104A.  Do you see that there?

19   A.  Yes.

20   Q.  And what is Government Exhibit 104A?

21   A.  It is a photograph of JD Harlem off of one of my videos,

22   one of my later videos.

23          MS. NICOLAS:  Your Honor, the government offers

24   Exhibit 104A into evidence.

25          MR. McGUINNESS:  No objection.

MAIQmia5

1          THE COURT:  Received.

2          (Government's Exhibit 104A received in evidence)

3     Q.  Mr. Foley, if you could grab the exhibit from the witness

4     and place Government Exhibit 104A below the JD name Harlem.

5          THE COURT:  Perhaps move the map to the left, if you

6     can, so that the board on the right is more visible.

7          Thank you.

8     Q.  Mr. Foley, if you could please play this clip again

9     beginning at second 26 right where we are.

10         (Video played)

11    Q.  Did you successfully purchase narcotics on that day?

12    A.  Yes.

13    Q.  Mr. Foley, if you could pull up Government Exhibit 3004,

14    please.

15         How much did you buy on January 15 of 2020?

16    A.  I bought two twists of crack cocaine for $40 of U.S.

17    currency.

18    Q.  I want to move now to what's marked as USA transaction

19    number 9.  On that date, who did you purchase narcotics from?

20    A.  I purchased narcotics from JD Duke and JD Harlem.

21    Q.  Is that the same set of individuals purchased from on

22    January 15?

23    A.  Yes.

24    Q.  Mr. Foley, could you please publish what's in evidence as

25    Government Exhibit 409A.

MAIQmia5

1          (Video played)

2    Q.  I'm going to ask you to play the first two or three seconds

3    for all of us.

4          Detective Murphy, where is this video recorded?

5    A.  This video appears to be recorded at the same location,

6    it's on 43rd Street, west of 8th Avenue on the south side of

7    the street.

8    Q.  Mr. Foley, continue playing, please.

9          (Video played)

10   Q.  Who did you approach?

11   A.  I approached a group of individuals and spoke with JD Duke.

12   Q.  What happened after you approached JD Duke?

13   A.  He said, "Go ahead," and I walked west with JD Harlem.

14   Q.  With whom?

15   A.  JD Harlem.

16   Q.  Mr. Foley, if you could play the remainder of the clip.

17        (Video played)

18   Q.  At this point, what did you observe -- what had you

19   observed about the relationship between JD Duke and JD Harlem?

20   A.  JD Duke was clearly giving directions to JD Harlem.

21   Q.  Were there other occasions when you approached JD Duke in

22   the area of 43rd?

23   A.  Yes.

24   Q.  Mr. Foley, if you could please publish what's in evidence

25   as Government Exhibit 412A.  I'm just going to ask you to play

MAIQmia5

1    one second and pause it.

2                (Video played)

3    Q.   Detective, do you recognize this area?

4    A.   I do.

5    Q.   Where is this recorded?

6    A.   This is the north side of 43rd Street, west of 8th Avenue,

7    just opposite where the other previous buys were shown on

8    video.

9    Q.   Can you read the timestamp on the bottom of this particular

10   clip?

11   A.   It says 17:03.  It's March 11, 2020.

12   Q.   Do you recall what transpired on March 11, 2020?

13   A.   I do.

14   Q.   Can you please describe for the jury what happened?

15   A.   On this video, at this time I met Mr. Mial.  He was

16   standing next to JD Duke.  Because this was the first time I

17   recalled seeing Mr. Mial, I approached him directly and not JD

18   Duke so that I could see what reactions were taking place.

19   Q.   I'm going to stop you there for a second.

20              Mr. Foley if, you could play the next two or three

21   seconds of the clip.

22              (Video played)

23   Q.   As you approach, what did you observe?

24   A.   I observe the hand-to-hand transaction.  The individual

25   that is walking towards me with the pom-pom hat on appeared to

MAIQmia5

1    have purchased narcotics.

2    Q.  Mr. Foley, if you could play the video next two seconds or

3    so.

4            As you came around the corner, what did you observe?

5    A.  As I walked around the fencing, I observed JD Duke and

6    standing to, my orientation, to the left of JD Duke was a

7    person who I later learned to be Mr. Mial.

8    Q.  Next to you is an object that's marked as Government

9    Exhibit 101A.  Do you see that there?

10   A.  Yes.

11   Q.  What is Government Exhibit 101A?

12   A.  It is a picture of Mr. Mial taken off of my video.

13   Q.  Is it a fair and accurate depiction of your surveillance

14   video?

15   A.  Yes.

16           MS. NICOLAS:  At this time, your Honor, the government

17   offers Government Exhibit 101A.

18           THE COURT:  Any objection?

19           MR. McGUINNESS:  No objection.

20           THE COURT:  Received.

21           (Government's Exhibit 101A received in evidence)

22   BY MS. NICOLAS:

23   Q.  Mr. Foley, if you could grab that and place it under the JD

24   name for the defendant.

25           Again, you just identified the person on the left.

MAIQmia5

1    Who is the person on the right as you approached?

2    A.   That's JD Duke.

3    Q.   Now, before we play, do you recall what happened as you

4    approached these two individuals?

5    A.   Yes.  As I approached these two individuals, I approached

6    Mr. Mial, JD Eyes, JD Smooth, and I asked him for a quantity of

7    narcotics.  I believe it was $60, to the best of my memory.  At

8    this point in time, you can see Mr. Mial look towards JD Duke.

9    JD Duke gives him the okay to sell to me, and then Mr. Mial

10   sells me crack cocaine.

11   Q.   Had you purchased crack cocaine from JD Duke prior to this

12   occasion?

13   A.   Yes.

14   Q.   Why did you choose not to approach JD Duke directly?

15   A.   Because I wanted to see who -- who the person was who was

16   standing next to him.  At this point in time, I do not recall

17   ever seeing Mr. Mial, so I wanted to see who he was.

18   Q.   Mr. Foley, if you could play the video beginning right here

19   which, is at second 8.  Mr. Foley, if you could please publish

20   Government Exhibit 3004.  If you could highlight transaction 9.

21   Excuse me, you were correct, transaction 12.  Thank you.

22          How much did you purchase on that date?

23   A.   On that day, I purchased three twists of crack cocaine for

24   $60 of U.S. currency.

25   Q.   I'm going to ask you to reach behind you and find what's

MAIQmia5

been entered into evidence as Government Exhibit 212. Do you

recognize that?

A. Yes.

Q. What is it?

A. These are the narcotics I purchased on March 11, 2020.

Q. Do you see the pair of scissors that's sitting next to you

there, Detective Murphy?

A. Yes, I do.

Q. I'm going to ask you to cut that evidence bag open.

There's also a pair of gloves if you want to put those on. Let

the record reflect that the witness is putting on gloves. Let

the record reflect the witness is cutting open the evidence

bag.

       Inside of that bag, do you see the UC envelope that

you used that day?

A. I do.

Q. Can you pull that out?

A. (Complies)

Q. If it's affixed, you can just hold it up for the jury?

A. The UC envelope is marked number 3 in the bag, it's this

right here on the top corner.

Q. Are those the narcotics that you purchased on that day also

affixed to that envelope?

A. Yes.

Q. Can you explain to the jury where they are and what they

MAIQmia5

1    look like?

2    A.   In number one, just below that security envelope, this is

3    narcotics that was tested by the laboratory, so it's unpackaged

4    and you can't really see it too well.

5         The one below that, you could see a twist of crack

6    cocaine which has been unprocessed by the lab, so it's still

7    packaged in a little plastic twist.

8    Q.   Thank you.  You can place that to the side.

9         Did your investigation continue into May of 2020?

10   A.   Yes.

11   Q.   I'm going to direct your attention to buy transaction

12   number 17 on Government Exhibit 3004.  What date did that

13   transaction occur on?

14   A.   May 27, 2020.

15   Q.   Where was that transaction?

16   A.   That location was at 255 West 43rd Street.

17   Q.   Mr. Foley, could you please publish what's in evidence as

18   Government Exhibit 417A.  I'll ask you to play this clip and

19   pause it at second 6, please.

20        (Video played)

21   Q.   Can you just describe to the jury where you are at the

22   beginning of this clip, Detective Murphy?

23   A.   At the beginning of this clip, again I'm walking eastbound

24   on 43rd Street towards 8th Avenue.  Where the clip is stopped,

25   I'm on the southwest corner of 43rd Street and 8th Avenue.

MAIQmia5

1   That's the corner where the Chick-fil-A is.

2   Q.  Do you recognize anyone in the frame at six seconds in this

3   clip?

4   A.  Yes, the only individual depicted here is JD Duke.

5   Q.  Mr. Foley, I'm going to ask you to play again and please

6   pause at second 14.

7           (Video played)

8   Q.  What just occurred in that portion of the clip?

9   A.  I approached JD Duke, as I have on prior occasions.  JD

10  Duke gave me directions on where to go.  He said go up the

11  block and look towards the east side of the street.  So I

12  followed his directions.

13  Q.  What did you understand him to be instructing you to do?

14  A.  He was instructing me on where to purchase crack cocaine.

15  Because in the video you heard, I told him I was looking for a

16  hundred, meaning I wanted a hundred dollars worth of crack

17  cocaine.

18  Q.  Did you in fact go up the block?

19  A.  I did.

20  Q.  Mr. Foley, if you could please play this clip beginning at

21  second 14 and pausing at second 29.

22          (Video played)

23  Q.  What street are you crossing here, Detective Murphy?

24  A.  I just crossed over 8th Avenue to the east side of the

25  street.  I'm now currently in the street of 43rd going from the

MAIQmia5

1  south side towards the north side.

2  Q.  As you crossed the street, did you recognize anyone in the

3  intersection?

4  A.  I did.

5  Q.  Who was that?

6  A.  The person you could see on the video standing there with

7  the blue and white and red is JD Ghost.

8  Q.  Is that the same JD Ghost that we have been discussing up

9  until this point?

10 A.  Yes.

11 Q.  What is his real name?

12 A.  Johnny Perez.

13 Q.  What did you do next before we continue playing this clip?

14 A.  I approached JD Ghost and had a short conversation where I

15 told him I was looking for a hundred dollars worth, and I

16 purchased crack cocaine.

17 Q.  Mr. Foley, you can go ahead and continue playing.

18          (Video played)

19 Q.  Did you recognize the individual that walked up to JD Ghost

20 as you were walking down the street with him?

21 A.  No.

22 Q.  Continue playing, Mr. Foley.

23          (Video played)

24 Q.  Detective Murphy, what happened during the portion of that

25 clip?

MAIQmia5

1    A.   During that portion of the clip, myself and JD Ghost walked

2    eastbound in front of the Times Square Hotel.  I told him how

3    much I was looking for, and another individual started speaking

4    with him.  They spoke about money that she owed to him, at

5    which time she also said that she was going to send someone to

6    him.  He said that was fine and it was okay to pay him later.

7    Q.   Did you purchase narcotics from JD Ghost on that day?

8    A.   I did.  I purchased loose crack cocaine from JD Ghost.

9    Q.   How much money did you spend on that transaction?

10   A.   A hundred dollars of U.S. currency.

11   Q.   Did your investigation continue into July of 2020?

12   A.   Yes.

13   Q.   Mr. Foley, please pull up Government Exhibit 3004, and

14   let's focus on transaction 20.

15        Detective Murphy, when did transaction 20 occur?

16   A.   Transaction 20 occurred on July 14, 2020.

17   Q.   Where did that transaction occur?

18   A.   In front of 249 West 43rd Street.

19   Q.   Mr. Foley, can you please pull up Government Exhibit 3006

20   this.

21        Approximately where is 249 West 43rd Street on this

22   map in Government Exhibit 3006?

23   A.   It's hard to see.  It's on 43rd Street right in the big

24   blob of transactions.

25   Q.   Mr. Foley, can you please publish what's in evidence as

MAIQmia5

1    Government Exhibit 420A, and just play one or two seconds.

2             (Video played)

3    Q.  If you could just take it back to second two on the video,

4    please.

5             Before we begin talking about what happened on this

6    day, can you just describe for the jury what direction you're

7    facing here?

8    A.  Again, I'm walking eastbound on 43rd Street.  It stopped

9    right here where I'm at the corner of 43rd Street and 8th

10   Avenue on the southwest corner.

11   Q.  Mr. Foley, could you please play until second 5.

12            (Video played)

13   Q.  As you approached the intersection, did you recognize any

14   one?

15   A.  Yes.

16   Q.  Who did you recognize?

17   A.  I recognized JD Duke sitting down.  You could see him there

18   sitting down next to the individual with the colorful hat.

19   He's the guy with the bald head.

20   Q.  What's he wearing in this clip?

21   A.  He's got the gray shirt on.

22   Q.  Did you approach him on this day?

23   A.  I did.

24   Q.  What happened when you approached him?

25   A.  Once I approached him, I was attempting to purchase

MAIQmia5

1    narcotics.  I was then given directions by JD Duke.

2                (Continued on next page)

1    BY MS. NICOLAS:

2    Q.  Mr. Foley, can you please continue playing.

3              (Video played)

4    Q.  What just happened when you interacted with JD Duke?

5    A.  When I interacted with JD Duke, he said, What's up with

6    you, you're scaring mother fuckers.  I took that that to mean

7    he was scared of me because I approached him from behind and he

8    thought I might be a cop.  I said a couple of names.  JD Duke

9    said, yeah, he remembers me, and he told me to go up the block

10   to where I'm to purchase narcotics.

11   Q.  Now, as you continued up the block, who if anyone were you

12   looking for?

13   A.  I was looking for any individuals that I have previously

14   seen regarding this case.

15   Q.  Mr. Foley, could you continue playing.

16             (Video played)

17   Q.  Pause here for a moment.

18             Are you walking alone at this point?

19   A.  No.

20   Q.  Who were you walking with?

21   A.  I'm walking with the individual with the colorful hat that

22   you've seen previous to this.  He's walking next to me.

23   Q.  Is that person known to you?

24   A.  I don't know his name.  I've never hung out with him, but I

25   know him from the street.  You know, we see each other in

MAI7MIA7                        Murphy - Direct

1   passing.

2   Q.  As you continued on the street, do you recall if you saw

3   anyone you recognized?

4   A.  Yes.

5   Q.  Who did you see?

6   A.  I don't remember off the top of my head right now.  I'd

7   have to refer to my notes or watch the video.

8   Q.  Continue the video, Mr. Foley, beginning at 48 seconds.

9                (Video played)

10  Q.  I'm going to ask you to pause it at a minute and 14

11  seconds.

12               (Video played)

13  Q.  If you could just go back about one second.

14               (Video played)

15  Q.  Just a little bit more, Mr. Foley.  Just play and pause

16  real quick.

17               (Video played)

18  Q.  That's perfect.

19               As you continued down the street, Detective Murphy,

20  did you see anyone you recognized?

21  A.  Yes.

22  Q.  Who did you see?

23  A.  If you look across the street in front of the Times Square

24  Hotel, in black, that's JD Tre.  You can briefly hear me say

25  "Where they at?"

1           At that point, you can see he's pointing more

2    eastbound.  You can see JD Tre pointing right now.

3    Q.  Can you describe exactly where on the video JD Tre is

4    standing?

5    A.  He's the one to the right of the door frame.  The

6    individual who stands out in white, to the right of the guy in

7    white is JD Tre with his arm extended and he's pointing up the

8    block.

9    Q.  Do you recognize JD Tre?

10   A.  Yes.

11   Q.  Based on him pointing up the block, what did you understand

12   from that interaction?

13   A.  I continued up the block.

14   Q.  What did you understand him to be communicating to you?

15   A.  To walk up the block.  Because he was looking at me and

16   pointing up the block.

17   Q.  And did you, in fact, continue walking up the block?

18   A.  I did.

19   Q.  Mr. Foley, can you continue playing the clip beginning here

20   at 1 minute and 13 seconds.

21           (Video played)

22   Q.  Pause right there.  Play one more second, Mr. Foley.

23           (Video played)

24   Q.  Pausing the video at one minute and 44 seconds.

25           As you passed through that scaffolding, do you

1  recognize anyone?

2  A.  Yes.

3  Q.  Who did you recognize?

4  A.  I recognize the JD Eyes, also known as JD Smooth, Mr. Mial.

5  Q.  As you approached him, what did you observe?

6  A.  I observed him interacting with another individual.

7  Q.  Mr. Foley, I'm going to ask you to back this clip up about

8  five seconds and play that again.

9           (Video played)

10  Q.  Continuing playing.

11           (Video played)

12  Q.  You can pause it right there.

13           Now, as you approach the defendant, did he sell drugs

14  to you immediately?

15  A.  No.

16  Q.  Why not?

17  A.  He questioned me.  He said, "Who are you?"  I told him my

18  name, Rob.  It's the name I use throughout this case.  I then

19  name dropped the two individuals that had just sent me to

20  Mr. Mial, Tre and Duke.

21  Q.  Why did you reference Tre and Duke?

22  A.  Because the organization, they all know each other's street

23  names and they all work together on occasion.

24           MR. MCGUINNESS:  Objection.

25           THE COURT:  Sustained.  Witness should answer with

1    regard to what his understandings were, rather than as a matter

2    of what the facts were.

3            You may rephrase.

4    Q.  Why was it that you decided to name Duke and Tre when

5    interacting with Smooth?

6    A.  On prior purchases, I had used names of individuals

7    involved in this case and individuals that I've seen hanging

8    out together.  So on this occasion, I used the names of people

9    that I had just seen that I had been involved with in purchases

10   before.

11   Q.  Continue playing the clip, Mr. Foley.

12           (Video played)

13   Q.  Detective Murphy, I'm going to ask you to reach behind you

14   and pull out what's in evidence as Government Exhibit 220.

15           And, Mr. Foley, if you could please publish what's in

16   evidence as Government Exhibit 220P.

17           If you could go to the second page of Government

18   Exhibit 220P.  Great.  Thank you.

19           If you could zoom in on the middle of the page.

20   Little bit further.  Up a little bit.  That's great.  Thank

21   you.

22           I'm going to again ask you to open up this bag,

23   Detective Murphy.  So if you can grab those scissors and

24   gloves, and cut that open for us, I have just a few questions

25   about that bag.

MAI7MIA7                          Murphy - Direct

1              Beginning with the exhibit itself, can you describe

2    what that is?

3    A.   The exhibit itself is the narcotics I purchased on that

4    day.

5    Q.   And just to be clear, that day was July 14 of 2020?

6    A.   Yes.  The video we just watched.

7    Q.   How were the narcotics that you purchased that day

8    packaged?

9    A.   They were packaged in capsules.

10   Q.   Can you describe what a capsule is?

11   A.   A capsule is a small, plastic container, it's about the

12   size of a pinky fingernail.  It has a top on it.  If you flip

13   the top up, it stays attached to the vessel.  The capsules come

14   in multiple different colors—most of them are opaque—and the

15   crack is sealed inside of the little container.

16   Q.   Detective Murphy, could you please cut open what's marked

17   as Item No. 2 on that?

18             MS. NICOLAS:  Your Honor, with the Court's permission

19   can Detective Murphy show the jury what these capsules look

20   like?

21             THE COURT:  Yes, he may.

22   Q.   Detective Murphy, if you could pour those capsules into

23   your hand and walk over to show the jury so they could see what

24   they look like.

25             And as you do so, Detective Murphy, if you could just

1   explain how the narcotics are packaged within those capsules.

2   A.  I'll do it twice so you guys over there can see and hear

3   better.

4           But if you look in my hand here, you can see the

5   different colored capsules.  And you take one individual

6   capsule—this is the top; it can flip up—and the crack is kept

7   inside there.

8           You heard?  So everyone can see the different colors.

9   And then these little tops will flip up.  The crack is kept

10  inside of these little containers.

11  Q.  If you could place those capsules back in the bag and set

12  that aside once you return to the stand.

13          Thank you, Detective Murphy.

14          Staying on the capsules for a moment, based on your

15  experience in Times Square, were these types of capsules common

16  in Times Square before December of 2019?

17  A.  No.

18  Q.  When did you first begin seeing them?

19  A.  I have seen them in the past on rare, rare occasions prior

20  to December of '19.  More into the year 2020 they became more

21  prevalent, mostly while buying from individuals involved in

22  this case.

23  Q.  I want to go back to your purchase of narcotics from the

24  defendant on July 14 of 2020.

25          Can you describe the nature of the interactions you

MAI7MIA7

1    saw between Duke and Tre and Smooth on that day?

2    A.   I approached JD Duke and he told me to go up the block.  As

3    I walked up the block, when I was in the area opposite to the

4    Times Square Hotel, JD Tre continued to direct me further up

5    the block.  I then continued up the block and under the

6    scaffolding.  Just past that, I observed Mr. Mial.  So I then

7    approached him and he sold me the crack cocaine.

8    Q.   Did there come a time when the defendant provided you with

9    a phone number?

10   A.   Yes.

11             THE COURT:  One moment.  Ms. Nicolas, if we're moving

12   off of July 14, 2020, would this be a good time for a

13   mid-afternoon break?

14             MS. NICOLAS:  Yes.

15             THE COURT:  I'm informed that the afternoon snack has

16   arrived.

17             MS. NICOLAS:  Yes, this is a good time.

18             THE COURT:  All right.  Ladies and gentlemen, we're

19   going to take a 15-minute recess.  As always, please don't

20   discuss the case.

21             THE DEPUTY CLERK:  All rise.

22             (Continued on next page)

23

24

25

MAI7MIA7

1                (Jury not present; witness not present)

2                THE COURT:  Counsel, for as long as this witness is

3      testifying, so that I don't have to keep reminding the

4      government or giving hand signals to go to the door each time

5      we take a break, whether at the end of the day, a comfort

6      break, I expect somebody from the government to immediately

7      move forthwith to the door to remove the sign and remove the

8      guard from the door.

9                MS. NICOLAS:  Understood.

10               THE COURT:  Counsel, I've given a little more thought

11     to the issue of the cross-examination of this witness, and

12     here's where I am.  And so I just want to say the following to

13     clarify and explain my judgment on this:

14               Regardless of the fact that it came out on direct, at

15     the end of the day, the design of other buy programs not

16     involving this defendant or the alleged coconspirators is,

17     frankly, irrelevant to anything that the jury has to decide

18     here.  Even more irrelevant, of course, would be whether any of

19     those programs were designed with an eye towards getting to a

20     number that had charging or punishment relevance.  Indeed,

21     punishment is explicitly no concern of the jury's.

22               The one issue within this area that is germane is the

23     design of the buy program here.  And the reason is that, at the

24     end of the day, the jury needs to make a calculation about the

25     amount of crack that is foreseeable and it, therefore, becomes

1   reasonable for defense counsel to probe from whom purchases

2   were being made, when purchases were not being made, when the

3   end date was, because counsel is entitled to use those data

4   points in arguing what amounts were or were not foreseeable.

5            What follows from that is three things:

6            On cross-examination, there is not to be any

7   questioning about the design of any other buy programs.

8   Notwithstanding the fact that it came out on direct and was not

9   objected to, it's just not relevant to any issue the jury needs

10  to find.

11           Number two, there is to be nothing about charges or

12  sentencing or punishment.  That is, I think by agreement, out

13  of bounds.

14           However, number three, defense counsel is entitled to

15  inquire about the operational design of this program, when

16  purchases were to be made, when they weren't going to be made,

17  by whom they were to be made, in what quantities they were to

18  be made, and when the buying was to start and stop.

19           It seems to me that is fair game from the evidence

20  that comes from that.  Counsel will be able to make responsible

21  arguments as to the foreseeable quantity.  I don't know whether

22  or not the answers to those questions will move the needle

23  much.  Nonetheless, they are grist for proper arguments and

24  counsel can't be reasonably constrained as to that.  But as to

25  what's happened in other cases, it seems to me irrelevant,

1    meaning in any other buy programs.

2         MR. MCGUINNESS:  Your Honor, my understanding of the

3    relevance that was discussed before lunch was that without

4    being able to bring that up as it was volunteered, I'm left

5    with what the officer explains and I'm not able to question the

6    credibility, which is proper cross-examination.  And it tests

7    the credibility if we go to his own words referencing what was

8    done in other programs.

9         THE COURT:  Well, you can test whether or not they

10   were managing to a number here.  And maybe there's something

11   about the numbers that were purchased that you can use to argue

12   that.  But at the end of the day, whatever happened in other

13   programs is really just -- it's just not germane.

14        MR. MCGUINNESS:  It tends to make it less likely that

15   it is truthful that they weren't going to a number if they

16   often do in other programs, as they often do.

17        THE COURT:  Government, what's your view?

18        MS. NICOLAS:  Your Honor, I'm not sure what the

19   relevance is of whether or not they were going to a particular

20   number.  I think the matter at hand is the amount that is

21   foreseeable to the defendant.  Regardless of what law

22   enforcement was trying to do or observe, the reality is there's

23   a much higher number extrapolated from other evidence that will

24   come in over the course of this trial.  I think this is

25   certainly one piece, but I just don't see how it's particularly

MAI7MIA7

1    relevant here.

2           THE COURT:  Look, it seems to me that if they were

3    managing here to a number, that is relevant.  If, for example,

4    the program here were designed to cherry pick, to choose dates

5    and times where officers reasonably thought they would get a

6    disproportionate quantity or something like that.  The argument

7    could be made in response to whatever arguments you will be

8    making about the extrapolation from the buys were made.

9           So it seems to me that the intentionality in terms of

10   what they're buying and when they were stopping is fair game.

11   In that respect, I don't agree with the government.  It seems

12   to me that if you assume a program design that was intended to

13   essentially create a greater illusion of foreseeable quantity,

14   that's, I think, fair game for counsel to inquire into.

15          What, however, happened in other cases is not fair

16   game.  You've elicited——probably should have been objected

17   to——that in other cases for charging relevance, different

18   decisions have been made.  Had there been an objection to that,

19   I would have sustained it.  But it seems to me that the fact

20   that that has happened in other cases simply doesn't bear on

21   the design of this program and it creates a number of 403

22   issues.

23          Number one, it brings us back to charges and

24   punishment, which regrettably was blurted out by the witness.

25   I don't want to go anywhere near there.  Punishment is not a

1  concern of the jury, and to get back into that as to other

2  cases gets right into that problem.

3        Number two is it creates a distracting issue as to

4  what happened in other cases and tends to put law enforcement

5  on trial as it relates to law enforcement's operation of other

6  cases.  It simply has nothing to do with any issue before the

7  jury here.

8        As I am focused on this, the relevant issue for the

9  jury is what's foreseeable to the defendant.  And in that

10  respect, the full-throated examination of the decisions that

11  were made here as to when to buy and when not to buy and from

12  whom to buy and in what quantities and and over what time

13  period is fair game.

14        That's my ruling.

15        MS. NICOLAS:  Understood, your Honor.

16        MR. MCGUINNESS:  If I may just say one final thing,

17  your Honor.  I mean, the comments that began this all were that

18  we could drive up the weight.  The witness testimony was the

19  weight would be driven up to lead to more serious charges, and

20  that's a good thing.  That was the testimony.

21        There seems to be a motivation to maximize the weight

22  to cherry pick.  And that's exactly what I am trying to drive

23  at, your Honor.  I do think it is fair game.  And I do think it

24  makes it more likely, those comments, that they are driving

25  towards increasing weight and cherrypicking when to buy, when

MAI7MIA7

1    to examine the purchases.

2              THE COURT:  And you're at liberty to develop facts

3    that suggest that the purchases that were made were not made,

4    and I don't know if you're going to contest that any of these

5    purchases never occurred.  But at the end of the day, if you're

6    not seriously disputing that the 67 purchases occurred in or

7    about the amounts indicated, where you're left then is to argue

8    why the quantities that were then bought shouldn't be

9    extrapolated to get over the relevant parameters that are set

10   in the verdict form.  But the subjective motivations,

11   particularly in other cases, are just not germane; they're just

12   not.

13             All right.  Counsel, we'll take a ten-minute recess

14   and I'll see you then.

15             (Recess)

16             (In open court; jury not present)

17             THE COURT:  In a moment, Mr. Smallman will get the

18   jury I just want to add one coda to what I said earlier.

19             If I had not been for the fact that a sentence or two

20   came out as a matter of background during the witness's direct

21   about what the motivations have been in some other cases with

22   respect to trying to achieve a certain number in terms of drug

23   quantity, there's literally zero chance that it would even be a

24   discussion point here for the cross-examination as to

25   motivations in other cases, or the purposes of other cases, or

MAI7MIA7

1    the plans in other cases could come into play would be

2    blatantly and clearly improper.

3        The issue here then is whether the fact that that

4    regrettably came out really changes the evidentiary analysis.

5    At the end of the day, it's unfortunate that it came out, but

6    it's also completely unprejudicial.  It's anything marginally

7    helpful that's out there on the record for the defense, but it

8    doesn't in any way change what the jury's limited

9    responsibilities will be, either as to liability or as to the

10   foreseeable drug quantity.  The fact that the witness

11   apparently slipped up and let a verbal sentence out about what

12   has happened in other cases simply doesn't make relevant what

13   happened in other cases.  And it certainly doesn't change the

14   403 analysis under which a discussion of all that raises

15   exactly the worries one has about punishment being front and

16   center before the jury, or about a trial within a trial, or a

17   distraction, but focused on the experience of other cases.

18       All right.  Let's get the jury.  Let's bring the

19   witness out.

20       Ms. Nicolas, is it still your projection that you will

21   be complete with direct by the witching hour?

22       MS. NICOLAS:  It is my sincere hope, your Honor.  I

23   think it will be quite close.

24       (Witness present)

25       THE COURT:  Okay.  Mr. McGuinness, if we're getting

MAI7MIA7

```
 1   close to 5 o'clock, I would be happy to give you the latitude
 2   to start up on the cross first thing Wednesday.  Should I
 3   assume that is your druthers, or do you want to be heard on
 4   that?
 5            MR. MCGUINNESS:  No.  That is my --
 6            THE COURT:  That would be your druthers.
 7            So if we end with not too much time on the clock, I
 8   should take it as your druthers that we stop a bit early and
 9   let you start fresh tomorrow?
10            MR. MCGUINNESS:  Yes, your Honor.  I'd say if we stop
11   any time before quarter of, I would like to use that time.  But
12   if we're within 15 minutes --
13            THE COURT:  That is exactly the line I would have
14   drawn.
15            Perfect.
16            (Continued on next page)
17
18
19
20
21
22
23
24
25
```

MAI7MIA7                         Murphy - Direct

1              (Jury present)

2              THE COURT:  Be seated.

3              Welcome back, ladies and gentlemen.

4              Detective Murphy, I'll remind you that you're still

5     under oath.

6              THE WITNESS:  Yes, your Honor.

7              THE COURT:  Counsel, you may inquire.

8              MS. NICOLAS:  Thank you, your Honor.

9     BY MS. NICOLAS:

10    Q.  Detective Murphy, welcome back.

11             When we had broke, we had just begun talking about the

12    defendant's cell phone.

13             Did there come a time when the defendant gave you his

14    phone number?

15    A.  Yes.

16    Q.  When did that occur?

17    A.  I don't recall the exact date, but I have it in my reports.

18    Q.  Would it refresh your recollection to look at the reports?

19    A.  Yes.

20    Q.  Mr. Foley, if you could just publish for the witness, the

21    Court, and the parties 350125.  You can scroll down to the

22    middle and zoom in for the witness, please.

23             MS. NICOLAS:  Excuse me, your Honor, may I have one

24    moment?

25             THE COURT:  Yes, you may.

1              MS. NICOLAS:  May I approach the witness?

2              THE COURT:  Yes, you may.

3              MS. NICOLAS:  Mr. Foley, you can close down.

4     BY MS. NICOLAS:

5     Q.  Detective Murphy, do you now recall the date in which the

6     defendant provided you with his phone number?

7     A.  Yes.

8     Q.  When was that?

9     A.  On August 7, 2020.

10    Q.  Once he provided you with that phone number, what did you

11    do with it?

12    A.  I saved it into my undercover phone that I used for only

13    undercover operations.  I saved it under the name "Smooth," the

14    name that was given to me by the defendant, Mr. Mial.

15    Q.  Did he ever provide you with an additional phone number?

16    A.  Yes.

17    Q.  Now, in the time after he provided you with those phone

18    numbers, did you ever call him?

19    A.  Yes, I did.

20    Q.  Did you sometimes text with him?

21    A.  Yes.

22    Q.  And did you preserve the records of those calls and text

23    conversations?

24    A.  Yes, I did.

25    Q.  Next to you in that binder that's marked "Government

1   Exhibits" there should be a series of tabs beginning with an 8.

2   Those are what's marked for identification.

3           And, Mr. Foley, as I talk through them, if you could

4   publish only for the parties, the Court, and the witness

5   Government Exhibits 801A, 801B, 802A, 802B, 827A, 828A, 838A,

6   841B, 842A, 845A, 847A, 853A, and finally, 856A.

7           Have you seen those before?

8   A.  Yes, I have.

9   Q.  What are they in general terms?

10  A.  This is screenshots of my phone, my undercover phone.  It

11  represents the phone numbers given to me by Mr. Mial and my

12  call logs.

13  Q.  Did you personally take these screenshots?

14  A.  I did.

15  Q.  Did you provide those screenshots to the U.S. Attorney's

16  Office?

17  A.  Yes, I did.

18  Q.  Are they fair and accurate depictions of the content of the

19  conversations as well as your call logs and contact information

20  saved on your undercover cell phone in the course of this

21  investigation?

22  A.  Yes.

23          MS. NICOLAS:  Your Honor, at this time, the government

24  offers the 800 series, which I can read by exhibit numbers into

25  the record.

1          THE COURT:  There are about a dozen of them?

2          MS. NICOLAS:  13, yes, your Honor.

3          THE COURT:  Why don't you read them into the record.

4          MS. NICOLAS:  Yes, your Honor.

5          Those are Government Exhibits 801A, 801B, 802A, 802B,

6    827A, 828A, 838A, 841B, 842A, 845A, 847A, 853A, and 856A.

7          THE COURT:  All right.  Is there any objection?

8          MR. MCGUINNESS:  Your Honor, I'm just waiting as the

9    government can finish his scrolling through.

10         THE COURT:  Okay.

11         MR. MCGUINNESS:  No objection.

12         THE COURT:  All right.  They're all received.

13         MS. NICOLAS:  Thank you, your Honor.

14         (Government Exhibits  801A, 801B, 802A, 802B, 827A,

15   828A, 838A, 841B, 842A, 845A, 847A, 853A, and 856A received

16   into evidence)

17         MS. NICOLAS:  Mr. Foley, if you could please publish

18   801A.

19   BY MS. NICOLAS:

20   Q.  Detective Murphy, can you just explain what Government

21   Exhibit 801A is?

22   A.  801A is the screenshot of my contact for JD Smooth.  And

23   right under "Smooth" you can see the phone number that he had

24   given to me that I stored into my cell phone.

25   Q.  Can you read that phone number into the record, please?

1   A.  Yes.  It is, 347-896-9664.

2   Q.  Now, on the day that he provided you with that phone

3   number, did he also sell you narcotics?

4   A.  Yes, he did.

5   Q.  Do you recall what happened on that day?

6   A.  On that day in which he gave me the phone number, we were

7   briefly -- a police officer briefly attempted to stop myself

8   and Mr. Mial.

9   Q.  So can you describe when you first interacted with Mr. Mial

10  on that date, August 7 of 2020?

11  A.  On that day, I met Mr. Mial on 8th Avenue north of 42nd

12  Street on the west side of the street between 42 and 43.  As we

13  were interacting and Mr. Mial was selling me narcotics, crack

14  cocaine, he had only given me part of the product when we

15  noticed a police officer approaching us.  It was -- appeared to

16  me to be a sergeant, a uniformed police officer.  As this

17  police officer approached, he briefly called out.  I couldn't

18  hear exactly what he was saying, but Mr. Mial briskly started

19  crossing 8th Avenue over to the east side of the street going

20  southbound.  I followed Mr. Mial.

21      Once across the street, we continued the sale.  While

22  crossing the street—I was in the middle of the street—I could

23  hear the uniformed officer getting closer and closer to me.  At

24  this time, I did have my police identification in my

25  pocket—just an ID card, not a shield—which I sometimes do,

1    but very rarely when I'm outdoors.  I pulled out my police

2    identification, I cupped it in my hands so no one could see it

3    unless you were next to me, I held it behind my person so the

4    sergeant could see that I was a police officer.  The sergeant

5    immediately stopped following.  I then put my ID in my pocket

6    while Mr. Mial was still crossing the street, leaving the

7    location.

8            I followed Mr. Mial to 41st Street where we continued

9    the transaction and finished the drug sale.

10   Q.  Did you ultimately purchase narcotics from Mr. Mial on that

11   day?

12   A.  Yes.

13   Q.  Mr. Foley, could you please pull up Government Exhibit

14   3004, focusing on buy 25.

15           Does the row that's marked "25" reflect the purchase

16   you just described?

17   A.  Yes.  The purchase happened on 41st Street on August 7,

18   2020.  I purchased $100 worth of crack in ten capsules from

19   Mr. Mial.

20   Q.  When you say "capsules," are you referring to the same type

21   of capsules that you showed the jury before the break?

22   A.  Yes.  They may have been different colors than the ones I

23   showed to the jury, but they are, in substance, the same type

24   of container.

25   Q.  Now, after you got his phone number, did you begin to

1   communicate with Mr. Mial by text message?

2   A.  Yes.

3   Q.  Why did you do that?

4   A.  I wanted to communicate with Mr. Mial via text message to

5   further the investigation to see if we could find out more

6   about the organization.

7   Q.  From a law enforcement perspective, why is that important?

8   A.  At one point during my purchases, Mr. Mial told me that he

9   has a car and he can now start delivering to me.  So we wanted

10  to get the actual plate number of the vehicle that he told me

11  he had.

12  Q.  Mr. Foley, can you please publish what's now in evidence as

13  Government Exhibit 827A.  I'm going to ask you to scroll to the

14  bottom of that exhibit -- bottom of the first page.

15          Before we start talking about the substance of this

16  text message, just to orient the jury as we're looking at this,

17  whose phone was this a screenshot from?

18  A.  This was a screenshot from my undercover phone.

19  Q.  Okay.  And so the text messages that are in green, who is

20  that?

21  A.  That would be me.

22  Q.  And the text messages in gray, who is that?

23  A.  That is a text message received from Mr. Mial.

24  Q.  Now, the date here that you can see above the text that's

25  sent at 4:47 p.m., what's the date of the beginning of this

1    conversation?

2    A.  August 18, 2020.

3    Q.  And what's the first thing you said on August 18, 2020?

4    A.  "I be around in 40."

5    Q.  And what were you communicating when you said, "I be around

6    in 40"?

7    A.  I'll be around the area in 40 minutes.

8    Q.  And how did Mr. Mial respond?

9    A.  He said, "Okay."

10   Q.  If you could keep scrolling down Mr. Foley.  My apologies.

11   Of 828A, please.

12          Is this a continuation of the same conversations,

13   Detective Murphy?

14   A.  Yes.

15   Q.  What's the next thing you said at 5:54 p.m.

16   A.  I said, "What I'm over here."

17   Q.  What were you communicating when you said, "I'm over here"?

18   A.  I was letting the defendant know that I'm in the area of

19   43rd Street and 8th Avenue.

20   Q.  How did he respond?

21   A.  He responded to me telling me to see his guy by the

22   scaffold again.

23   Q.  And what did you understand it to mean when the defendant

24   is said, "See my guy by the scaffolding again"?

25   A.  The scaffolding is the scaffolding that we've seen in prior

1    evidence as photos on 43rd Street.  On the north side there is

2    scaffolding; and on the south side there was also scaffolding.

3    Q.  Mr. Foley, can you please bring up Government Exhibit 428A.

4    428A, please.  If you could just make that a full screen and

5    pause it.

6            On that particular day, did you, in fact, go to 43rd

7    and 8th?

8    A.  I did.

9    Q.  And did you find someone to buy crack cocaine from on that

10   day?

11   A.  I did.

12   Q.  Did you recognize that individual?

13   A.  I would have to watch the video or go to my reports to be

14   100 percent sure.

15   Q.  Before we start the video, what is the time stamp here at

16   the beginning of this video?

17   A.  The time stamp is August 18, 2020, 17:57 hours.  That's

18   military time for 5:57 p.m.

19   Q.  Is that close in time to when you were exchanging text

20   messages with the defendant?

21   A.  Yes.

22   Q.  Mr. Foley, you can go ahead and play this part of the

23   video.

24           (Video played)

25   Q.  We're pausing the video at second 35.

MAI7MIA7                          Murphy - Direct

1          Who was it that you approached when you got to 43rd?

2     A.   I approached JD Tre.

3     Q.   Is that the same JD Tre that's on the board at the moment

4     in Government Exhibit 105C -- excuse me.  105A?

5     A.   Yes, it's the JD Tre that is on the board.

6     Q.   Okay.  So at this point in the video, what's occurring?

7     A.   I approached JD Tre.  You heard me say, "Oh, I didn't

8     realize it was you."  On my text messages with Mr. Mial, you

9     had seen I said, I don't recognize who you're sending me to.

10    Then I saw JD Tre.  So I laughed.  I said, "I didn't know it

11    was you."  And then myself and JD Tre started to walk.

12    Q.   So at this point, are you walking alone?

13    A.   At this point, I'm not exactly sure how close JD Tre is to

14    me, but JD Tre told me to go up the block.

15    Q.   Okay.  Mr. Foley, can you continue playing, beginning at

16    second 35.

17          (Video played)

18    Q.   We're pausing the video at second 46.

19          Did some time elapse before a narcotics transaction

20    was completed on this day?

21    A.   Yes.

22    Q.   Mr. Foley, please fast forward the video or move forward to

23    2 minutes and 12 seconds.  You can go ahead and play it.

24          (Video played)

25    Q.   Can you just describe what we saw in that portion of the

MAI7MIA7                          Murphy - Direct

1    video?

2    A.  In that portion of the video, once we got under the

3    scaffolding, JD Tre sold me crack cocaine; at which point, I

4    walked away.  We had some quick banter, and I continued

5    westbound away from JD Tre.

6    Q.  Mr. Foley, can you please publish Government Exhibit 3004

7    and move, again, to transaction 28.

8            Detective Murphy, do you recall how the narcotics were

9    packaged during transaction 28?

10   A.  Yes.  I received 10 capsules of crack cocaine.

11   Q.  Mr. Foley, can you please publish what's in evidence as

12   Government Exhibit 228P.  Go to the second page, please.

13           Detective Murphy, do you recognize what's on the

14   screen here?

15   A.  Yes.  These are the narcotics I had purchased.

16   Q.  Okay.  Can you describe --

17           Mr. Foley, if you could zoom in on the top half of the

18   page.

19           Could you describe how the narcotics were packaged in

20   this case?

21   A.  You can clearly see here that there are capsules; they're

22   opaque in different colors; one was tested and other ones

23   weren't.

24   Q.  Mr. Foley, you can pull these down.  Thank you.

25           We can go back to Government Exhibit 3004.

1            Detective Murphy, I'm going to direct your attention

2    to September 4 of 2020.  This is transactions 32 and 33.

3            Detective Murphy, how many times did you purchase

4    narcotics on September 4 of 2020?

5    A.   Twice.

6    Q.   And from whom did you purchase those narcotics?

7    A.   I purchased narcotics from Mr. Mial and JD Tre on separate

8    occasions.

9    Q.   So beginning with the first transaction, transaction 32,

10   can you walk us through the information in Government Exhibit

11   3004 as to transaction 32?

12   A.   I purchased 15 capsules of crack cocaine from Mr. Mial.

13   And that was in front of 424 West 43rd Street.

14   Q.   And how much money did you spend is on that particular

15   occasion?

16   A.   $140 of U.S. currency.

17   Q.   Mr. Foley, can you publish Government Exhibit 432A in

18   evidence.  I'm going to ask you to play the first about 15

19   seconds or so, Mr. Foley.

20           (Video played)

21   Q.   Play about another two seconds, please.

22           (Video played)

23   Q.   Pausing the video at second 21.

24           Detective Murphy, do you recognize the individual on

25   the screen?

1    A.   Yes.  That is Mr. Mial.

2    Q.   And as he approached you that day, do you recall what his

3    method of transportation was?

4    A.   A little electrical scooter.

5    Q.   So as he rode up to on his scooter and began a

6    conversation, do you recall -- or can you interpret what you

7    heard him talking about here?

8    A.   He came up to me and started to talk about the interaction

9    which we had previously had where the police officer was trying

10   to stop myself and Mr. Mial.

11   Q.   And is that the same interaction that you described to the

12   jury just a moment ago?

13   A.   Yes.

14   Q.   On this occasion, did you communicate to the defendant that

15   you wanted to buy narcotics?

16   A.   I did.

17   Q.   And what happened after you told him you were interested in

18   buying narcotics?

19   A.   We came to an agreement to meet at this location.  And once

20   we met at this location, Mr. Mial sold me crack cocaine.

21           MS. NICOLAS:  Mr. Foley, can you continue playing the

22   clip.

23           (Video played)

24

25

MAIQmia7                          Murphy - Direct

1   Q.  At this point in your interaction with the defendant on

2   this day, has he sold you narcotics?

3   A.  During this day?  No.

4   Q.  During this part of the conversation?

5   A.  No.

6   Q.  What did he direct you to do at the end of that

7   interaction?

8   A.  He told me to walk up the block, which I did.  He went in

9   front of me in his scooter -- on his scooter.

10  Q.  Did you in fact follow him down the block?

11  A.  I did.

12  Q.  Mr. Foley, can you please publish what's in evidence as

13  Government Exhibit 432B.

14          Before we play this clip, can you orient the jury to

15  what is on the first frame at the beginning of Government

16  Exhibit 432B?

17  A.  You see Mr. Mial with his scooter next to him.  He's

18  looking down at his hands.  It's hard to tell from the video,

19  but he's looking at crack cocaine.

20  Q.  Mr. Foley, go ahead and hit play on this clip.  I'm going

21  to ask you to pause at second 17.

22          (Video played)

23          MS. NICOLAS:  Your Honor, at this time I'd ask that

24  the jury consult their transcript binders, flip to the tab in

25  432T.

1          THE COURT:  Ladies and gentlemen, your binders are

2     under your chairs.  Please open them and turn to 432T.

3          Ms. Nicolas, 432T?

4          MS. NICOLAS:  That is correct, your Honor.

5          THE COURT:  Very good.

6     Q.  Detective Murphy, are you also looking at the transcript

7     marked 432T?

8     A.  I am.

9          MS. NICOLAS:  Your Honor, as this is the first time

10    the jury has consulted their binders, if you would like to

11    address with them reading ahead.

12         THE COURT:  Sure.  Yes.

13         Ladies and gentlemen, please keep your attention only

14    on the particular tab that counsel has directed you to.  There

15    may well be others that we get to, but it's important that

16    everyone stay focused on the particular piece of evidence

17    that's being addressed at the time.  Thank you;

18    BY MS. NICOLAS:

19    Q.  Before moving forward, Detective Murphy, beginning on

20    what's marked as page 2, the first full page of text of 432T,

21    does that page summarize as what you just be described as the

22    initial interaction with the defendant about the cops chasing

23    you on the prior interaction?

24    A.  Yes.

25    Q.  Moving to page 3, does this portion reflect the portion of

1    the video that we just watched?

2    A.  Yes, it does.

3    Q.  So looking at line 4, where it says, "These are some big

4    full caps.  So it's 14 straight right there.  You probably

5    could make about the amount out of that."

6         What did you understand that to mean?

7    A.  That I could sell part of the drugs I purchased, and I

8    would make my money back.

9    Q.  You then asked him for "one extra."  What does that mean?

10   A.  It's common when purchasing drugs, drug buyers always ask

11   for extra.  It's, you know, like anyone in life, you want to

12   get a good deal, so I always try to ask for extra because

13   that's what users and buyers do.

14   Q.  Did the defendant have the ability to give you extra?

15   A.  Yes, he did.

16   Q.  I'm going to ask everyone to set aside the transcript

17   binders for a moment.

18        Mr. Foley, if you could play the remainder of this

19   clip beginning at second 17.

20        (Video played)

21   Q.  Did you successfully purchase narcotics on that day?

22   A.  Yes, I did.

23   Q.  How were the narcotics packaged on that day?

24   A.  Capsules.

25   Q.  Moving to later that same day, did you make a second

1    narcotics purchase?

2    A.  I did.

3    Q.  Mr. Foley, could you please publish what's in evidence as

4    Government Exhibit 433A.

5              (Video played)

6    Q.  Could you just describe and orient for the jury quickly

7    where we are at the beginning of this video?

8    A.  I am -- at the beginning of the video, I appear to be in

9    the middle of 8th Avenue looking at the northeast corner of 8th

10   Avenue and 43rd Street.

11   Q.  Continue, Mr. Foley, beginning at second 4.

12             (Video played)

13   Q.  As you cross the street on that particular day, do you see

14   anyone you recognized?

15   A.  Yes, JD Tre.

16   Q.  Continue beginning at second 13.

17             (Video played)

18   Q.  Were you able to successfully purchase narcotics from

19   JD Tre on this day?

20   A.  Yes, I was.

21   Q.  Do you recall how those narcotics were packaged?

22   A.  They were capsules.

23   Q.  Mr. Foley, could you please publish side by side pages 2 of

24   Government Exhibit 232P and 233P.

25             While he's doing that, Detective Murphy, can you

1    describe as it relates to the way that the evidence is numbered

2    in this case what the significance of the numbers 32 and 33

3    have in Government Exhibits 232 and Government Exhibit 233?

4    A.  They are the order in which I purchased the narcotics.

5    Q.  Do those numbers correlate with the numbers on Government

6    Exhibit 304 for each transaction?

7    A.  Yes, they do.

8    Q.  Do they also correlate to the numbers on the tabs in

9    Government Exhibit 306?

10   A.  Yes.

11   Q.  Or 3006.

12   A.  Yes.

13   Q.  Please go to page 2 of both of these documents.  And zoom

14   in on Government Exhibit 232P.  If you could zoom in on the

15   bottom right as much as you're able.

16        Then on the left Government Exhibit 233P, if you could

17   zoom in on the top left corner of that.

18        The narcotics you purchased on the same day, on

19   September 4 of 2020, can you describe how they compare in terms

20   of their packaging?

21   A.  They're both capsules, just different colors.

22   Q.  On the left, Government Exhibit 232P, who did you purchase

23   those narcotics from?

24   A.  That was from Mr. Mial.

25   Q.  On the right, 233P?

MAIQmia7                          Murphy - Direct

 1   A.  That was from JD Tre.

 2   Q.  Thank you.

 3          Mr. Foley, let's go back to Government Exhibit 3004.

 4   We're going to move to transaction 34.

 5          Did you purchase narcotics on September 8 of 2020,

 6   Detective Murphy?

 7   A.  Yes, I did.

 8   Q.  Can you walk us through the information on Government

 9   Exhibit 3004 for transaction 34?

10   A.  The transaction 34 was done on September 8, 2020.  I

11   purchased eight capsules of crack for $140 of U.S. currency.

12   JD Duke, JD Smooth, JD Harlem were all present.  This happened

13   at 688 8th Avenue.

14   Q.  Mr. Foley, could you please publish what's in evidence as

15   Government Exhibit 434A.

16          (Video played)

17   Q.  Before we begin playing this, again, orient the jury to

18   what we're looking at in the first frame of Government Exhibit

19   434A?

20   A.  Again, I was on the southwest corner of 43rd Street and 8th

21   Avenue, and I am facing eastbound, facing the west which is on

22   the east side of the street.

23   Q.  Mr. Foley, could you please play the first two or three

24   seconds of this particular clip.

25          (Video played)

MAIQmia7                          Murphy - Direct

1    Q.  Two or three more seconds, please.

2                (Video played)

3    Q.  As you approached the intersection we're paused here at

4    second 6, do you recognize anyone as you approached the

5    intersection?

6    A.  Yes.  I recognized JD Tre.  You could see him on the right

7    side of the screen.  JD, who I later learned to be JD Trinny,

8    is just left of him.

9    Q.  Is there anyone else who was there that day that you

10   recall?

11   A.  Yes.  I believe JD Duke was there as well.  I would have to

12   watch the video to be a hundred percent certain.

13   Q.  Mr. Foley, could you play the video beginning at second 6.

14               (Video played)

15   Q.  As you stood in that group, did you recognize anyone at

16   that intersection?

17   A.  Yes, I'm in the middle of the group, and sitting down, you

18   briefly saw him, was JD Duke.  Standing up, leaning against the

19   pole was Mr. Mial.  And facing me right here in this video

20   screenshot is JD Harlem.

21   Q.  Continue playing from here, Mr. Foley.

22               (Video played)

23   Q.  Pause at second 41 of the clip.

24               Detective Murphy, what are you doing at this point in

25   the video?

MAIQmia7                            Murphy - Direct

1     A.  At this point in the video I'm standing in the middle of

2     the street.  I was standing next to JD Harlem just seconds ago

3     who turned and spoke with JD Duke prior to that.

4     Q.  Why are you standing with JD Harlem?

5     A.  JD Harlem was told to take me up to the block to take care

6     of me to sell me drugs.

7     Q.  Go ahead, Mr. Foley, continue playing from second 41.

8             (Video played)

9     Q.  When you said 140, what were you referencing, Detective

10    Murphy?

11    A.  The amount of currency which I was looking to spend on

12    crack cocaine.

13    Q.  The record is paused at one minute, 4 seconds.  Mr. Foley,

14    if you could continue playing.

15            (Video played)

16    Q.  Did you successfully purchase narcotics from JD Harlem on

17    that day?

18    A.  I did.

19    Q.  How were they packaged?

20    A.  They were capsules.

21    Q.  Mr. Foley, could you please turn back to Government Exhibit

22    3004.

23            And, Detective Murphy, I'd like to direct your

24    attention to the very next day, September 9, 2020.  Did you

25    purchase narcotics on September 9, 2020?

A.  Yes, I did.

Q.  From who?

A.  From Mr. Mial.

Q.  Could you please just walk us through the information on Government Exhibit 3004 as it relates to transaction 35.

A.  On that day, September 9, 2020, I purchased 15 capsules of crack cocaine for $140 of U.S. currency near 249 West 43rd Street.

Q.  Mr. Foley, could you please publish what's in evidence as Government Exhibit 435A.  You can begin playing that clip and pause it at second 10.

        (Video played)

Q.  As you stood waiting, did you see anyone you recognized?

A.  Yes, Mr. Mial approached me.

Q.  What did he instruct you to do?

A.  Walk up a little more.

Q.  Mr. Foley, if you could continue playing to 52.

        (Video played)

Q.  Detective Murphy, as you stood there, what did you observe?

A.  A drug transaction between Mr. Mial and another person who was unidentified.

Q.  When the defendant said, "Look out," what did you understand that to mean?

A.  It's common street terminology for "Look out.  Watch my back.  Look for cops."

Q.  Did you make a narcotics purchase from the defendant that day?

A.  I did.

Q.  Mr. Foley, continue playing the clip beginning at 54 seconds.

(Video played)

Q.  When the defendant said "15," what did you understand him to be communicating?

A.  He told me he was giving me 15 capsules of crack cocaine.

Q.  Mr. Foley, if we could go back to Government Exhibit 3004, I'd like to turn to transaction 37.

Detective Murphy, when did transaction 37 occur?

A.  September 15, 2020.

Q.  Can you summarize what you purchased that day and where that purchase took place?

A.  I purchased 20 capsules of crack cocaine for $140 of U.S. currency.  I purchased from persons present were JD Trinny, JD Smooth, JD Duke, and JD Tre.  And that was near 255 West 43rd Street.

Q.  Mr. Foley, please publish what's in evidence as Government Exhibit 437A.  When that comes up, I'm going to ask you to play it and pause at nine seconds.

(Video played)

MS. NICOLAS:  We may be having a technical issue here.

Q.  Take it back about one second.

1          Detective Murphy, where is this camera recording right

2    now?

3    A.  This camera we're on 43rd Street just east of 8th Avenue,

4    just east of the Times Square Hotel where in the previous

5    exhibits you've seen a psychic sign, it's right there.

6    Q.  What were you saying as you walked down this portion of the

7    sidewalk?

8    A.  This individual was asking me what I was looking for.  This

9    is JD Trinny.  I didn't recognize him at that point in time, so

10   I told him I was looking for -- and I used street names for the

11   individuals involved in this case.

12   Q.  And what street names did you use?

13   A.  I said I told him I was looking for JD Tre.

14   Q.  Next to you, there is a Government Exhibit marked

15   Government Exhibit 107A.  Do you see that?

16   A.  I do.

17   Q.  Do you recognize that individual?

18   A.  Yes, I do.

19   Q.  Who is that?

20   A.  This is JD Trinny.  It's a screenshot taken off of one of

21   my videos.

22          MS. NICOLAS:  Your Honor, at this time the government

23   offers Government Exhibit 107A.

24          MR. McGUINNESS:  No objection.

25          THE COURT:  Received.

MAIQmia7                          Murphy - Direct

1          (Government's Exhibit 107A received in evidence)

2    Q.  Mr. Foley, if you could take 107A from the witness and

3    place it by JD Trinny's JD name on the screen.

4          After you referenced Duke and Tre, how did JD Trinny

5    respond?

6    A.  Not using his exact words, from this point forward on the

7    video, you're going to see he tells me he remembers me.  He

8    describes himself, and he tells me he's one of the guys.

9    Q.  Mr. Foley, could you begin playing a second and -- second

10   30, if you could take it back one second.

11          (Video played)

12   Q.  Can you describe what we just observed during that buy?

13   A.  I didn't purchase yet.  This is the beginning parts of the

14   purchase.  I was talking with JD Trinny.  I did not recognize

15   him.  He told me he was the guy.  I told him how much I wanted,

16   at which point he said to me "I have to go get another packet."

17   Q.  In that interaction, did he refer to a shift?

18   A.  Yes, he told me that he was the nighttime, and then he

19   corrected and said daytime shift.

20   Q.  What did you understand that to mean?

21   A.  What hours he worked.

22   Q.  And by "worked," what do you mean?

23   A.  Sold drugs.

24   Q.  When he told you he needed a packet, what did you

25   understand that to mean?

A.  Packet is terminology for package of drugs.  You've seen in videos someone holding a sandwich bag they'll have a sandwich bag or some sort of container.  Inside of there will be a number of smaller bags or capsules of crack cocaine.  That's called a package, the larger bag of the capsules of crack cocaine.

Q.  When he said he needed "a packet," what did you understand that to mean?

A.  I took that to mean he was going to re-up, as street terminology, or go get more drugs so he could fulfill what I asked for.

Q.  After you asked that, did you see where he went?

A.  Yes.

Q.  Could you describe where he went?

A.  He went to the southeast corner of 43rd Street and 8th Avenue of where I lost sight of him.

Q.  Can you see JD Trinny in the frame here?

A.  Yes.  You can see him walking away if you look at the W in Westin, he's the male a little below that still in the street.

Q.  Did he eventually return to you?

A.  Yes.

Q.  While he was gone, what did you do?

A.  I spoke with the street individual who I recognize and, you know, who hangs out in the area of 43rd Street and 8th Avenue.

Q.  Did you speak with the defendant?

1    A.  I did.  I placed a phone call to Mr. Mial.

2    Q.  Why did you do that?

3    A.  I was unsure still at the beginning of this buy of who

4    JD Trinny was, so I called Mr. Mial to confirm if he was out or

5    if JD Trinny was the person.

6    Q.  Did you successfully purchase narcotics from JD Trinny when

7    he returned?

8    A.  Yes.

9    Q.  After that narcotics purchase, what did you do?

10   A.  I walked to the southeast corner of 43rd Street and 8th

11   Avenue so I could get a look to see who was hanging around on

12   the corner to see if I could see any subjects that were

13   involved in this case.

14   Q.  From a law enforcement perspective, why did you do that?

15   A.  I wanted to know where JD Trinny was going and see if

16   possible any individuals that were in the direction of where he

17   went.

18   Q.  Mr. Foley, could you please publish what's in evidence as

19   Government Exhibit 437B.

20           Before you play, I'm going to have the witness, if you

21   could just orient the jury to what's in the first frame here.

22           (Video played)

23   A.  This is the Foundry.  This is the little cafe.  Next to it

24   is another cafe that's attached to the Westin Hotel, so I'm

25   physically standing on the southeast corner of 43rd Street and

MAIQmia7                        Murphy - Direct

1    8th Avenue looking southbound.

2    Q.  Is that consistent with the area JD Trinny walked to

3    moments earlier?

4    A.  Yes, this is the corner where I last seen him.

5    Q.  Mr. Foley, if you could hit play, please.

6                (Video played).

7

8    Q.  Take it about about two seconds.

9                As you turned that corner, did you see anyone you

10   recognized?

11   A.  Yes, I observed Mr. Mial sitting there.  And as I was

12   standing there, he started to speak with me.

13   Q.  Did you see anyone else you recognized?

14   A.  Yes, JD Duke.

15   Q.  Mr. Foley, go ahead and hit play.

16                (Video played)

17   Q.  Please describe that interaction with the defendant.

18   A.  The defendant was speaking to me, telling me that if I call

19   him, I should come to him.  I told him, you know, I was calling

20   to make sure that JD Trinny works with them.  And next to the

21   defendant you seen JD Duke and JD Tre.

22   Q.  Mr. Foley, could you please publish Government Exhibit

23   3004.

24                And, Detective Murphy, directing your attention to

25   transaction 38.  Did you purchase narcotics during transaction

1    38?

2    A.  I did.

3    Q.  What date did that take place on?

4    A.  September 18, 2020.

5    Q.  Mr. Foley, could you please publish what's in evidence as

6    Government Exhibit 838A.

7            Detective Murphy, what's displayed on the screen in

8    Government Exhibit 838A?

9    A.  It is a screenshot of my UC phone with my communications

10   with Mr. Mial.

11   Q.  The timestamp -- excuse me -- the date stamp Friday,

12   September 8, 2020, can you read your message from 4:29 p.m.?

13           THE COURT:  I think you said 8th.  It's 18th.

14   Q.  Excuse me, Friday, September 18 at 2020 at 4:29 p.m.?

15   A.  Yes, the timestamp for the 18th is "I'll be by in like 15

16   minute.  WYA."  Where are you at?

17   Q.  What were you communicating in that type message?

18   A.  That message I was looking to find out where Mr. Mial was

19   so that I could purchase narcotics.

20   Q.  Mr. Foley, if you could keep scrolling down.

21           If you could, Detective Murphy, describe your

22   conversations with the defendant here.

23   A.  He told me where to meet him.  He said 43rd Street and 9th

24   Avenue by Starbucks.  I told him, "Okay, I'm almost there."  I

25   told him I was on 42nd Street.  At that point he told me to

MAIQmia7                        Murphy - Direct

1    come to 43rd Street and 8th Avenue.  He said he's by the train

2    station.

3    Q.  Mr. Foley, can you scroll down.  And how did you respond?

4    A.  "K" as in okay.

5    Q.  So after that, Mr. Foley, if you scroll back up, please.

6           Was that the last text message that you sent to the

7    defendant on September 18?

8    A.  Yes.

9    Q.  Based on that conversation, where did you go?

10   A.  I went to the corner of 43rd Street and 8th Avenue.  There

11   are right over there a couple subway entrances.  There's one on

12   42nd, one on 43rd.  There's also one on the east side between

13   42nd and 43rd.  I looked around.  I observed individuals

14   hanging around on the east side of 8th Avenue by that subway

15   entrance.

16   Q.  Mr. Foley, would you please publish what's in evidence as

17   438A, and play the first 15 seconds.

18          Can you describe where the part of this video is

19   recorded?

20   A.  This video is recorded on 43rd Street -- well, it's on 8th

21   Avenue just south of 43rd Street.  Where we're looking, we're

22   facing 42nd Street, it's the east side of the street.

23   Q.  Is there a subway entrance visible in this frame at 15

24   seconds?

25   A.  Yes, there is.

MAIQmia7                    Murphy - Direct

1  Q.  Mr. Foley, if you could please take it back to an earlier

2  frame.

3            As you approached -- can we pause at 14 seconds?

4            As you approached that subway entrance, did you see

5  anyone you recognized?

6  A.  Yes.  As I was approaching, I observed Mr. Mial.  You could

7  see him holding the scooter.  To Mr. Mial's right, our left

8  looking at this, is JD Trinny.  Prior to this, me being this

9  close, you'll observe JD Harlem leave the group and go into the

10 subway.

11 Q.  Now, as you approached that group, what -- as you

12 approached that group, what happened?

13 A.  As I approached that group, I was instructed to go into the

14 subway.

15 Q.  Who instructed you?

16 A.  Mr. Mial.

17 Q.  Is that audible on the video?

18 A.  I haven't watched the video really recently, so I'm not

19 sure of that, no.

20 Q.  Mr. Foley, can you play the video beginning at 14 seconds.

21            (Video played)

22 Q.  We are now paused at 20 seconds.  Is Mr. Mial's instruction

23 to you audible on the video?

24 A.  I couldn't hear it on the video, but you do hear me saying

25 "Yeah, yeah, yeah."  So in response to Mr. Mial telling me to

MAIQmia7                        Murphy - Direct

1    go into the subway, I said, "Yeah, yeah, yeah," and I continued

2    into the subway where I seen JD Harlem go.

3    Q.  Is there is there any reason why your recording equipment

4    might not pick something up, like instructions by the

5    defendant?

6    A.  Direction of the equipment.  If somebody is standing behind

7    me or to the side of me, it's hard to pick up sounds.

8    Q.  Did you follow the defendant's instruction to enter the

9    subway?

10   A.  I did.

11   Q.  Mr. Foley, begin playing at 20 seconds.

12          (Video played)

13   Q.  As you entered the subway, did you encounter someone you

14   recognized?

15   A.  Yes, standing in this shot, you can't really see his face,

16   but that's JD Harlem.

17   Q.  Have you purchased narcotics from JD Harlem before?

18   A.  Yes.

19   Q.  How did you communicate on this day how much you wanted to

20   purchase from him?

21   A.  I told him the money value I wanted, I believe I said 160.

22   Q.  Did you in fact purchase $160 worth of crack cocaine on

23   that day?

24   A.  Yes.

25   Q.  While you were purchasing narcotics, what else did you

MAIQmia7                          Murphy - Direct

1    observe?

2    A.  I observed another individual walking to the subway and

3    interact with us.

4    Q.  Mr. Foley, could you please play the video from here until

5    one minute and 12 seconds.

6             (Video played)

7    Q.  Mr. Foley, you can pull that down.  Pull back up Government

8    Exhibit 3004, please.

9             Detective Murphy, I want to direct your attention to

10   transaction 39.  When did transaction 39 occur?

11   A.  September 22, 2020.

12   Q.  On that date, did you speak with the defendant on the

13   phone?

14   A.  I would have to look at my phone call logs to be one

15   hundred percent certain.

16   Q.  Mr. Foley, could you publish what's in evidence as

17   Government Exhibit 802A, in terms of page 5.

18            Focusing on September 22, 2020, referencing Government

19   Exhibit 802A, did you speak to the defendant on the phone that

20   day?

21   A.  Yes, we had four phone calls.

22   Q.  In sum and substance, what were those phone calls about?

23   A.  The phone calls were making an agreement to meet at a

24   location for me to purchase narcotics.

25   Q.  Mr. Foley, can you please publish what's in evidence as

MAIQmia7                          Murphy - Direct

1   Government Exhibit 439B.

2              Before we begin watching 439B, Detective Murphy, could

3   you read for me the timestamp that's on the bottom right corner

4   of the screen.

5   A.  It's 17:10 hours, which is 5:17 p.m., and the date is

6   September 22, 2020.

7   Q.  17:10 is what time?

8   A.  5:10 p.m.

9   Q.  Is that close in time to when you were communicating with

10  the defendant by phone?

11  A.  Yes.

12  Q.  Before we begin watching this, do you recognize anyone in

13  the first frame of this video?

14  A.  Yes, in the lower right-hand corner of the video wearing

15  the Pirates hat, black baseball hat, is Mr. Mial.

16  Q.  Do you recall how he was communicating that day?

17  A.  I believe to the best my recollection, he was on a scooter

18  again.

19  Q.  Did you approach him once you recognized him on the street?

20  A.  Yes.

21  Q.  Mr. Foley, could you begin playing Government Exhibit 439B.

22              (Video played)

23  Q.  When the defendant said, "You got my last 18," what did you

24  understand that to mean?

25  A.  My last 18, meaning last 18 capsules he had on his person.

MAIQmia7                          Murphy - Direct

1    That's what I took that to mean.

2    Q.  Did your investigation continue into October 2020?

3    A.  Yes.

4    Q.  You testified earlier the defendant eventually gave you a

5    second phone number.  Is that correct?

6    A.  Yes.

7    Q.  Mr. Foley, could you please publish what is in evidence as

8    Government Exhibit 801B.

9        Detective Murphy, what is Government Exhibit 801B?

10   A.  It is a screenshot of my UC cell phone.  Reading it, you

11   could see it says, "Smooth 2."  That is Mr. Mial's number, the

12   second number he used to contact me with.

13   Q.  Read that phone number into the record, please.

14   A.  The phone number for the contact Smooth 2 is 347-896-9051.

15   Q.  Did you ever communicate with the defendant using text

16   messages with this phone number?

17   A.  Yes, I did.

18   Q.  Mr. Foley, would you please publish what's in evidence as

19   Government Exhibit 841B.

20       beginning at the top, what's the date of that second

21   message with the phone number?

22   A.  On October 6, 2020, which was a Tuesday, Mr. Mial was the

23   first to text me.  He let me know it was Smooth.  And I said

24   okay.

25   Q.  And what's the next thing that the defendant said to you at

1    4:41 p.m.?

2    A.  He told me that he was on 43rd and 8th, meaning 8th Avenue

3    and 43rd Street sitting down.  Then he changed to say where he

4    was.  He said, "Meet me on 43rd," meaning 43rd Street, "towards

5    9th," meaning 9th Avenue where the park is.

6    Q.  Is that in the vicinity of your earlier buys in this case?

7    A.  Yes.

8    Q.  Did you in fact go to 43rd and 8th to make a purchase on

9    October 6 of 2020?

10   A.  I did.

11   Q.  Mr. Foley, would you please publish what's in evidence as

12   Government Exhibit 441A.

13            (Video played)

14   Q.  Detective Murphy, can you describe what occurred in that

15   clip?

16   A.  What happened was as I was approaching the city park there,

17   it's on the north side of 43rd Street, closer to 9th Avenue, as

18   I was approaching the park, Mr. Mial approached me on his

19   scooter.  He handed me a bag, and he said it was just the

20   weight value.  It wasn't broken down into capsules.  I agreed

21   upon that and made the exchange.  I was trying to ask him how

22   much weight it was, and he told me it was two grams.

23   Q.  Mr. Foley, can you please go back to Government Exhibit

24   3004, please.  I'd like to move down and turn your attention to

25   transaction 43.

MAIQmia7                         Murphy - Direct

1          Detective Murphy, when did transaction 43 occur?

2     A.   It happened in October 14, 2020.

3     Q.   On that date, what did you purchase?

4     A.   I purchased 15 capsules of crack for $160 of U.S. currency.

5     The location was opposite of 255 West 43rd Street.

6     Q.   Mr. Foley, please publish what's in evidence as Government

7     Exhibit 443A and just play the first one or two seconds,

8     please.

9          (Video played)

10    Q.   Detective Murphy, do you recognize this area?

11    A.   Yes.  I don't recall exactly what corner I'm standing on at

12    this time.  Actually, I do.  I'm on 42nd Street west of 9th

13    Avenue in this photo.

14    Q.   Mr. Foley, if you could continue to play from four seconds

15    in on Government Exhibit 443.

16         (Video played)

17    Q.   Mr. Foley, pause for one second.  Pull that down and please

18    pull up Government Exhibit 443A.

19            Do you recognize this corner?

20    A.   Yes.

21    Q.   Is this a clip of the longer video we just watched the

22    first one or two seconds of?

23    A.   Yes.  Where I started was where I started the video.  It

24    takes me a couple minutes, and then I get to this location.

25    Q.   What is this location?

MAIQmia7                        Murphy - Direct

1   A.   This is the Westin, the cafe that's next to it, the

2   Foundry.  It's on the southeast corner of 43rd Street and 8th

3   Avenue.

4   Q.   What happens as you approach the corner?

5   A.   I observe subjects which I had recognized, JD Harlem and

6   individual in the gray sweatsuit is JD Mac.

7   Q.   Had you seen JD Mac before?

8   A.   I don't recall if this is the first buy with JD Mac or not.

9   I'm not sure.

10  Q.   To your left, there should be a Government Exhibit marked

11  Government Exhibit 106A.  Do you see that there?

12  A.   Yes.

13  Q.   What is that?

14  A.   This is from one of my videos.  It's JD Mac, a screenshot

15  pulled off of the video.

16         MS. NICOLAS:  Your Honor, the government offers

17  Government Exhibit 106A into evidence?

18         THE COURT:  Any objection?

19         MR. McGUINNESS:  No objection.

20         THE COURT:  Received.

21         (Government's Exhibit 106A received in evidence)

22  Q.   Mr. Foley, please place that on the board by JD Mac's JD

23  name.

24         Detective Murphy, as you approached JD Mac on this

25  day, October 14 of 2020, do you recall what happened?

MAIQmia7                        Murphy - Direct

A.  Yes.  We eventually walked eastbound on 43rd Street, and I
purchased narcotics.

Q.  Mr. Foley, could you please hit play beginning where the
video is currently paused.

        (Video played)

Q.  Detective Murphy, during that interaction, what did you
observe JD Mac to be doing?

A.  During that interaction, myself and JD Mac were walking
eastbound on 43rd.  Next to JD Mac was JD Harlem, who also was
on the corner when I approached.  You could hear in the video
JD Mac told JD Harlem, "I got four."  He was referring to four
capsules of crack cocaine.  And JD Mac gave me the four
capsules of crack cocaine, and he told me JD Harlem, without
using his name, would give me the other 12 for a total of 16
capsules of crack cocaine, which would equal $160 of U.S.
currency.  Once we got further up the block and JD Harlem
handed me the 12 capsules of crack cocaine, I argued for free
bags because I wanted more.

Q.  Turning your attention now to October 20 of 2020,
Mr. Foley, can you please publish what's in evidence as
Government Exhibit 845A.  Go to page 2, please.  Excuse me,
page 1.

        Can you describe the conversation between yourself and
the defendant on this day?

A.  On this day, I tried to get Mr. Mial to meet me at a

1    different location other than 43rd Street.

2    Q.   Why did you do that?

3    A.   I did that because we wanted to find out which vehicle

4    Mr. Mial was driving and attempt to get his license plate

5    number.

6    Q.   Mr. Foley, can you continue to scroll down on Government

7    Exhibit 845A, please.

8              Ultimately, where did the defendant ask you to meet

9    him on this day?

10   A.   The first text messages I had with him were earlier in the

11   day.  As the day went on, a little bit before 5:00 p.m.,

12   Mr. Mial told me that I would have to come to him.  Then at

13   5:11 p.m. he told me to meet him on 41st Street and 8th Avenue.

14   Q.   Did you in fact go to 41st and 8th?

15   A.   I did.

16   Q.   Mr. Foley, could you please publish what's in evidence as

17   Government Exhibit 445A.

18              (Video played)

19   Q.   As you crossed the sidewalk at the beginning of the video

20   at 41st and 8th, did you recognize anyone?

21   A.   Yes, Mr. Mial was on the corner of 41st and 8th, but he was

22   on the northeast corner.  I was on the southeast corner.

23   Mr. Mial then approached me.

24   Q.   What did he instruct you to do?

25   A.   As we walked, he told me to keep walking.  He was going to

1    head up ahead and get it ready.

2    Q.  Did you in fact follow him further up the block?

3    A.  I did.  I followed the direction Mr. Mial went.

4    Q.  Mr. Foley, please publish what's in evidence as be

5    Government Exhibit 445B.

6            (Video played)

7    Q.  Detective Murphy, can you describe what just occurred

8    during that portion of the video?

9    A.  Once I finally got up to Mr. Mial where he had stopped on

10   his little scooter, I approached him.  I said, "You good?"  He

11   said, "Yeah."  He handed me narcotics, crack cocaine.  We made

12   the exchange.  I gave him my money, at which point he told me,

13   "I would have come to you, but, you know, I had things to do

14   and my car's parked."  I told him, "That's all right, no big

15   deal," and I left the location.

16   Q.  As it relates to this transaction, Mr. Foley, if you could

17   pull up Government Exhibit 3004.

18           THE COURT:  Ms. Nicolas, it's 4:58.  I want to bring

19   it in before 5:00.  Can you find us a natural break point?

20           MS. NICOLAS:  It's my final question.

21           THE COURT:  Very good.

22   Q.  On that particular day, Detective Murphy, looking at

23   Exhibit 3004, transaction 45, what quantity of narcotics did

24   you purchase on that day?

25   A.  I purchased 23 capsules of crack cocaine for $200 of U.S.

MAIQmia7                          Murphy - Direct

1    currency from Mr. Mial, JD Smooth in front of 230 West 41st

2    Street.

3              MS. NICOLAS:  Your Honor, I think that's a natural

4    breaking point.

5              THE COURT:  Very good.

6              Ladies and gentlemen, it's 5:00.  It's time to adjourn

7    for the day.  I will ask everyone to kindly put your transcript

8    binders underneath your chairs.  We'll pick up with them

9    tomorrow morning.  Same schedule for tomorrow as today.

10   Breakfast will be available at 8:45.  I ask everyone to please

11   be here at 9:20.  I will bring you out at 9:30 assuming

12   everybody is here.  We made good tracks today, and I'm

13   confident we'll make more tomorrow.  I wish you good evening.

14   Safe trip home.  And, as always, please don't discuss the case.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

MAIQmia7

1          (Jury not present)

2          THE COURT:  Do counsel have anything to take up before

3    we adjourn?

4          MR. McGUINNESS:  No, your Honor.  I will say by way of

5    scheduling estimations, I believe at sometime I said I was

6    going to take approximately the same amount of time with the

7    undercover agent.  It's going to be considerably shorter.

8          THE COURT:  That's welcome news.  That's good to hear.

9          Ms. Nicolas, how long do you envision you have

10   remaining on direct?  Not hurrying you; it's important

11   testimony.

12         MS. NICOLAS:  I have about eight more transactions to

13   get through.  So I anticipate less than an hour but hard to say

14   exactly.

15         THE COURT:  Not holding you to it, but it may matter

16   because of the the Conga line of lab experts for us tomorrow.

17   Can you ballpark for us how long you think cross might be?

18         MR. McGUINNESS:  It will be less than two hours.

19         THE COURT:  You'll surely have the afternoon for those

20   witnesses, and perhaps yet more than that.  Very good.

21         I have nothing else for you.  I know Mr. Smallman

22   raised an issue just privately with the government table with

23   respect to people leaving the courtroom during the closure for

24   the undercover.  Be mindful of that.

25         MR. BHATIA:  We will, your Honor.  And there is one

MAIQmia7

1    thing we wanted to raise.

2          On the logistics for tomorrow, I guess the Conga line

3    that will start tomorrow, the experts need to be qualified as

4    expert witnesses, and so we're planning to ask all of those

5    standard:  Where did you go to college?  What did you do?  Have

6    you performed tests?

7          THE COURT:  These are people who simply test drugs to

8    determine -- test substances to determine whether they are in

9    this case crack cocaine.

10          MR. BHATIA:  Yes, that's right.

11          THE COURT:  All right.

12          MR. BHATIA:  Our question is a logistical one of how

13    you prefer to have us qualify them in the beginning.  I know

14    different courts have different practices.

15          THE COURT:  Let me, first of all, just make sure that

16    is the required step here.

17          Defense?  Whatever other issues are, is that going to

18    be in dispute?

19          MR. McGUINNESS:  Judge, I don't plan on voir diring

20    them on their qualifications, objecting to their

21    qualifications.  Any de minimus presentation that they are

22    qualified will be fine.

23          THE COURT:  Look, Mr. Bhatia, how about this:  Present

24    the questions in succinct form enough to create a factual basis

25    for their being qualified.  And then ask -- I ask that Ms. JD

MAIQmia7

1    Doe be qualified as an expert in what's the right formulation?

2    Forensic something?

3            MR. BHATIA:  I think they're called criminalists.

4            THE COURT:  Is that right, as opposed to something

5    that really describes what they're doing.

6            MR. BHATIA:  As opposed to forensic scientists.

7            THE COURT:  I want to make sure the formulation is

8    targeted to the issue at hand.  Are these chemists, for

9    example?

10           MR. BHATIA:  We can say experts in the field of

11   controlled substance analysis.

12           THE COURT:  Look, Mr. McGuinness, that feels targeted

13   enough to me and sounds right to me.  Do you have an issue with

14   that being the formulation?

15           MR. McGUINNESS:  No, your Honor.

16           THE COURT:  I don't want to create an issue tomorrow.

17   There are probably five or six different slight variations on

18   how the relevant expertise can be described.  Do you have an

19   objection if the government formulates it that way?  It sounds

20   fine to me.

21           MR. McGUINNESS:  Can I hear it one more time?

22           MR. BHATIA:  An expert in the field of controlled

23   substance analysis.

24           MR. McGUINNESS:  That's fine.

25           THE COURT:  Succinct questions to call out the

MAIQmia7

credentials, and I ask the expert will be qualified as an

expert in that field, and I will say he or she is so qualified.

MR. BHATIA:  We had previously proposed to the defense

and drafted a stipulation that would list out their credentials

and say that they are qualified under the relevant rules of

evidence.  Hearing that defense counsel doesn't expect to

challenge that, I will re-propose the same stipulation.

THE COURT:  That's for you to stipulate or not.

Defense counsel is putting you to your proof, but he's making

it clear he is not going to fight and die on that hill.  For

the time being, I encourage you to be as succinct as you need

to be and encourage the witness to be.  You know, would you

briefly set out your education and relevant credentials, and

tell them you're expecting the 60 to 90-second version,

something like that that should do the trick.  I have a hunch

after several of these, the stipulation that you seek may come

in midstream, maybe it won't, but I'm not going to force

anything on the defense.

MR. BHATIA:  Okay.

THE COURT:  How long do you imagine a typical such

examination is going to last?

MR. BHATIA:  So the first, and maybe the second one, I

was planning to go into some depth on what the police lab test,

how they do their testing, et cetera.  For the ones after that,

I think it could be quite short.

MAIQmia7

```
 1              THE COURT:  Good.  I encourage you to do that.  I
 2    think that's right.  The first several just to educate the
 3    jury, and afterwards considerably shorter, and if ultimately
 4    you run into a situation where there's meaningful cross testing
 5    the integrity of the conclusions, you may need to refer to the
 6    long form.
 7              MR. BHATIA:  That's right.
 8              THE COURT:  Anything further from anyone?
 9              MR. McGUINNESS:  No.  Thank you.
10              MR. BHATIA:  Not from us.
11              THE COURT:  I assume that there's some mode you have
12    to get the undercover out of here, given that he's leaving
13    around the same time as the jury, but just be attentive to
14    that, for obvious reasons.
15              Very good.  I will see counsel at 9:00 tomorrow.
16              One other issue.  There's an outstanding issue on my
17    plate which I need not resolve tonight, but as to the
18    government's motion to preclude lines of cross-examination as
19    to disciplinary matters as to Officers 3, 4 and 5.  Under the
20    circumstances, it seems improbable we will get to them
21    tomorrow.
22              Is that the government's estimation?  Just given all
23    the lab people.
24              MR. BHATIA:  We might, your Honor, be able --
25    depending how quickly tomorrow goes, I know with many short
```

MAIQmia7

1    witnesses, it can either become very quick or it can really

2    drag.

3              THE COURT:  Why don't we be prepared to take that up

4    tomorrow morning.

5              Look, Mr. McGuinness, in the interest of moving us

6    along, the first question will be to you, which is whether you

7    object to anything the government is seeking to preclude.

8              MR. McGUINNESS:  Yes, your Honor.

9              THE COURT:  Have a good evening.

10             (Trial continued October 19, 2022 at 9:00 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   DENNIS FREY

 4   Direct By Mr. Bhatia . . . . . . 73

 5   Cross By Mr. Mcguinness  . . . . 85

 6   JOSÉ TAVERAS

 7   Direct By Mr. Bhatia . . . . . . 87

 8   Cross By Mr. Mcguinness  . . . . 92

 9   Redirect By Mr. Bhatia . . . . . 93

10    ED MURPHY

11   Direct By Ms. Nicolas  . . . . .103

12                      GOVERNMENT EXHIBITS

13   Exhibit No.                          Received

14   2003   . . . . . . . . . . . . . . . . . . .77

15   904    . . . . . . . . . . . . . . . . . . .78

16   907    . . . . . . . . . . . . . . . . . . .79

17   905    . . . . . . . . . . . . . . . . . . .81

18   902    . . . . . . . . . . . . . . . . . . .82

19   903    . . . . . . . . . . . . . . . . . . .83

20   s 902P-905P and 907P  . . . . . . . . . . .84

21   901    . . . . . . . . . . . . . . . . . . .90

22   901P   . . . . . . . . . . . . . . . . . . .95

23   401 to 467, exclusive of 419, 425, 431  . . . 132

24           or 453 and 454

25   412T, 420T, 427T, 432T, 434T, 435T, . . . . . 134
```

437T, 438T, 441T, 444T, 445T,

446T and 447T, 449T, 451T,

455T, 464T and 467T

299 and 299P . . . . . . . . . . . . . . . . 135

101C, 101D, 102C, 103C, 103D, 104C, . . . . . 145

105C, 106C, 107C and 108C

201-267 and 201P-267P  . . . . . . . . . . . 147

3004  . . . . . . . . . . . . . . . . . . 152

102B  . . . . . . . . . . . . . . . . . . 155

101B  . . . . . . . . . . . . . . . . . . 156

3006  . . . . . . . . . . . . . . . . . . 161

301-308 . . . . . . . . . . . . . . . . . 165

102A  . . . . . . . . . . . . . . . . . . 193

103A  . . . . . . . . . . . . . . . . . . 196

105A  . . . . . . . . . . . . . . . . . . 200

104A  . . . . . . . . . . . . . . . . . . 204

101A  . . . . . . . . . . . . . . . . . . 207

801A, 801B, 802A, 802B, 827A, 828A,  . . . . 235

838A, 841B, 842A, 845A, 847A,

853A, and 856A

107A  . . . . . . . . . . . . . . . . . . 256

106A  . . . . . . . . . . . . . . . . . . 269